🖥 **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
RICHMOND COUNTY, GEORGIA

**2018RCCV00566**
**CARL C. BROWN JR.**
**NOV 06, 2018 10:20 AM**

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

## IN THE SUPERIOR COURT FOR THE COUNTY OF RICHMOND, STATE OF GEORGIA

| | |
|---|---|
| DAESANG CORPORATION ) | CIVIL ACTION |
| ) | NO. |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| THE NUTRASWEET COMPANY and ) | |
| MANUS BIO, INC. ) | |
| ) | |
| _____ Defendants. _____ ) | |

## COMPLAINT FOR AVOIDANCE OF TRANSFERS

NOW COMES the Plaintiff, Daesang Corporation ("Daesang" and/or "Plaintiff"), and files this its Complaint against Defendants The NutraSweet Company ("NutraSweet") and Manus Bio, Inc. ("Manus") (collectively the "Defendants") as follows:

## PARTIES, JURISDICTION AND VENUE

1.  Plaintiff is a corporation organized under the laws of the Republic of Korea and submits to the jurisdiction and venue of this Court.

2.  NutraSweet is a foreign corporation that is registered and authorized to do business in Georgia with its principal place of business in Augusta, Richmond County, Georgia. The subject matter of this suit involves the purchase of property located in Richmond County. NutraSweet is subject to the jurisdiction and venue of this Court.

3.  Manus is a foreign corporation that is registered and authorized to do business in Georgia. The subject matter of this suit involves the purchase of property by Manus located in Richmond County. Manus is subject to the jurisdiction and venue of this Court.

## NATURE OF THE ACTION

4.  Plaintiff brings this action, pursuant to the Uniform Voidable Transactions Act, as enacted

Exhibit "A"

in Georgia in O.C.G.A. § 18-2-70 et seq. (the "UVTA"), and the common law of the State of Georgia, to void the transfer of multi million dollars-worth of certain real estate and other assets fraudulently transferred from debtor NutraSweet to Manus.

5.  In or about June of 2018, NutraSweet transferred to Manus real property and, based upon information and belief, other assets worth multi millions of dollars.

6.  Based upon information and belief, NutraSweet transferred these assets to Manus for a total purchase price of $900,000.

7.  Previously, J. W. Childs Equity Partners II, LP, a private equity firm in Boston, Massachusetts, acquired these assets, including the name "NutraSweet," and set up a group of NutraSweet entities to own the assets in or about March 2000 from Monsanto Company for a purchase price of $440,000,000.  See News Articles attached as Exhibit "A."

8.  Before the transfers were made from NutraSweet to Manus, Plaintiff had instituted an arbitration action against NutraSweet in the International Court of Arbitration of the International Chamber of Commerce ("ICC") and obtained a unanimous award from the 3-person tribunal[1] in the amount of $100,766,258.

9.  NutraSweet failed to disclose to Plaintiff and concealed from Plaintiff the transfer of the real property and other assets by NutraSweet to Manus.

10. NutraSweet made the transfers to Manus with actual intent to hinder, delay or defraud its present and future creditors, including Plaintiff.

11. NutraSweet further made the transfers to Manus without receiving fair consideration at a time when NutraSweet was insolvent.  As a result, Plaintiff is entitled to have the transfers voided and to recover its reasonable attorneys' fees, pursuant to the UVTA, as well as the

---

[1] The three person tribunal that issued the unanimous arbitration award of $100,766,128 consisted of one arbitrator selected by NutraSweet, one selected by Daesang and a third arbitrator selected by the ICC.

common law of the State of Georgia.

12. After the transfers by NutraSweet to Manus of assets, the value of NutraSweet's remaining assets were further reduced and are substantially less than the amount it owes to Plaintiff.

## FACTUAL BACKGROUND

13. On or about June 28, 2018, NutraSweet transferred various assets and real property, including the improvements, structures and buildings thereon, located at 1722, 1762 and 1784 Lovers Lane, Augusta, Richmond County, Georgia 30901 and identified as Richmond County map and parcel numbers 102-0-007-00-0; 102-0-003-01-0; and 102-0-008-00-0 (the "Property") to Manus via limited warranty deed, a copy of which is attached hereto as Exhibit "B". Reference is made to the legal description contained in the Deed for further identification and is incorporated herein by reference.

14. The Property consisted of approximately 44 acres on which there are at least 26 structures totaling approximately 265,701 square feet, according to the official Richmond County GIS maps. Pictures of various buildings and structures, including those from the official Richmond County GIS maps, are attached hereto as Exhibit "C."

15. Based upon information and belief, in addition to the Property, NutraSweet also transferred to Manus assets located on and found in facilities at the Property, consisting of machinery and equipment (the "Additional Assets").

16. Based upon information and belief, Manus paid a total of $900,000.00 to NutraSweet as the purchase price for the Property and the Additional Assets located at the Property.

17. The sale of the Property and the Additional Assets by NutraSweet to Manus (the "Transfer") qualifies as a transfer under the UVTA.

18. At the time of the Transfer, Plaintiff was, and still is, a creditor of NutraSweet, as defined

by the UVTA, as a result of a pending arbitration commenced by Plaintiff against NutraSweet on or about June 4, 2008 with the ICC in Paris, France (the "Arbitration") and subsequent award in favor of Plaintiff and against NutraSweet in the amount of $100,766,258 (the "Arbitration Award"). A copy of the Arbitration Award is attached hereto as Exhibit "D."

19. The Transfer was made while the Plaintiff's Petition for Confirmation of the Arbitration Award was on appeal and prior to the September 27, 2018 appellate division court order reversing the lower court's order and ordering the entry of the Arbitration Award. A copy of the Appellate Court decision is attached hereto as Exhibit "E."

20. The Arbitration arose out of the sale by Plaintiff of its aspartame[2] business to NutraSweet in 2003 for the purchase price of $79,250,000.00 (the "Transaction").

21. As part of the sale by Plaintiff of its aspartame business to NutraSweet, the parties entered into a series of agreements, including a joint defense and confidentiality agreement, an asset purchase agreement ("APA"), and a processing agreement (collectively, the "Transaction Documents").

22. Pursuant to the APA, NutraSweet was to pay the purchase price of the Transaction of $79,250,000.00 (the "Purchase Price") to Plaintiff through a $5,000,000 payment at closing, with the balance paid in installments over a five-year period.

23. Three years after the closing on the Transaction, NutraSweet failed to make one of the required installment purchase price payments.

24. This default continued for a period of six months, at which time Plaintiff exercised its rights under the APA to accelerate the remaining purchase price payment obligations from

---

[2] Aspartame is a low-calorie artificial sweetener widely used in various products, including food and beverages, around the world.

NutraSweet.

25. Several months later, and almost four years after the closing of the Transaction, NutraSweet sent notice it was rescinding the Transaction based upon a provision in one of the Transaction Documents.

26. As part of the Transaction, Plaintiff and NutraSweet agreed to arbitrate all disputes arising from the Transaction under the rules of the ICC.

27. On or about June 4, 2008, Plaintiff filed a request for arbitration with the ICC, asserting claims against NutraSweet for breach of the APA and processing agreement and seeking the balance of the Purchase Price.

28. An evidentiary hearing was held in the Arbitration in New York City for nine (9) days from July 11 through July 21, 2011.

29. On December 21, 2012, the ICC Tribunal that presided over the Arbitration established liability by rendering a partial award dismissing all defenses and counterclaims of NutraSweet (the "Partial Award") but did not decide the issue of damages, reserving all other decisions, including the nature and form of relief to be granted Plaintiff, to a subsequent award.

30. Throughout the pendency of the Arbitration, Plaintiff and NutraSweet participated in negotiations in an attempt to resolve the claims asserted in the Arbitration, including the possible acquisition of NutraSweet assets by Plaintiff. Following the issuance of the Partial Award, the ICC Tribunal granted multiple stays at the joint request of Plaintiff and NutraSweet, and Plaintiff and NutraSweet re-commenced negotiations in an attempt to resolve Plaintiff's claims against NutraSweet (collectively, the "Negotiations").

31. In September of 2014, Plaintiff and NutraSweet informed the ICC Tribunal that

Negotiations had terminated.

32. From September of 2014 until the end of April of 2016, Plaintiff and NutraSweet submitted various filings related to damages in the Arbitration.

33. On June 14, 2016, the ICC Tribunal issued a unanimous Final Award in the Arbitration, determining that NutraSweet breached its obligations under the Transaction Documents and awarded damages to Plaintiff in the amount of $100,766,258.00 (the "Arbitration Award").

34. In September of 2016, Plaintiff filed a petition to confirm the Arbitration Award in the Supreme Court of the State of New York, New York County.

35. In an order dated May 15, 2017, the Supreme Court of the State of New York, New York County vacated in part the Arbitration Award and remanded in part to the ICC Tribunal.

36. Within the time required, Plaintiff appealed the May 15, 2017 order to the New York Supreme Court Appellate Division.

37. The New York City Bar Association submitted an *amicus* brief in support of Plaintiff's position in its appeal.

38. In an order dated September 27, 2018, the four-justice panel of the New York Supreme Court Appellate Division issued a unanimous ruling completely reversing the lower court and ordered the petition to confirm the Final Arbitration Award be entered.

39. It was while this appeal was pending that NutraSweet transferred the Property and the Additional Assets to Manus on or about June 28, 2018.

40. Based upon information and belief, both before and after the Transfer, NutraSweet's assets were and are grossly inadequate to satisfy, and far below the amount of, the Arbitration Award.

41. The sale of the Property and Additional Assets by NutraSweet to Manus qualifies as a transfer under the UVTA.

42. Based upon information and belief, the machinery and equipment installed in the plant located at the Property have a fair market value significantly more than the $900,000 purchase price paid by Manus.

43. Based upon information and belief, this machinery and equipment was transferred to Manus by NutraSweet as part of the sale of the Property for the $900,000 purchase price.

44. Based upon information and belief, the machinery, equipment and spare parts not installed in the plant and stored at the Property has a value significantly more than the $900,000 purchase price paid by Manus.

45. Based upon information and belief, the machinery, equipment and spare parts not installed in the plant and stored at the Property was transferred to Manus by NutraSweet as part of the Transfer for the $900,000 purchase price.

46. Based upon information and belief, the land and the structures and buildings located at the Property transferred by NutraSweet to Manus have a fair market value significantly more than the $900,000 total purchase price paid by Manus.

47. The Purchase Price paid by Manus to NutraSweet for the Property and Additional Assets was not reasonably equivalent to its value.

48. The Transfer of the Property and Additional Assets by NutraSweet to Manus for an amount far below their value was not made in good faith.

49. Plaintiff has claims against NutraSweet for breach of the Transaction Documents which were litigated in the Arbitration (the "Claims") prior to the Transfer.

50. Based upon the Claims and the Arbitration Award, Plaintiff is a creditor of NutraSweet as

defined in the UVTA.

51. Based upon the Claims and the Arbitration Award, NutraSweet is a debtor as defined in the UVTA.

**COUNT I: Statutory Voidable Transaction - Actual Intent**

52. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53. The Transfer by NutraSweet to Manus was made with the actual intent to hinder, delay, or defraud NutraSweet's present and future creditors, including Plaintiff.

54. Accordingly, the Transfer is voidable under the UVTA, and of no effect as to Plaintiff.

55. Defendants hold the assets that are the subject of the Transfer in a constructive trust for the benefit of Plaintiff.

56. Plaintiff is entitled to an Order nullifying and voiding the Transfer and declaring that title to and ownership of the assets that are the subject of the Transfer remain in NutraSweet.

**COUNT II: Statutory Voidable Transaction - Insufficient Remaining Assets**

57. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 56 of this Complaint as if fully set forth herein.

58. The Transfer was made without NutraSweet receiving a reasonably equivalent value in exchange for the Transfer.

59. At the time the Transfer was made, NutraSweet was engaged in the Arbitration and the value of its assets at such time was grossly inadequate to satisfy the Arbitration Award previously rendered by the arbitration panel.

60. At the time the Transfer was made, NutraSweet had incurred, or believed or reasonably

should have believed that it would incur or had incurred, debts beyond its ability to pay them as they became due.

61. Accordingly, the Transfer is voidable under the UVTA, and of no effect as to Plaintiff.

62. Defendants hold the assets that are the subject of the Transfer in a constructive trust for the benefit of Plaintiff.

63. Plaintiff is entitled to an Order nullifying and voiding the Transfer and declaring that title to and ownership of the assets that are the subject of the Transfer remain in NutraSweet.

### COUNT III: Statutory Voidable Transaction - Insolvency

64. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 63 of this Complaint as if fully set forth herein.

65. NutraSweet made the Transfer after it had incurred its obligations to Plaintiff under the Transaction Documents.

66. NutraSweet made the Transfer without receiving a reasonably equivalent value in exchange.

67. NutraSweet was insolvent at the time of the Transfer.

68. Accordingly, the Transfer is voidable under the UVTA, and of no effect as to Plaintiff.

69. Defendants hold the assets that are the subject of the Transfer in a constructive trust for the benefit of Plaintiff.

70. Plaintiff is entitled to an Order nullifying and voiding the Transfer and declaring that title to and ownership of the assets that are the subject of the Transfer remain in NutraSweet.

### COUNT IV: Common Law Fraudulent Transfers - Action at Law

9

71. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 70 of this Complaint as if fully set forth herein.

72. The Transfer from NutraSweet to Manus involved large commercial companies comprised of knowledgeable and sophisticated business people.

73. No urgency existed for the Defendants to complete the Transfer in June of 2018.

74. Neither NutraSweet nor Manus, prior to the Transfer, contacted or communicated with Plaintiff regarding the Transfer but instead chose to consummate the Transfer in secret from Plaintiff.

75. The shocking price discrepancy existing between the value of the Property and the Additional Assets sold and the purchase price of $900,000 paid by Manus to NutraSweet, as well as the secret manner in which the Defendants chose to act in connection with the Transfer, clearly demonstrate a lack of good faith on the part of the Defendants and an intent to defraud the Plaintiff.

76. The Transfer interferes with the rights of Plaintiff as a creditor of NutraSweet in violation of O.C.G.A. § 18-2-21.

77. The Transfer by NutraSweet to Manus was a fraudulent transfer under the common law and is void and of no effect as to Plaintiff.

78. Defendants hold the assets that are the subject of the Transfer in a constructive trust for the benefit of Plaintiff.

79. Plaintiff is entitled to an Order nullifying and voiding the Transfer and declaring that title to and ownership of the assets that are the subject of the Transfer remain in NutraSweet.

**COUNT V: Common Law Fraudulent Transfers - Action in Equity**

80. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81. The Transfer from NutraSweet to Manus involved large commercial companies comprised of knowledgeable and sophisticated business people.

82. No urgency existed for the Defendants to complete the Transfer in June 2018.

83. Neither NutraSweet nor Manus, prior to the Transfer, contacted or communicated with Plaintiff regarding the Transfer but instead chose to consummate the Transfer in secret from Plaintiff.

84. The shocking price discrepancy existing between the value of the Property and the Additional Assets sold and the purchase price of $900,000 paid by Manus to NutraSweet, as well as the secret manner in which the Defendants chose to act in connection with the Transfer, clearly demonstrate a lack of good faith on the part of the Defendants and an intent to defraud the Plaintiff.

85. The Transfer interferes with the rights of Plaintiff as a creditor of NutraSweet in violation of O.C.G.A. § 18-2-21 and was a fraudulent transfer under the common law, making such transfer subject to attack in equity.

86. In addition, in making the Transfer, Defendants acted contrary to legal or equitable duty, trust, or confidence, justly reposed, which is contrary to good conscience and operated to the injury of Plaintiff in violation of O.C.G.A. § 23-2-51(b).

87. Plaintiff respectfully requests that the Court exercise its equitable power to void, set aside, and annul the Transfer, find that Defendants hold the assets that are the subject of the Transfer in a constructive trust for the benefit of Plaintiff until returned, and grant such other and further relief as the Court deems proper.

WHEREFORE, Plaintiff prays for the following relief:

a) That this Court void and set aside the Transfer by NutraSweet to Manus and declare that title to and ownership of the assets that are the subject of the Transfer remain in NutraSweet;

b) That Plaintiff be awarded its attorney fees for the cost of pursuing this action;

c) For a jury trial on any contested facts; and

d) That this Court awards such other and further relief as may be just and proper.

This 6th day of November, 2018.

                                       *s/Davis A. Dunaway*
                                       David E. Hudson
                                       Georgia Bar. No. 374450
                                       Davis A. Dunaway
                                       Georgia Bar No. 232902
                                       Attorneys for Daesang Corporation

Hull Barrett, P.C.
PO Box 1564
Augusta, GA 30903-1564
(706) 722-4481
ddunaway@hullbarrett.com

# EXHIBIT "A"



News | March 28, 2000

# JW Childs Acquires Monsanto's NutraSweet Sweetener Business

J.W. Childs Equity Partners II, LP, a Boston-based private equity firm with experience in the food, beverage and food ingredient industries, has signed a definitive agreement to acquire Monsanto Co.'s sweetener ingredient business, which includes NutraSweet sweetener. Under terms of the agreement, Monsanto will receive $440 million in cash for the business. All current employees of the business will be offered employment with the new company formed by J.W. Childs.

NutraSweet, headquartered in Chicago, IL, is the most widely recognized aspartame sweetener brand name in the world. Introduced in 1981, it now has regulatory approval in more than 100 countries on six continents. It is used in more than 5,000 food and beverage products.

"NutraSweet's world-class employees are credited with the best quality, service and delivery of aspartame in the world. We look forward to building upon NutraSweet's heritage of technological leadership, innovation and great product quality with an additional focus on developing our next generation high intensity sweetener, neotame," says Nick E. Rosa, a senior executive at Monsanto who will become CEO of the new NutraSweet Co.

"We are excited about this acquisition and intend to put the necessary resources toward positioning NutraSweet for the future,'" said Tim Healy, managing director of JW Childs. "NutraSweet will be able to draw upon JW Childs' experience to capitalize on growth opportunities."

Monsanto also announced that it has signed a definitive agreement to sell for $67 million in cash its equity interests in two European joint venture companies, NutraSweet AG, and Euro-Aspartame SA, to Ajinomoto Co., Inc., Monsanto's long-standing partner in the joint ventures. The sale to Ajinomoto includes several strategic agreements to ensure existing

customers will continue to receive services in an efficient and quality manner. Closing of the sale of Monsanto's equity interests in these joint ventures will occur concurrently with the closing of the transaction with Childs.

Upon closing of the transactions with Childs and Ajinomoto and the previously-announced sale of its biogums business for $685 million in cash to Hercules 2000, LLC, Monsanto will have completed execution of its strategic restructuring plan announced July 1, 1999, that included selling its consumer and bulk food ingredients businesses. On March 20, 2000, Monsanto announced the closing of the sale of its table top sweetener business to Merisant Company for $570 million in cash. Proceeds from the sale of all of the businesses included in the plan will be used to pay down debt and for other corporate purposes.

"We've delivered on the restructuring commitments we made in 1999 in order to realign our long term strategies. Proceeds from these divestitures will further strengthen our balance sheet, and will enable us to focus on the areas critical to achieving our near- and long-term growth targets," said Gary Crittenden, Monsanto's chief financial officer.

*Edited by Wendy Reynolds*

**The New York Times**

ARCHIVES  |  2000

# COMPANY NEWS; MONSANTO SELLING SWEETENER INGREDIENT BUSINESS

**By THE ASSOCIATED PRESS**    MARCH 28, 2000

The Monsanto Company is selling its sweetener ingredient business, which includes a NutraSweet brand name, to a Boston-based investment firm for $440 million. Monsanto, a St. Louis-based agricultural and pharmaceutical company, signed an agreement yesterday to sell the unit to J. W. Childs Equity Partners II L.P. Monsanto also announced the sale of its interest in two European joint ventures: NutraSweet A. G. and Euro-Aspartame S. A. The deals end Monsanto's business in consumer and bulk food ingredients. Last week, it completed the sale of its tabletop sweetener business, which also includes a NutraSweet brand, to Merisant Company.

**Subscribe and see the full article in TimesMachine**

New York Times subscribers* enjoy full access to TimesMachine—view over 150 years of New York Times journalism, as it originally appeared.

*Does not include Crossword-only or Cooking-only subscribers.

We are continually improving the quality of our text archives. Please send feedback, error reports, and suggestions to archive_feedback@nytimes.com.

A version of this article appears in print on March 28, 2000, on Page C00004 of the National edition with the headline: COMPANY NEWS; MONSANTO SELLING SWEETENER INGREDIENT BUSINESS.

© 2018 The New York Times Company

**4**
ARTICLES
REMAINING

Subscribe for $2 a week.

SUBSCRIBE NOW     Subscriber login

# EXHIBIT "B"

**2018036853**

WD **1636** Pg **884**

Filed and Recorded:
**7/9/2018 2:40:21 PM**
Hattie Holmes Sullivan
Clerk of Superior Court
Augusta Richmond County,

Transfer Tax $900.00

Recording Fee: $30.00

After recording please return to:

First American Title Insurance Company
National Commercial Services
666 Third Avenue, 5th Floor
New York, New York 10017



When Recorded Return To:
Heather Townsend
National Commercial Services
First American Title Insurance Company
Six Concourse Parkway, Ste. 2000
Atlanta, GA 30328
File No: NCS   90009

## LIMITED WARRANTY DEED

**The NutraSweet Company** (formerly known as NSC Operating Company), a Delaware corporation ("Grantor"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) paid to Grantor and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, SOLD and CONVEYED and does hereby GRANT, SELL and CONVEY unto **Manus Bio Inc.**, a Delaware corporation ("Grantee"), and its successors and assigns, that certain land located in Richmond County, Georgia being more particularly described in Exhibit A attached hereto and incorporated herein by reference, together with all improvements located on such land (such land and improvements being collectively referred to as the "Property").

This conveyance is made and accepted subject to all matters (the "Permitted Exceptions") set forth in Exhibit B, attached hereto and incorporated herein by reference.

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances pertaining thereto, including all of Grantor's right, title and interest in and to adjacent streets, alleys and right-of-way, subject to the Permitted Exceptions, unto Grantee and Grantee's successors and assigns forever; and Grantor does hereby bind itself and its successors to warrant and forever defend the Property unto Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor, but not otherwise.

[SIGNATURE PAGE FOLLOWS]

RECORD BOOK **1636** Pg **885**

IN WITNESS WHEREOF, the said party of the first part has hereunto set hand and seal to be effective as of the day and year above written.

**GRANTOR:**

**ATTEST:**

**THE NUTRASWEET COMPANY** (formerly known as NSC Operating Company), a Delaware corporation

By: Darlene M. Clark
Name: Darlene M. Clark
Title:

By:
Name:  Stephen Gray
Title:  President and Secretary

Signed, sealed and delivered this 21st day of June, 2018, in the presence of:

Jocelyn McL
Notary Public Jocelyn McLean

My commission expires:

2/3/24



[NOTARIAL SEAL]

RECORD BOOK **1636** P **886**

**EXHIBIT A**

**PROPERTY**

PARCEL 1:

TRACT A-1

ALL THAT TRACT OF LAND LYING, SITUATE AND BEING IN THE COUNTY OF RICHMOND, STATE OF GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR ON THE EASTERN PROPERTY LINE OF GEORGIA POWER SAID REBAR BEING SOUTH 21 DEGREES 16 MINUTES 05 SECONDS WEST, 8479.87 FEET FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN DRIVE AND LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.

THENCE SOUTH 68 DEGREES 47 MINUTES 57 SECONDS EAST, 1018.34 FEET TO A #4 REBAR
THENCE SOUTH 28 DEGREES 33 MINUTES 13 SECONDS WEST, 343.81 FEET TO A #4 REBAR;
THENCE NORTH 61 DEGREES 26 MINUTES 47 SECONDS WEST, 555.00 FEET TO A #4 REBAR:
THENCE NORTH 28 DEGREES 33 MINUTES 13 SECONDS EAST, 160.76 FEET TO A #4 REBAR;
THENCE NORTH 61 DEGREES 39 MINUTES 42 SECONDS WEST, 450.94 FEET TO A #4 REBAR;
THENCE NORTH 24 DEGREES 19 MINUTES 23 SECONDS EAST, 54.57 FEET TO THE POINT OF BEGINNING.

SAID PARCEL CONTAINS 4.79 ACRES.

TRACT A-2 (REVISED)

ALL THAT TRACT OF LAND LYING, SITUATE AND BEING IN THE COUNTY OF RICHMOND, STATE OF GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR ON THE EASTERN R/W OF LOVERS LANE, SAID REBAR BEING SOUTH 22 DEGREES 18 MINUTES 33 SECONDS WEST, 9512.21 FEET FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN DRIVE AND LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.

THENCE SOUTH 61 DEGREES 26 MINUTES 21 SECONDS EAST, 1076.40 FEET TO A #4 REBAR;
THENCE SOUTH 28 DEGREES 34 MINUTES 06 SECONDS WEST, 274.00 FEET TO A #4 REBAR;
THENCE SOUTH 61 DEGREES 25 MINUTES 52 SECONDS EAST, 219.60 FEET TO A #4 REBAR;
THENCE SOUTH 28 DEGREES 32 MINUTES 00 SECONDS WEST, 1073.77 FEET TO A #4 REBAR;
THENCE NORTH 67 DEGREES 47 MINUTES 11 SECONDS WEST, 1152.22 FEET TO A #4 REBAR ON THE EASTERN R/W OF LOVERS LANE;
THENCE AS THE R/W OF LOVERS LANE NORTH 22 DEGREES 42 MINUTES 16 SECONDS EAST, 232.13 FEET TO A #4 REBAR;
THENCE LEAVING THE R/W OF LOVERS LANE RUNNING SOUTH 61 DEGREES 22 MINUTES 45 SECONDS EAST, 870.66 FEET TO A #4 REBAR;

THENCE NORTH 28 DEGREES 37 MINUTES 15 SECONDS EAST, 279.46 FEET TO A #4 REBAR;
THENCE NORTH 61 DEGREES 22 MINUTES 45 SECONDS WEST, 274.10 FEET TO A #4 REBAR;
THENCE SOUTH 28 DEGREES 37 MINUTES 15 SECONDS WEST, 211.36 FEET TO A #4 REBAR;
THENCE NORTH 61 DEGREES 22 MINUTES 45 SECONDS WEST, 603.62 FEET TO A #4 REBAR
ON THE R/W OF LOVERS LANE THENCE AS THE R/W OF LOVERS LANE NORTH 22
DEGREES 42 MINUTES 16 SECONDS EAST, 1182.33 FEET TO A #4 REBAR THE POINT OF
BEGINNING.

SAID TRACT CONTAINS 35.56± ACRES.

TOGETHER WITH THE FOLLOWING TWO TRACTS (TO BE ADDED TO TRACT A-2):

C-2

ALL THAT PARCEL OF LAND LYING, SITUATE AND BEING IN THE COUNTY OF
RICHMOND, STATE OF GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS
FOLLOWS:

BEGINNING AT A #4 REBAR SOUTH 20 DEGREES 40 MINUTES 53 SECONDS WEST, 9545.77
FEET FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN DRIVE AND
LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.

THENCE SOUTH 61 DEGREES 42 MINUTES 19 SECONDS EAST, 111.50 FEET TO A #4 REBAR;
THENCE SOUTH 29 DEGREES 24 MINUTES 18 SECONDS WEST, 0.52 FEET TO A #4 REBAR;
THENCE NORTH 61 DEGREES 26 MINUTES 21 SECONDS WEST, 111.49 FEET TO A #4 REBAR
THE POINT OF BEGINNING.

SAID PARCEL CONTAINS 29 SQUARE FEET.

C-4

ALL THAT PARCEL OF LAND LYING, SITUATE AND BEING IN THE COUNTY OF
RICHMOND, STATE OF GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS
FOLLOWS:

BEGINNING AT A #4 REBAR SOUTH 19 DEGREES 54 MINUTES 37 SECONDS WEST, 9562.75
FEET FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN DRIVE AND
LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.

THENCE SOUTH 61 DEGREES 47 MINUTES 57 SECONDS EAST, 260.34 FEET TO A #4 REBAR;
THENCE SOUTH 60 DEGREES 58 MINUTES 46 SECONDS EAST, 413.60 FEET TO A #4 REBAR;
THENCE NORTH 61 DEGREES 26 MINUTES 21 SECONDS WEST, 673.89 FEET TO A #4 REBAR;
THENCE NORTH 27 DEGREES 31 MINUTES 43 SECONDS EAST, 1.68 TO A #4 REBAR THE
POINT OF BEGINNING.

SAID PARCEL CONTAINS 0.03 ACRES, 1.337 SQUARE FEET.

LESS AND EXCEPT THE FOLLOWING THREE TRACTS FROM TRACT A-2

RECORD BOOK 1636 Pg 888

PARCEL C-1

ALL THAT PARCEL OF LAND LYING, SITUATE AND BEING IN THE COUNTY OF RICHMOND, STATE OF GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR SOUTH 21 DEGREES 03 MINUTES 55 SECONDS WEST, 9535.14 FEET FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN DRIVE AND LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.

THENCE SOUTH 61 DEGREES 26 MINUTES 21 SECONDS EAST, 64.53 FEET TO A #4 REBAR; THENCE SOUTH 27 DEGREES 59 MINUTES 20 SECONDS WEST, 52.29 FEET TO A #4 REBAR; THENCE NORTH 61 DEGREES 35 MINUTES 48 SECONDS WEST, 64.56 FEET TO A #4 REBAR; THENCE NORTH 28 DEGREES 01 MINUTE 40 SECONDS EAST, 52.47 FEET TO A #4 REBAR THE POINT OF BEGINNING.

SAID PARCEL CONTAINS 0.08 ACRES, 3,381 SQUARE FEET.

PARCEL C-3

ALL THAT PARCEL OF LAND LYING, SITUATE AND BEING IN THE COUNTY OF RICHMOND, STATE OF GEORGIA AND IN BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR SOUTH 20 DEGREES 40 MINUTES 53 SECONDS WEST, 9545.77 FEET FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN DRIVE AND LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.

THENCE SOUTH 61 DEGREES 26 MINUTES 21 SECONDS EAST, 18.24 FEET TO A #4 REBAR; THENCE SOUTH 27 DEGREES 31 MINUTES 43 SECONDS WEST, 14.15 FEET TO A #4 REBAR; THENCE NORTH 61 DEGREES 54 MINUTES 38 SECONDS WEST, 18.65 FEET TO A #4 REBAR; THENCE NORTH 29 DEGREES 24 MINUTES 18 SECONDS EAST, 13.14 FEET TO A #4 REBAR THE POINT OF BEGINNING.

SAID PARCEL CONTAINS 0.01 ACRES, 231 SQUARE FEET.

PARCEL C-5

ALL THAT TRACT OF LAND LYING, SITUATE AND BEING IN THE COUNTY OF RICHMOND, STATE OF GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR ON THE EASTERN R/W OF LOVERS LANE, SAID REBAR BEING SOUTH 22 DEGREES 21 MINUTES 18 SECONDS WEST, 10,762.97 FEET FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN DRIVE AND LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.

THENCE SOUTH 61 DEGREES 22 MINUTES 45 SECONDS EAST, 496.91 FEET TO A #4 REBAR; THENCE SOUTH 28 DEGREES 35 MINUTES 29 SECONDS WEST, 177.77 FEET TO A #4 REBAR;

RECORD BOOK 1636 Pg 889

THENCE NORTH 67 DEGREES 47 MINUTES 11 SECONDS WEST, 476.05 FEET TO A #4 REBAR ON THE EASTERN R/W OF LOVERS LANE; THENCE AS THE R/W OF LOVERS LANE NORTH 22 DEGREES 42 MINUTES 16 SECONDS EAST, 232.13 FEET TO THE POINT OF BEGINNING.

SAID TRACT CONTAINS 2.28 ACRES.

TRACT A-5 (REVISED)

ALL THAT TRACT OF LAND LYING, SITUATE AND BEING IN THE COUNTY OF RICHMOND, STATE OF GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR ON THE EASTERN R/W OF LOVERS LANE, SAID REBAR BEING SOUTH 22 DEGREES 21 MINUTES 10 SECONDS WEST, 10,694.51 FEET FROM CENTERLINE INTERSECTION OF COLUMBIA NITROGEN DRIVE AND LANEY WALKER BOULEVARD SAID REBAR BEING THE POINT OF BEGINNING.

THENCE SOUTH 61 DEGREES 22 MINUTES 45 SECONDS EAST, 603.62 FEET TO A #4 REBAR: THENCE NORTH 28 DEGREES 37 MINUTES 15 SECONDS EAST, 211.36 FEET TO A #4 REBAR; THENCE SOUTH 61 DEGREES 22 MINUTES 45 SECONDS EAST, 274.10 FEET TO A #4 REBAR; THENCE SOUTH 28 DEGREES 37 MINUTES 15 SECONDS WEST, 279.46 FEET TO A #4 REBAR; THENCE NORTH 61 DEGREES 22 MINUTES 45 SECONDS WEST, 870.66 FEET TO A #4 REBAR ON THE EASTERN R/W OF LOVERS LANE; THENCE AS THE P/W OF LOVERS LANE NORTH 22 DEGREES 42 MINUTES 16 SECONDS EAST, 68.46 FEET TO THE POINT OF BEGINNING.

SAID TRACT CONTAINS 2.70 ACRES.

TRACT C-6

ALL THAT TRACT OF LAND LYING, SITUATE AND BEING IN THE COUNTY OF RICHMOND, STATE OF GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR SOUTH 19 DEGREES 52 MINUTES 59 SECONDS WEST, 11,004.16 FEET FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN DRIVE AND LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.

THENCE SOUTH 67 DEGREES 47 MINUTES 11 SECONDS EAST, 457.45 FEET TO A #4 REBAR; THENCE SOUTH 28 DEGREES 17 MINUTES 46 SECONDS WEST, 310.44 FEET TO A #4 REBAR; THENCE NORTH 59 DEGREES 40 MINUTES 55 SECONDS WEST, 289.88 FEET TO A #4 REBAR; THENCE SOUTH 28 DEGREES 20 MINUTES 12 SECONDS WEST, 117.61 FEET TO A #4 REBAR; THENCE NORTH 61 DEGREES 24 MINUTES 45 SECONDS WEST, 166.99 FEET TO A #4 REBAR; THENCE NORTH 28 DEGREES 35 MINUTES 29 SECONDS EAST, 368.51 FEET TO THE POINT OF BEGINNING.

SAID TRACT CONTAINS 3.37 ACRES.

TOGETHER WITH (FOR TRACT C-6)

ALL THAT PROPERTY LYING, SITUATE AND BEING IN THE COUNTY OF RICHMOND, STATE OF GEORGIA, SAID PROPERTY BEING FURTHER DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR SAID REBAR BEING LOCATED SOUTH 18 DEGREES 43
MINUTES 01 SECONDS WEST, 11,298.41 FEET FROM THE CENTERLINE INTERSECTION OF
COLUMBIA NITROGEN DRIVE AND LANEY WALKER BLVD, SAID REBAR BEING THE
POINT OF BEGINNING. THENCE SOUTH 28 DEGREES 17 MINUTES 46 SECONDS WEST, 53.21
FEET TO A REBAR; THENCE NORTH 59 DEGREES 40 MINUTES 55 SECONDS WEST, 104.85
FEET TO A REBAR; THENCE NORTH 28 DEGREES 20 MINUTES 12 SECONDS EAST, 53.21
FEET TO A REBAR; THENCE SOUTH 59 DEGREES 40 MINUTES 55 SECONDS EAST, 104.85
FEET TO A REBAR THE POINT OF BEGINNING.

PROPERTY DESCRIBED CONTAINS 0.127 ACRES.

AND LESS AND EXCEPT (FROM TRACT C-6)

ALL THAT PROPERTY LYING, SITUATE AND BEING IN THE COUNTY OF RICHMOND,
STATE OF GEORGIA, SAID PROPERTY BEING FURTHER DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR SAID REBAR BEING LOCATED SOUTH 18 DEGREES 43
MINUTES 04 SECONDS WEST, 11,298.41 FEET FROM THE CENTERLINE INTERSECTION OF
COLUMBIA NITROGEN DRIVE AND LANEY WALKER BLVD, SAID REBAR BEING THE
POINT OF BEGINNING. THENCE NORTH 28 DEGREES 17 MINUTES 46 SECONDS E, 30.00
FEET TO A REBAR; THENCE SOUTH 59 DEGREES 40 MINUTES 55 SECONDS EAST, 185.00
FEET TO A REBAR; THENCE SOUTH 28 DEGREES 17 MINUTES 46 SECONDS WEST, 30.00
FEET TO A REBAR, THENCE NORTH 59 DEGREES 40 MINUTES 55 SECONDS W, 185.00 FEET
TO A REBAR THE POINT OF BEGINNING.

PROPERTY DESCRIBED CONTAINS 0.128 ACRES.

PARCEL 2:

TOGETHER WITH (AS AN APPURTENANCE TO ALL THE ABOVE TRACTS)

ALL RIGHTS UNDER THE AMENDED AND RESTATED EASEMENT AND OPERATING
AGREEMENT BY AND AMONG ELI LILLY AND COMPANY, AN INDIANA CORPORATION,
FIBRANT SOUTH CENTER, LLC, A DELAWARE LIMITED LIABILITY COMPANY AND THE
NUTRASWEET COMPANY, A DELAWARE CORPORATION, DATED MARCH 21, 2017, FILED
FOR RECORD MARCH 28, 2018, AND RECORDED IN DEED BOOK 1572, PAGE 1582,
AFORESAID RECORDS.

PARCEL 3:

TOGETHER WITH (AS AN APPURTENANCE TO TRACT A-1) ALL RIGHTS UNDER THE
EASEMENT AGREEMENT, BY AND BETWEEN GEORGIA POWER COMPANY, A GEORGIA
CORPORATION, AND THE NUTRASWEET COMPANY, ITS SUCCESSOR IN TITLE AND
ASSIGNS, DATED DECEMBER 18, 2000, FILED FOR RECORD FEBRUARY 14, 2001, AND
RECORDED IN DEED BOOK 716 PAGE 798, AFORESAID RECORDS.

BEING THE SAME PROPERTY, GRANTED AND CONVEYED TO THE NUTRASWEET COMPANY, A DELAWARE CORPORATION (FORMERLY KNOWN AS NSC OPERATING COMPANY):

AS TO TRACT A-1, BY VIRTUE OF BY VIRTUE OF THAT CERTAIN LIMITED WARRANTY DEED FROM PHARMACIA CORPORATION, A DELAWARE CORPORATION (FORMERLY KNOWN AS MONSANTO COMPANY), DATED MAY 19, 2000, FILED MAY 26, 2000, AND RECORDED IN DEED BOOK 687, PAGE 2239, RICHMOND COUNTY, GEORGIA RECORDS; BY VIRTUE OF THAT CERTAIN QUIT CLAIM DEED FROM MONSANTO COMPANY, A DELAWARE CORPORATION THAT WAS FORMED ON FEBRUARY 9, 2000 UNDER THE NAME MONSANTO AG COMPANY AND CHANGED ITS NAME TO MONSANTO COMPANY ON MARCH 31, 2000, DATED OCTOBER 2, 2008, FILED MAY 27, 2009, AND RECORDED IN DEED BOOK 1218, PAGE 115, AFORESAID RECORDS.

AS TO TRACT A-2, BY VIRTUE OF BY VIRTUE OF THAT CERTAIN LIMITED WARRANTY DEED FROM PHARMACIA CORPORATION, A DELAWARE CORPORATION (FORMERLY KNOWN AS MONSANTO COMPANY), DATED MAY 19, 2000, FILED MAY 26, 2000, AND RECORDED IN DEED BOOK 687, PAGE 2239, RICHMOND COUNTY, GEORGIA RECORDS; BY VIRTUE OF THAT CERTAIN QUIT CLAIM DEED FROM MONSANTO COMPANY, A DELAWARE CORPORATION THAT WAS FORMED ON FEBRUARY 9, 2000 UNDER THE NAME MONSANTO AG COMPANY AND CHANGED ITS NAME TO MONSANTO COMPANY ON MARCH 31, 2000, DATED OCTOBER 2, 2008, FILED MAY 27, 2009, AND RECORDED IN DEED BOOK 1218, PAGE 115, AFORESAID RECORDS; BY VIRTUE OF THAT CERTAIN LIMITED WARRANTY DEED FROM G. D. SEARLE & CO., A DELAWARE CORPORATION, DATED AUGUST 8, 2000, FILED DECEMBER 29, 2000, AND RECORDED IN DEED BOOK 711, PAGE 974, AFORESAID RECORDS.

AS TO TRACT A-5, BY VIRTUE OF THAT CERTAIN LIMITED WARRANTY DEED FROM PHARMACIA CORPORATION, A DELAWARE CORPORATION (FORMERLY KNOWN AS MONSANTO COMPANY), DATED MAY 19, 2000, FILED MAY 26, 2000, AND RECORDED IN DEED BOOK 687, PAGE 2239, RICHMOND COUNTY, GEORGIA RECORDS; BY VIRTUE OF THAT CERTAIN QUIT CLAIM DEED FROM MONSANTO COMPANY, A DELAWARE CORPORATION THAT WAS FORMED ON FEBRUARY 9, 2000 UNDER THE NAME MONSANTO AG COMPANY AND CHANGED ITS NAME TO MONSANTO COMPANY ON MARCH 31, 2000, DATED OCTOBER 2, 2008, FILED MAY 27, 2009, AND RECORDED IN DEED BOOK 1218, PAGE 115, AFORESAID RECORDS.

AS TO TRACT C-6, BY VIRTUE OF THAT CERTAIN LIMITED WARRANTY DEED FROM PHARMACIA CORPORATION, A DELAWARE CORPORATION (FORMERLY KNOWN AS MONSANTO COMPANY), DATED JULY 26, 2000, FILED DECEMBER 29, 2000, AND RECORDED IN DEED BOOK 711, PAGE 970, AFORESAID RECORDS; AND BY VIRTUE OF THAT CERTAIN LIMITED WARRANTY DEED FROM MONSANTO COMPANY, A DELAWARE CORPORATION INCORPORATED ON FEBRUARY 9, 2002 (AS SUCCESSOR IN INTEREST TO PHARMACIA CORPORATION), DATED JUNE 17, 2002, FILED OCTOBER 30, 2002, AND RECORDED IN DEED BOOK 819, PAGE 18, AFORESAID RECORDS.

GSCCCA.org - Image Index

PRO FORM INFORMATION

RECORD BOOK 1636 PAGE 884 VIRGINIA

Policy Number: 900096

## EXHIBIT B

## PERMITTED EXCEPTIONS

1.     Any mineral or mineral rights leases, granted or retained by current or prior owners.

2.     Taxes and assessments for the year 2018 and subsequent years, not yet due and payable, and taxes for prior years arising from reassessments or digest disputes, none now due and payable.

3.     Rights of upper and lower riparian owner's in and to the waters of any creek or stream which bounds or traverses the land, free from increase, decrease or pollution.

4.     Rights of Eli Lilly and Company, d/b/a Elanco Animal Health pursuant to that certain Lease Agreement, by and between The NutraSweet Company, a Delaware corporation, and Eli Lilly and Company, an Indiana corporation, d/b/a Elanco Animal Health, dated July 6, 2015, as amended by that certain First Amendment to Lease Agreement, by and between The NutraSweet Company and Eli Lilly and Company, dated February 2, 2017, as tenants only, without any rights of first refusal, purchase options, or other purchase rights, under unrecorded occupancy agreements. (Affects A-1 and A-2)

5.     Matters as shown on that certain plat recorded in Book 4, Pages 290-291, Richmond County, Georgia records, as approximately shown on that ALTA/NSPS Land Title Survey made by CreSurveys dated April 19, 2018, last revised June 14, 2018, as Surveyor Ref #18-1220 (the "Survey") (Affects C-5, less and except from A-2).

6.     Matters as shown on that certain plat recorded in Book 7, Page 104, aforesaid records, as approximately shown on the Survey (Affects A-1 and A-2).

7.     Matters as shown on that certain plat recorded in Realty Reel 199, Pages 2011-2018, aforesaid records, as approximately shown on the Survey. (Affects A-1)

8.     Matters as shown on that certain plat recorded in Book 706, Page 982, aforesaid records. (Affects All)

9.     Matters as shown on that certain plat recorded in Book 777, Pages 1019-1020, aforesaid records. (Affects All)

10.    Matters as shown on that certain plat recorded in Realty Reel 25, Page 2092, aforesaid records, as approximately shown on the Survey. (Affects Parcel 3)

11.     Easement from J. C. Richardson to American Telephone and Telegraph Company of Georgia, dated December 1, 1929, filed for record December 12, 1929, and recorded in Deed Book 11-U, Page 356, aforesaid records.

12.     Terms and provisions of that certain Plant Urquhart-South Augusta Transmission Line, by and between Georgia Power Company and Development Authority of Richmond County, filed for record September 28, 1973, and recorded in Realty Reel 26, Page 2036, aforesaid records, as approximately shown on the Survey. (Affects Parcel 3)

13.     Right of Way Easement from Georgia Power Company to Development Authority of Richmond County, a Development Authority of the State of Georgia, dated September 26, 1973, filed for record September 28, 1973, and recorded in Realty Reel 26, Page 2051, aforesaid records, as approximately shown on the Survey. (Affects A1)

14.     Terms and provisions of that certain Agreement, by and between Georgia Power Company, a Georgia corporation and The Development Authority of Richmond County, of Augusta, Richmond County, Georgia, dated December 2, 1974, filed for record January 29, 1975, and recorded in Realty Reel 44, Page 697, aforesaid records.

15.     Terms and provisions of that certain Grant of Easement and Agreement Among the City Council of Augusta, Georgia & G. D. Searle & Co. and Development Authority of Richmond County for Water & Sewer Services, by and between Development Authority of Richmond County and G. D. Searle & Co. and City of Augusta, filed for record December 10, 1982, and recorded in Realty Reel 157, Page 2262, aforesaid records.

16.     Easement from Searle Chemicals to Georgia Power Company dated December 8, 1983, filed for record January 4, 1984, and recorded in Realty Reel 175, Page 265, aforesaid records.

17.     Easement from NutraSweet to Georgia Power Company dated October 31, 1989, filed for record November 14, 1989, and recorded in Realty Reel 322, Page 1016, aforesaid records.

18.     Terms and provisions of that certain Encroachment Agreement, by and between G. D. Searle and Georgia Power Company, dated July 17, 1991, filed for record August 1, 1991, and recorded in Realty Reel 364, Page 1162, aforesaid records.

19.     Amended and Restated Easement and Operating Agreement by and among Eli Lilly and Company, an Indiana corporation, Fibrant South Center, LLC, a Delaware limited liability company and The NutraSweet Company, a Delaware corporation, dated March 21, 2017, filed for record March 28, 2018, and recorded in Deed Book 1572 Page 1582, aforesaid records. (Affects A-1, A-2 and C-5, less and except from A-2)

RECORD BOOK **1636** Pg **894**
**Hattie Holmes Sullivan**
Clerk of Superior Court
Augusta Richmond County,

20. Terms and provisions of that certain Easement Agreement, by and between Georgia Power Company, a Georgia corporation and The Nutrasweet Company, its successors-in-title and assigns, dated December 18, 2000, filed for record February 14, 2001, and recorded in Deed Book 716, Page 798, aforesaid records, as approximately shown on the Survey. (Affects A-1 and Parcel 3)

21. Terms and provisions of that certain Easement Agreement, by and between Georgia Power Company, a Georgia corporation and G. D. Searle & Co., its successors-in-title and assigns, dated January 26, 2001, filed for record February 14, 2001, and recorded in Deed Book 716, Page 804, aforesaid records, as approximately shown on the Survey. (Affects Parcel 3)

22. Any facts, rights, interests or claims that may exist or arise by reason of the following matters disclosed by the Survey:

    (A)    Fence encroaches over the Southwesterly portion of the Land. (Tract A-1)
    (B)    Building on the Southwesterly portion of the Land encroaches over the 10-foot building setback line. (Tract A-1)
    (C)    Overhead power lines encroach onto Northwesterly portion of the Land without the benefit of any known easement. (Tract A-2)
    (D)    One-story metal building on the Northerly portion of the Land encroaches over the 10-foot building setback line. (Tract A-2).
    (E)    Fence encroaches over the Northeasterly portion of the Land. (Tract A-2)
    (F)    One-story metal building on the Easterly portion of the Land encroaches over the 10-foot building setback line. (Tract A-2)
    (G)    Overhead power lines encroach onto Southeasterly portion of the Land without the benefit of any known easement. (Tract C-6)
    (H)    Fence encroaches over the Southwesterly portion of the Land. (Tract A-2)
    (I)    Elevated pipes located throughout the Land without the benefit of any known easement. (Affects All)

23. Matters as shown on that certain plat recorded in Book 32-T, Pages 459-464, aforesaid records. (Affects C-6)

# EXHIBIT "C"









08/12/2015 12:45



08/12/2015













08/12/2015  12:42





08/12/2015







08/12/2015 12



08/12/2015 12:4







08/12/2015 13:16



08/12/2015 12:43







01/27/2015 12:16





# EXHIBIT "D"

## INTERNATIONAL CHAMBER OF COMMERCE
## INTERNATIONAL COURT OF ARBITRATION

**DAESANG CORPORATION,**

      **(Republic of Korea)**

               **Claimant,**

      -and-

                      **ICC Case No. 15641/VRO/AGF/RD**

1. **THE NUTRASWEET COMPANY,**

        **(U.S.A.)**

2. **NUTRASWEET IP HOLDINGS, INC.,**

        **(U.S.A.)**

3. **SWEETENERS HOLDINGS KOREA LTD.,**

      **(Republic of Korea)**

               **Respondents.**

### FINAL AWARD

### The Arbitral Tribunal:

Arnold S. Schickler
Jonathan D. Schiller
Louis B. Kimmelman, Chairman

ICC Case No. 15641/VRO/AGF/RD

## **TABLE OF CONTENTS**

Page

I.    INTRODUCTION..................................................................................... 1

    A.    Summary of Case .......................................................................... 1

    B.    Parties and Counsel ...................................................................... 2

II.   PROCEDURAL HISTORY ...................................................................... 3

    A.    Pleadings and Constitution of Arbitral Tribunal ......................... 3

    B.    Terms of Reference and Provisional Timetable ............................ 4

    C.    Procedural Orders......................................................................... 6

    D.    Evidentiary Hearing ..................................................................... 7

    E.    The Partial Final Award and Subsequent Proceedings .............. 11

III.  FACTUAL BACKGROUND ................................................................... 15

IV.   JURISDICTION AND GOVERNING LAW ........................................... 19

V.    THE CLAIMS AND DEFENSES ............................................................ 21

    A.    Daesang's Claims ....................................................................... 21

    B.    Respondents' Defenses/Counterclaims ...................................... 22

VI.   ANALYSIS OF APPROPRIATE REMEDY ........................................... 24

    A.    The Parties' Positions With Respect to the Appropriate Remedy............ 24

        1.    Claimant's Position ......................................................... 24

        2.    Respondents' Position...................................................... 24

    B.    The Tribunal's Analysis of Respondents' Arguments ............................ 25

        1.    Respondents' Arguments Relating to Alleged Errors in the Partial Award.......................................................................... 25

        2.    Respondents' Position Regarding the Appropriate Remedy........ 31

    C.    The Appropriate Remedy In This Case..................................................... 33

        1.    The APA............................................................................ 33

            (a)    The Parties' Submissions Regarding Claimant's Use of Respondents' Property ................................... 35

            (b)    The Tribunal's Analysis of the Parties' Positions............. 39

            (c)    Claimant's Use of the Purchased Assets ............................ 41

        2.    The Processing Agreement................................................ 46

        3.    Conclusion........................................................................ 49

VII.  COSTS.................................................................................................... 51

VIII. FINAL AWARD ..................................................................................... 53

APPENDIX A:  Partial Final Award dated December 21, 2012 ......................A-1

APPENDIX B:  APA Section 2(d)....................................................................B-1

i

ICC Case No. 15641/VRO/AGF/RD

## I.   **INTRODUCTION**

### A.   **Summary of Case**

1.   This case arises from the sale by Claimant Daesang Corporation ("Claimant" or "Daesang") of its aspartame[1] business to Respondent The NutraSweet Company ("NSC") and certain of its subsidiaries (collectively "Respondents"). Three years after the closing of the transaction, Respondents failed to make one of the required installment purchase price payments. This default continued for a period of six months. Claimant then exercised its contractual right to accelerate the remaining purchase price payment obligations. Several months later, and almost four years after the closing of the transaction, Respondents sent notice that they were rescinding the entire transaction based on a provision in one of the transaction documents. This arbitration followed. Claimant seeks damages based on several alleged breaches of payment obligations under the transaction agreements, and Respondents argue that they are entitled to rescind the entire transaction and recover rescissionary damages.

2.   On December 21, 2012, the Tribunal rendered a Partial Final Award in which it dismissed all defenses and counterclaims asserted by Respondents in this arbitration. In that award the Tribunal reserved all other decisions, including the nature and form of relief to be granted to Claimant and the allocation of the costs of the arbitration, to a future award.

3.   Shortly after the parties received the Partial Final Award, they made successive applications for a stay of the proceeding so that they could pursue settlement discussions, and the Tribunal granted each requested stay. However, on September 4, 2014, the parties advised the Tribunal that the settlement negotiations had terminated and that the Tribunal should resolve the remaining

---

[1] Aspartame is a low-calorie artificial sweetener widely used in various products, including foods and beverages, around the world.

issues in the case. The Tribunal then issued instructions requiring submissions as to the appropriate remedy in this case and the allocation of costs. Thereafter, the Tribunal issued further instructions regarding the issue of damages. This Final Award resolves all the remaining issues in the case.

## B.   Parties and Counsel

4.   Claimant:  The Claimant is DAESANG CORPORATION ("Claimant" or "Daesang"), a corporation organized under the laws of the Republic of Korea with offices located at:

> Daesang Corporation
> 96-48 Shinsul-dong, Dongdaemun-ku
> Seoul 130-706
> Korea

5.   Claimant is represented by counsel, The Law Offices of Richard B. Pacella, with offices located at:

> The Law Offices of Richard B. Pacella
> 61 Broadway
> Suite 1301
> New York, New York  10006
> U.S.A.
> *Attention:*  Richard B. Pacella

6.   Respondents:  The Respondents are THE NUTRASWEET COMPANY ("NSC"), a corporation organized under the laws of the State of Delaware, U.S.A. and two of its wholly-owned subsidiaries, NUTRASWEET IP HOLDINGS, INC. ("IPCO"), also a Delaware corporation, and SWEETENERS HOLDINGS KOREA LTD. ("NSC Korea"), a Korea corporation (hereafter "NSC", "IPCO" and "NSC Korea" are collectively referred to as "Respondents" or the "NSC Parties"). The offices of the Respondents are located at:

> 1.  The NutraSweet Company
> The Merchandise Mart
> 222 Merchandise Mart Plaza, Suite 936
> Chicago, Illinois 60654
> U.S.A.

> and

2

ICC Case No. 15641/VRO/AGF/RD

> 1762 Lovers Lane
> Augusta, Georgia 30901
> U.S.A.

2. NutraSweet IP Holdings, Inc.
   The Merchandise Mart
   222 Merchandise Mart Plaza, Suite 936
   Chicago, Illinois 60654
   U.S.A.

3. Sweeteners Holdings Korea Ltd.
   228-1 Soryong-dong, Gunsan
   Jeollabuk-do 573-879
   Korea

7.  Respondents are represented by counsel, Sperling & Slater, P.C., with offices located at:

> Sperling & Slater, P.C.
> 55 West Monroe
> Suite 3200
> Chicago, Illinois 60603
> U.S.A.
> *Attention:*    Greg Shinall, Michael G. Dickler

## II.   **PROCEDURAL HISTORY**

### A.   **Pleadings and Constitution of Arbitral Tribunal**

8.  Claimant commenced this arbitration by filing a Request for Arbitration that was received by the International Court of Arbitration of the International Chamber of Commerce ("ICC Court") in Paris, France on or about June 4, 2008.

9.  In response, Respondents filed with the ICC Court an Answer and Counterclaims to the Request for Arbitration dated August 11, 2008 ("Answer and Counterclaims").

10. Claimant filed a Reply to Counterclaims that was received by the ICC Court on or about September 15, 2008.

3

ICC Case No. 15641/VRO/AGF/RD

11.    In its Request for Arbitration, Claimant nominated Arnold S. Schickler, Esq. as a co-arbitrator in this case.  The ICC Court confirmed the nomination of Mr. Schickler on August 29, 2008, pursuant to Article 9(1) of the ICC Rules of Arbitration in force from 1 January 1998 ("ICC Rules").

12.    In their Answer and Counterclaims, Respondents nominated Jonathan D. Schiller, Esq. as a co-arbitrator in this case.  The ICC Court confirmed the nomination of Mr. Schiller on August 29, 2008, pursuant to Article 9(1) of the ICC Rules.

13.    At its session of August 29, 2008, the ICC Court decided that this arbitration proceed pursuant to Article 6(2) of the ICC Rules.

14.    By letters dated October 13, 2008, the parties advised the Secretariat of the ICC Court that they agreed to the appointment of a United States national as Chairman of the Arbitral Tribunal.

15.    The ICC Court appointed Louis B. Kimmelman, Esq. as Chairman of the Arbitral Tribunal on November 7, 2008, pursuant to Article 8(4) of the ICC Rules, upon proposal of the United States National Committee of the ICC.

16.    The Arbitral Tribunal was fully constituted on November 7, 2008.

**B.     Terms of Reference and Provisional Timetable**

17.    On February 2, 2009, the parties and the Arbitral Tribunal signed the Terms of Reference in this case.

18.    In the Terms of Reference, Claimant summarized its claims against Respondents for breach of the purchase price obligations and other obligations in the transaction documents, plus interest and the fees and costs of this proceeding.

19.    In the Terms of Reference, Respondents also described their defenses and counterclaims.  These claims included a contractual right to rescind the entire

4

transaction as well as an equitable right to rescission based on Claimant's alleged fraud plus rescissionary damages arising from alleged breaches of contract.

20.    On February 17, 2009 the parties requested the Tribunal to defer issuing the Provisional Timetable.  As a result of the parties' request, the proceedings in this case were stayed until April 22, 2009, at which time the Claimant requested the Tribunal to proceed with the case.

21.    Following written submissions from the parties, the Tribunal issued Procedural Order No. 1 dated May 19, 2009, which included the Provisional Timetable.

22.    Procedural Order No. 1 provided that the parties could apply to the Tribunal for resolution of any threshold or jurisdictional issues in the case by May 29, 2009.

23.    Claimant and Respondents both filed applications dated May 29, 2009 seeking a determination of certain threshold and/or jurisdictional issues.  On August 11, 2009, the Tribunal heard oral argument on the parties' respective applications.  In Procedural Order No. 3 dated August 21, 2009, the Tribunal determined that it could not then resolve the various threshold and/or jurisdiction issues submitted by the parties and that it would consider these issues together with the merits of the case.

24.    On August 21, 2009, Respondents filed Amended Counterclaims in this case.  By email dated September 4, 2009, the parties agreed that Respondents' "Amended Counterclaims are intended to entirely replace the counterclaims originally asserted by [Respondents] in [their] Answer and Counterclaims."  The parties further agreed that the Reply filed by Claimant and referred to in paragraph 10 above would be deemed a denial of the allegations in the Amended Counterclaims.

ICC Case No. 15641/VRO/AGF/RD

C.    **Procedural Orders**

25.    In Procedural Order No. 1 and in subsequent procedural orders, the Tribunal provided for various procedural steps to prepare the case for an evidentiary hearing. These steps included document disclosure, disclosure of fact witnesses, disclosure of expert witnesses, submission of pre-hearing memoranda and reply memoranda to address the various factual and legal issues in dispute, together with witness statements, expert reports and documentary evidence.

26.    In Procedural Order No. 2 dated July 6, 2009, the Tribunal provided that the evidentiary hearing would take place on January 25 - 29, 2010. At the request of the parties, the Tribunal changed the dates of the evidentiary hearing to October 26 - November 5, 2010. This is reflected in Procedural Order No. 4 dated December 24, 2009.

27.    On April 7, 2010, Respondents submitted an "Additional Counterclaim and Defense" based on the affidavit of Dae Yeab Park that Respondents stated they obtained in January 2010. In response, Claimant submitted a motion objecting to the new counterclaim and defense.

28.    In Procedural Order No. 5 dated July 26, 2010, the Tribunal ordered that Respondents could assert the Additional Counterclaim and Defense (Counterclaim XIII and Affirmative Defense J) pursuant to Article 19 of the ICC Rules. In doing so, the Tribunal made no determination with respect to the substantive issues or arguments advanced by the parties at that time and the parties were permitted to make whatever arguments they deemed appropriate with respect to the Additional Counterclaim and Defense or the "Affidavit of Dae Yeob Park" in their respective filings with the Tribunal as provided in Procedural Order No. 4 and at the Evidentiary Hearing.

29.    On July 29, 2010, Claimant submitted an application to extend various dates in the case, including the dates for the evidentiary hearing. Respondents opposed

6

this application.  In an order dated August 10, 2010, the Tribunal extended various dates in the case, including the dates of the evidentiary hearing, and requested the parties to confer and submit a proposed new schedule.

30.    Based on a joint proposal by the parties, the Tribunal in Procedural Order No. 6 dated September 14, 2010, ordered that the evidentiary hearing would take place on May 2 - 13, 2011.

31.    On March 3, 2011, Respondents requested an extension of certain dates in the case, including the dates of the evidentiary hearing.  Claimant opposed this application.

32.    In Procedural Order No. 7 dated March 30, 2011, the Tribunal extended certain dates in the case, including the dates of the evidentiary hearing.  The dates of the evidentiary hearing were changed to July 11 - 23, 2011.

33.    On June 8, 2011, the parties submitted various applications with respect to the conduct of the evidentiary hearing.

34.    The Tribunal held a procedural hearing with the parties on June 13, 2011 in New York City to plan for the evidentiary hearing.

35.    In Procedural Order No. 9 dated June 30, 2011, the Tribunal ruled on all the pending applications relating to the evidentiary hearing.

**D.    Evidentiary Hearing**

36.    Prior to the evidentiary hearing, the parties filed written submissions in support of their respective positions.

37.    On July 2, 2010, Claimant submitted its Opening Pre-Hearing Brief with supporting witness statements and exhibits.  On February 25, 2011, Claimant submitted its Pre-Hearing Opposition Brief with supporting witness statements

ICC Case No. 15641/VRO/AGF/RD

and exhibits.  Finally, on May 31, 2011, Claimant submitted its Pre-Hearing Reply Brief with supporting witness statements and exhibits.

38.    On July 2, 2010, Respondents submitted their Pre-Hearing Memorandum with supporting witness statements and exhibits.  On February 25, 2011, Respondents submitted their Pre-Hearing Response Memorandum with supporting witness statements and exhibits.  On May 31, 2011, Respondents submitted their Pre-Hearing Reply Memorandum with supporting witness statements and exhibits.  On June 6, 2011, Respondents submitted a supplemental witness statement together with an exhibit.  On June 17, 2011, Respondents submitted an additional witness statement amending a prior witness statement.  On June 30, 2011, Respondents submitted certain additional witness statements and exhibits.  In addition, on June 29, 2011, Respondents withdrew certain paragraphs of their Amended Counterclaims.[2]

39.    The evidentiary hearing took place in New York City on nine consecutive days during the period July 11 through July 15, 2011 and July 18 through July 21, 2011.

40.    Prior to the evidentiary hearing, Claimant submitted witness statements for the following fact witnesses:

> Chang Keun Jeon Witness Statement No. 1, dated February 16, 2011
> Chang Keun Jeon Witness Statement No. 2, dated May 25, 2011
> Kun Keun Kim Witness Statement, dated February 16, 2011
> Sun-Young Kim Witness Statement, dated May 25, 2011
> Tae Chul "Scott" Kim Witness Statement, dated February 16, 2011
> Hee Byung Lee Witness Statement No. 1, dated June 28, 2010
> Hee Byung Lee Witness Statement No. 2, dated February 16, 2011
> Yong Ki Lee Witness Statement, dated June 28, 2010
> Jung Bae Lim Witness Statement No. 1, dated June 28, 2010
> Jung Bae Lim Witness Statement No. 2, dated February 16, 2011
> Seok Yeol Oh Witness Statement No. 1, dated February 16, 2011
> Seok Yeol Oh Witness Statement No. 2, dated May 24, 2011

---

[2] Specifically, Respondents withdrew paragraphs I(C), III(D), III(E), VIII(A) and XII(A) of their Amended Counterclaims.

ICC Case No. 15641/VRO/AGF/RD

Richard B. Pacella, Esq. Witness Statement No. 1, dated February 25, 2011
Richard B. Pacella, Esq. Witness Statement No. 2, dated May 27, 2011

41.     Also prior to the evidentiary hearing, Claimant submitted the expert report of Dr. Michael A. Salinger, dated February 24, 2011.

42.     Prior to the evidentiary hearing, Respondents submitted witness statements for the following fact witnesses:

William L. DeFer Statement No. 1, dated July 2, 2010
William L. DeFer Statement No. 2, dated February 25, 2011
William L. DeFer Statement No. 3, dated May 31, 2011
William L. DeFer Statement No. 4, dated June 28, 2011
Jon B. Dubrow Statement, dated May 24, 2011
Kenneth E. Furlong Statement No. 1, dated July 2, 2010
Kenneth E. Furlong Statement No. 2, dated May 26, 2011
Kenneth E. Furlong Statement No. 3, dated June 24, 2011
Jeffrey M. Hoster Statement No. 1, dated February 23, 2011
Jeffrey M. Hoster Statement No. 2, dated June 10, 2011
Bernard S. Kramer Statement No. 1, dated February 25, 2011
Bernard S. Kramer Statement No. 2, dated May 31, 2011
Bernard S. Kramer Statement No. 3, dated June 6, 2011
Ted H. Park Statement, dated July 2, 2010
Craig R. Petray Statement No. 1, dated July 2, 2010
Craig R Petray Statement No. 2, dated February 24, 2011
Craig R Petray Statement No. 3, dated May 31, 2011
Rick E. Seigler Statement No. 1, dated July 2, 2010
Rick E. Seigler Statement No. 2, dated May 27, 2011
Adam L. Suttin Statement, dated July 2, 2010

43.     Also prior to the evidentiary hearing, Respondents submitted the expert report of Dr. Russell Lamb, dated May 31, 2011.

44.     At the evidentiary hearing, Respondents cross-examined the following fact witnesses and expert witness offered by Claimant:

J. B. Lim
H. B. Lee
D. Y. Park
Dr. Michael A. Salinger

45.    At the evidentiary hearing, Claimant cross-examined the following fact witnesses and expert witness offered by Respondents:

>     William DeFer
>     John Dubrow
>     Craig Petray
>     Kenneth Furlong
>     Adam Suttin
>     Rick Seigler
>     Dr. Russell Lamb

46.    On the last day of the evidentiary hearing (July 21, 2011), the Tribunal requested the parties to submit several documents, including (1) an outline of each party's respective claims and defenses, together with citations to the factual and legal authority that supported those claims and defenses, and (2) a list of the issues to be determined in the case that had been included in the Terms of References, together with the parties' respective positions on each issue. The parties submitted these requested documents.

47.    On September 20, 2011, Respondents withdrew certain defenses contained in their Answer and Counterclaims.[3]

48.    After the evidentiary hearing, Claimant submitted the witness statement of Chang Keun Jeon dated September 23, 2011.

49.    Following receipt of the requested documents (*see* ¶ 46, above), the Tribunal heard oral argument on October 20, 2011 in New York City on the claims and defenses of the parties.[4]

50.    The ICC Court at its session of December 19, 2012, extended the time limit for rendering the Final Award to February 28, 2013.

---

[3] Specifically, Respondents withdrew defenses F, G and H in their Answer and Counterclaims.

[4] Before and after the hearing on October 20, 2011, the Tribunal received further submissions from the parties on September 23, 2011, September 24, 2011, September 30, 2011, October 3, 2011, October 14, 2011, October 17, 2011, October 18, 2011, October 28, 2011, and November 1, 2011.

ICC Case No. 15641/VRO/AGF/RD

51.     By email dated December 17, 2012, the Tribunal advised the parties pursuant to Article 22(1) of the ICC Rules that the proceedings were closed.

**E.     The Partial Final Award and Subsequent Proceedings**

52.     On December 21, 2012, the Tribunal rendered a Partial Final Award in which it dismissed all defenses and counterclaims asserted by Respondents.  In the award the Tribunal also reserved all other decisions, including the nature and form of relief to be granted to Claimant and the allocation of the costs of the arbitration proceeding, to a subsequent award.  A copy of the Tribunal's Partial Final Award dated December 21, 2012 ("Partial Award") is attached hereto as Appendix A and is incorporated herein.  This Final Award assumes familiarity with the Tribunal's decisions in the Partial Award.

53.     On January 11, 2013, the Tribunal issued Procedural Order No. 11 establishing a procedure for determining "the nature and form of the relief that is appropriate in the context of this case"[5] as well as whether the costs of the entire arbitration should be allocated and, if so, in what proportion pursuant to Article 31 of the ICC Rules.

54.     On January 14, 2013, the parties requested the Tribunal to stay all further proceedings in this case so the parties could determine whether a settlement could be reached.

55.     Thereafter, the parties requested further stays of this arbitration on January 25, 2013, February 15, 2013, March 1, 2013 and March 14, 2013, which the Tribunal granted.

56.     On April 11, 2013, the Parties advised the Tribunal that "a settlement in principle has been reached."

---

[5] Quoting Partial Award ¶123.

11

57.    Following a telephonic conference call with the Tribunal on May 13, 2013, the parties on May 21, 2013 filed an application for a stay of all proceedings so that they could pursue a settlement.  On July 10, 2013, the parties updated the Tribunal on the status of their negotiations.

58.    On July 13, 2013, the Tribunal advised the parties that it would stay all proceedings in the case if the parties submitted a signed Joint Application for a Stay of the Proceedings that addressed the timing of the settlement.

59.    The parties submitted a joint application for a stay on August 16, 2013.  On September 11, 2013, the Tribunal issued Procedural Order No. 12 granting the parties' joint application for a stay subject to a monthly reporting requirement.

60.    On September 4, 2014 the parties advised the Tribunal that their settlement negotiations had terminated and that the Tribunal should now resolve the remaining issues in this case.

61.    On September 11, 2014, the Tribunal directed the parties in Procedural Order No. 13 to submit a written statement as to each element of relief to be awarded in this case with the legal and factual basis for the requested relief.  These statements were to be submitted on October 3, 2014 and rebuttal statements were to be submitted on October 24, 2014.  The Tribunal also directed the parties to submit applications for costs on November 21, 2014.

62.    On October 3, 2014, Claimant submitted Claimant's Written Statement of Damages ("Claimant's Remedy Statement").  Also on October 3, 2014, Respondents submitted NutraSweet's Statement as to the Appropriate Remedy ("Respondents' Remedy Statement").

63.    On October 24, 2014, Claimant submitted Claimants' Rebuttal Statement in Further Support of Claimants' Statement of Damages ("Claimant's Remedy Rebuttal").  Also on October 24, 2014, Respondents submitted an Application for

12

Leave to File a Reply in Lieu of a Response Submission ("Respondents'
Application"). In Respondents' Application, Respondents stated that because
"NutraSweet's initial submission answers Daesang's initial submission, no further
response is required."

64.  On October 27, 2014, the Tribunal denied Respondents' Application to submit a
reply in lieu of a rebuttal. The Tribunal stated as follows:

> "The application is denied. The procedure that the Tribunal
> directed the parties to follow is set forth in Procedural
> Order No. 13. To the extent the Tribunal requires any
> further briefing from the parties, the Tribunal will request
> submissions from both parties."

65.  On November 21, 2014, Claimant submitted Claimant's Application for Costs
("Claimant's Costs Application"). Also on November 21, 2014, Respondents
submitted NutraSweet's Application for Costs ("Respondents' Costs
Application").

66.  On September 17, 2015, the Tribunal issued Procedural Order No. 14, directing
the parties to file written submissions concerning the issue of mitigation of
damages with respect to Claimant's use of the assets that were purchased by
Respondents.

67.  On October 17, 2015, Claimant submitted (i) Claimant's Memorandum on
Mitigation of Damages ("Claimant's Mitigation Mem."), (ii) Witness Statement
of Dong Hak Yang dated October 16, 2015, and (iii) Benefit Calculation Report
dated October 16, 2015 ("Samil Benefit Report"), prepared by Samil
PricewaterhouseCoopers ("Samil PwC").

68.  On October 29, 2015, Respondents requested a two-week extension of time to
respond to Claimant's submission relating to mitigation of damages. Respondents
stated that, on October 25, 2015, they had requested that Claimant produce certain
documents, including the documents provided to Samil PwC as well as other

documents concerning Daesang's cost allocations and actual incremental cost to produce aspartame.

69.    On October 30, 2015, the Tribunal asked for Claimant's comments on the requested extension of time and also a report from all counsel as to the status of any pending document requests.

70.    On October 30, 2015, Claimant stated that it did not object to the requested two-week extension, but did object to production of the requested documents.

71.    On November 2, 2015, Respondents submitted to the Tribunal a copy of its request for information addressed to Claimant dated October 25, 2015, including an explanation of the documents requested.

72.    On November 4, 2015, Claimant submitted objections to Respondents' October 25, 2015 document requests.

73.    On November 8, 2015, the Tribunal granted Respondents' requested extension of time and directed the parties to address all issues, including the document requests, in their submissions to the Tribunal on the mitigation issue.

74.    On November 20, 2015, Respondents submitted NutraSweet's Response to Daesang's Submissions Concerning the Benefits Obtained from the Aspartame Assets, with exhibits (including the Fifth Witness Statement of William L. DeFer dated November 20, 2015) ("Respondents' Benefits Submission").

75.    On November 27, 2015, Claimant submitted (i) Claimant's Reply Memorandum on Mitigation of Damages ("Claimant's Mitigation Reply"), (ii) Witness Statement of Sung-Kwang Yang dated November 26, 2015, (iii) Second Sworn Statement of Dong Hak Yang dated November 27, 2015, and (iv) Claimant's Final Calculation of Damages dated November 27, 2015 ("Claimant's Final Calculation").

76.     On December 2, 2015, Respondents submitted NutraSweet's Response to
        Daesang's Submission Concerning the Calculation of Damages together with
        exhibits (including the Sixth Witness Statement of William L. DeFer dated
        December 2, 2015) ("Respondents' Calculation Response").

77.     On April 20, 2016, the Tribunal advised the parties that pursuant to Article 22(1)
        of the ICC Rules, the record in this case was closed.  Shortly thereafter (on the
        same day), Respondents submitted an application to file an attached Supplemental
        Response to Daesang's Argument Regarding Tax Liability and Liens Asserted by
        Korean Tax Authority dated April 20, 2016 ("Respondents' Supplemental Tax
        Response").

78.     The Tribunal accepted the filing of Respondent's Supplemental Tax Response and
        directed Claimant to respond by April 28, 2016.   The Tribunal stated that it
        would then close the record in this case.

79.     On April 28, 2016, Claimant filed Daesang's Reply to NutraSweet's
        Supplemental Response regarding Nutrasweet's Tax Liability and Korean Tax
        Authority Liens Burdening Nutrasweet's Property dated April 28, 2016
        ("Claimant's Reply to Respondents' Supplemental Tax Response").

80.     On April 29, 2016, the Tribunal closed the record in this case pursuant to Article
        22(1) of the ICC Rules.

81.     The ICC Court at its session of 12 May 2016, and pursuant to Article 24(2) of the
        ICC Rules, extended the time limit for rendering a final award until 30 June 2016.

## III.   **FACTUAL BACKGROUND**

82.     In order to address the remaining issues in this case, we summarize the basic
        factual background.

15

83.    The disputes in this case arise from three agreements.  The first is an Asset
       Purchase Agreement dated April 30, 2003 ("APA") between NSC and Daesang.
       The second is a Processing Agreement dated May 13, 2003 ("Processing
       Agreement") between Daesang, NSC and NSC Korea.  The third is a Joint
       Defense and Confidentiality Agreement dated December 13, 2002 ("JDA")
       between NSC, Daesang, counsel for NSC and counsel for Daesang.  Claimant's
       claims in this arbitration are based on the APA and Processing Agreement.
       Respondents' defenses are based in part on the JDA.

84.    In 2002, Daesang and NSC discussed entering into a  transaction in which
       Daesang would sell certain assets to NSC.  The potential transaction was reflected
       in a letter of intent dated December 10, 2002. [Claimant's Exhibit A]

85.    Immediately thereafter, NSC and Daesang together with their respective counsel
       entered into the JDA.  The JDA refers to the letter of intent entered into by NSC
       and Daesang and to the fact that NSC and Daesang concluded that they had a
       common interest with respect to any review or challenge of the transaction
       contemplated by the letter of intent and any resulting governmental investigation,
       proceedings or litigation.  Section 10 of JDA provided that in certain
       circumstances NSC had the right to rescind the transaction that the parties were
       negotiating.  The JDA contained a New York choice-of-law clause.

86.    Thereafter, NSC and Daesang entered into the APA on April 30, 2003.  Pursuant
       to that agreement, NSC purchased certain of Daesang's assets in Korea for the
       manufacturing, marketing and selling of aspartame.  The purchase price was
       US$79,250,000, which was to be paid by NSC as follows:  US$5,000,000 at
       closing and the balance in installments over a five year period as specified in the
       APA §2(c)(i) and APA Exhibit 2(c)(i). The APA did not grant Daesang a security
       interest in any of the transferred assets during the period that the purchase price
       installments were to be made.  The APA contained various representations and
       warranties made by Daesang with respect to the assets being sold as well as
       remedies available to NSC in the event the representations and warranties were

16

breached.  The APA also contained an "Entire Agreement" provision, a New York choice-of-law clause and an arbitration clause.

87.    As provided in the APA, on the closing date of the transaction, May 13, 2003, Daesang, NSC and NSC Korea entered into the Processing Agreement.  Pursuant to that agreement, Daesang was to utilize the assets purchased by the Respondents pursuant to the APA and certain of Daesang's manufacturing facilities to manufacture aspartame for the Respondents in accordance with agreed sales specifications.  The Processing Agreement contained warranties with respect to the quality of the aspartame to be manufactured and remedies for any non-conforming goods.  The Processing Agreement also contained an "Entire Agreement" provision, a New York choice-of-law clause and an arbitration clause.

88.    NSC made the first anniversary purchase price payment under the APA of US$5,000,000 on or before June 12, 2004.  [J.B. Lim, 6/28/10 at ¶ 6]

89.    On May 12, 2005, Daesang granted, at NSC's request, a four-month extension of time for the Respondents to make the second anniversary payment under the APA.  [J.B. Lim, 6/28/10 at ¶ 8; DS 11]

90.    On October 25, 2005, NSC requested a further extension of time to make the second anniversary purchase price payment.  [J.B. Lim, 6/28/10 at ¶ 9; DS 12]  Daesang denied this extension request.  [J.B. Lim, 6/28/10 at ¶ 9]  On or before October 30, 2005, NSC made the second anniversary payment of US$5,000,000.  [*Id.*]

91.    On April 20, 2006, NSC requested an extension of time to make the third anniversary purchase payment.  [DS 13]  Daesang denied this extension request.  [DS 14]

ICC Case No. 15641/VRO/AGF/RD

92.     On June 12, 2006, NSC defaulted on the third anniversary installment payment of US$9.25 million.  [J.B. Lim, 6/28/10 at ¶ 11]

93.     On December 22, 2006, after the continuation of the default by the Respondents for six months, Daesang exercised the right to accelerate the remaining purchase price installment payments of US$55 million pursuant to Section 2(d)(i)(B)(1) of the APA.  [J.B. Lim, 6/28/10 at ¶ 13; DS 18]

94.     On March 15, 2007, Daesang notified NSC that pursuant to its rights under Section 2(d)(i)(B)(2) of the APA, Daesang would use the Korean manufacturing facility sold to NSC to produce aspartame for sale to Daesang's own customers. [J.B. Lim, 6/28/10 at ¶ 17; DS 30]

95.     On March 20, 2007, NSC (by its attorneys McDermott, Will & Emery) notified Daesang that NSC had exercised its right to rescind the transaction pursuant to Section 10 of the JDA based upon the lawsuit captioned *In re Aspartame Antitrust Litigation* (Master Docket No. 2:06-CV-1732), which was filed in the U.S. District Court for the Eastern District of Pennsylvania on June 20, 2006.  The defendants in the case included major aspartame manufacturers, including NSC and Daesang.  The Consolidated Amended Class Action Complaint alleged an illegal agreement to allocate the aspartame market and to fix prices.  [NS 2][6]

96.     On June 18, 2007, NSC, NSC Korea and IPCO advised Daesang that NSC had exercised its right to rescind the transaction and that NSC, NSC Korea and IPCO were selling, transferring, assigning and reconveying all assets subject to the APA back to Daesang and terminating all agreements, including the Processing Agreement.  [NS 4]

97.     On June 4, 2008, Daesang commenced this arbitration.

---

[6] On January 18, 2007, the district court in *In re Aspartame Antitrust Litigation* denied the defendants' motions to dismiss the Consolidated Amended Class Action Complaint. [NS 5]

18

## IV.    JURISDICTION AND GOVERNING LAW

98.    The Tribunal has jurisdiction to resolve the claims in this case based on the arbitration clauses in the APA and Processing Agreement as well as the parties' agreement in the Terms of Reference. [Partial Final Award ¶¶ 51-56; Terms of Reference ¶¶ 41-42, 44]

99.    Section 10(o) of the APA (between Daesang and NSC) includes an arbitration clause that states in full as follows:

> All disputes arising out of or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce (the "Rules") by three (3) arbitrators, of which one arbitrator shall be appointed by each of the Parties and the third arbitrator by the two (2) arbitrators designated by the Parties.  If the two (2) arbitrators designated by the Parties are unable to agree upon the third arbitrator within thirty (30) days after the first two (2) arbitrators are appointed, the third arbitrator shall be appointed pursuant to the Rules as soon as possible thereafter.  If the two (2) arbitrators designated by the Parties are unable to agree upon the third arbitrator within thirty (30) days after the first two (2) arbitrators are appointed, the third arbitrator shall be appointed pursuant to the Rules as soon as possible thereafter. Arbitration proceedings shall be held in New York, New York, and shall be conducted in the English language. Nothing in this §10(o) shall be construed to prevent either Party from seeking a preliminary injunction or other preliminary equitable relief in any court of competent jurisdiction before an arbitration proceeding is commenced or pending the final award or decision of the arbitrators. The resolution of disputes by the arbitrators shall be set forth in writing and shall be conclusive and binding upon and non-appealable by the Parties.

100.    Section 17.2 of the Processing Agreement (between Daesang, NSC and NSC Korea) includes an arbitration clause that states in full as follows:

> Except for disputes as to calculations required under this Agreement, any dispute or controversy arising out of or in connection with this Agreement shall be finally settled by

ICC Case No. 15641/VRO/AGF/RD

> arbitration in accordance with the arbitration rules of the
> International Chamber of Commerce then in effect.
> Arbitration proceedings shall be held in New York, New
> York and shall be conducted in the English language
> before a tribunal of three (3) arbitrators constituted in
> accordance with the aforesaid arbitration rules. Nothing in
> this paragraph shall be construed to prevent either party
> hereto from seeking preliminary injunction or other
> preliminary equitable relief in any court of competent
> jurisdiction before an arbitration proceeding is commenced
> or pending the final award or decision of the arbitrators.

101.   The JDA (between NSC, Daesang, counsel for NSC and counsel for Daesang),
upon which Respondents base one of their defenses, does not contain an
arbitration clause. Respondents contend that the APA and Processing Agreement
were rescinded and terminated in accordance with Section 10 of the JDA. In the
Terms of Reference, Respondents "consent[ed] to the jurisdiction of the Arbitral
Tribunal to determine all issues concerning Paragraph 10 of the JDA," and
Claimant did not object to this submission to jurisdiction. [Terms of Reference
¶¶ 41-42]

102.   Furthermore, in Paragraph 44 of the Terms of Reference, both Claimant and
Respondents "agree[d] that these arbitration proceedings shall be determined by a
single tribunal comprised of three members."[7]

103.   As a result, none of the parties raised any jurisdictional objection at the
evidentiary hearing, at the oral argument on October 20, 2011 or in any of the
post-hearing written submissions.

104.   Both the APA and the Processing Agreement are governed by New York law.

---

[7] In addition, on September 29, 2011, Respondents withdrew their original objections to
jurisdiction in Paragraph H of their Answer and Counterclaims.

ICC Case No. 15641/VRO/AGF/RD

105.   Section 10(h) of the APA states in its entirety:

> (h) <u>Governing Law</u>. THIS AGREEMENT SHALL BE
> GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH
> THE DOMESTIC LAWS OF THE STATE OF NEW YORK
> WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT
> OF LAW PROVISION OR RULE (WHETHER OF THE STATE
> OF NEW YORK OR ANY OTHER JURISDICTION) THAT
> WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY
> JURISDICTION OTHER THAN THE STATE OF NEW YORK.

106.   Section 17.1 of the Processing Agreement states in its entirety:

> 17.1   **Governing Law.**  This agreement shall be governed by and
> construed in accordance with the laws of the State of New
> York, excluding the U.N. Convention on Contracts for the
> International Sale of Goods, without giving effect to the
> conflict of laws principles of New York law.

## V.   <u>THE CLAIMS AND DEFENSES</u>

### A.   **Daesang's Claims**

107.   Daesang has asserted claims in this arbitration under both the APA and the
Processing Agreement.

108.   First, Daesang claims that NSC breached its purchase price payment obligations
under the APA.  Daesang seeks to recover the third anniversary installment
payment of US$9,250,000 and the remaining payments of US$55,000,000 that
were due under the APA, totaling US$64,250,000.  In addition Daesang seeks
interest as provided in the APA.  [Daesang Initial Claim Form 1; APA
§ 2(c)(i)(D), (E), (F), APA §2(d)(i)(A), (B); Terms of Reference, ¶29 (1) & (2)]

109.   Second, Daesang has asserted that NSC and NSC Korea breached certain terms of
the Processing Agreement.

> (a)   First, Daesang seeks to recover US$238,301, plus interest, for its
> manufacture and delivery of aspartame to NSC and NSC Korea that was

21

not paid.  [Daesang Initial Claim Form 2; Processing Agreement, Art. 5.3; Terms of Reference, ¶29 (6)]

(b)     Second, Daesang seeks to recover US$45,835, plus interest, for the failure of NSC and NSC Korea to reimburse Daesang for employment-related expenses for two employees in Korea.  [Daesang Initial Claim Form 3; Processing Agreement, Art. 2.2(a); DS 43; Terms of Reference, ¶29 (8)]

(c)     Third, Daesang seeks to recover US$647,030, plus interest, for the profit lost as a result of NSC and NSC Korea's failure to purchase the full amount of aspartame as required in the 2007 Binding Forecast.  [Daesang Initial Claim Form 4; Processing Agreement, Art. 5.1(a); Terms of Reference, ¶29 (11)]

(d)     Fourth, Daesang seeks to recover US$15,575,000, plus interest, for NSC and NSC Korea's breach of the obligation to provide Binding Forecasts for the contract years 2008 – 2012 and to meet the minimum aspartame purchase requirements for those years.  [Daesang Initial Claim Form 5; Processing Agreement, Art. 5.2; Terms of Reference, ¶29 (15)]

(e)     Alternatively, with respect to claims (c) and (d) above, Daesang seeks to recover the termination fee provided in Article 6.2 of the Processing Agreement totaling US$9,287,030, plus interest. [Daesang Initial Claim Form 6; Processing Agreement, Art. 6.2; Terms of Reference, ¶29 (16)]

## B.     Respondents' Defenses/Counterclaims

110.    Respondents do not dispute the calculation of the principal amounts of Daesang's claims.  [Transcript, Oct. 20, 2012 at 8-11; 19-20; 27-30; 34; 57]  Rather, they assert that the entire transaction should be rescinded and that rescission constitutes a total defense to Daesang's claims.  [Terms of Reference, ¶26; 30(1)]

111. First, Respondents claim that NSC rescinded the transaction pursuant to Section 10 of the JDA. As a result, no payments are due under either the APA or the Processing Agreement. [NS Summaries § I; Terms of Reference, ¶30 (1)]

112. Second, Respondents claim that they are entitled to equitable rescission because Daesang fraudulently induced NSC to enter into the transaction by misrepresenting in Section 3(f) of the APA that it had complied with all applicable law in the operation of the aspartame business, when in fact it had conspired to violate the antitrust laws. [NS Summaries § II; Terms of Reference, ¶30 (2) (viii); Respondents' Additional Counterclaim and Defense]

113. Third, Respondents claim that they are entitled to equitable rescission because Daesang fraudulently induced NSC to enter into the transaction by misrepresenting certain facts with respect to the aspartame that was to be manufactured for NSC. [NS Summaries § III; Terms of Reference, ¶30(2)(a) & (b)]

114. Fourth, in connection with the claim of rescission, Respondents assert that Daesang "breached every significant obligation it undertook pursuant to the APA and the Processing Agreement." [NS Summaries § IV; Terms of Reference, ¶30 (2)(c) & (d); NS 230-Updated]

115. Finally, Respondents assert that each of the foregoing defenses/counterclaims seeking rescission entitles the Respondents to recover rescissionary damages from Daesang. [Terms of Reference, ¶26; NS 230-Updated]

116. As set forth in the Partial Award, the Tribunal determined that each of the Respondent's defenses/counterclaims is without merit and must be dismissed. [Partial Award ¶ 126]

ICC Case No. 15641/VRO/AGF/RD

## VI.    ANALYSIS OF APPROPRIATE REMEDY

### A.    The Parties' Positions With Respect to the Appropriate Remedy

#### 1.    Claimant's Position

117.    Daesang seeks recovery of the amounts claimed under the APA and Processing
Agreement and set forth in paragraphs 108 and 109 above.  In support of its
damages claim, Daesang argues that (i) under New York law, the parties'
agreement, particularly where the parties are sophisticated, must be enforced in
accordance with its terms [Claimant's Remedy Statement at 5-6]; (ii) the parties
fashioned the specific monetary relief to be awarded under both the APA and the
Processing Agreement [Claimant's Remedy Statement at 6-13]; and (iii) the relief
provided for in the APA and the Processing Agreement is not subject to any offset
or reduction [Claimant's Remedy Statement at 14].[8]

#### 2.    Respondents' Position

118.    Respondents offer two arguments in response.  With respect to the remedy in this
case, they assert that Daesang should not recover any damages (and that
Respondents are in fact entitled to a recovery) because the value of the aspartame
assets in the possession of Daesang exceeded the amounts unpaid under the APA
in 2006 and the termination payment provided for under the Processing
Agreement.  [Respondents' Remedy Statement at 1]  Second, Respondents claim
that they are entitled to recover damages caused by Claimant's breach of contract,
"which the Tribunal mistakenly failed to address in its Partial Award."
[Respondents' Remedy Statement at 1]

119.    In addition, Respondents assert that the Tribunal made three errors in rendering
the Partial Award.  The first alleged error was the Tribunal's "unsupported"

---

[8] Although Respondents were given the opportunity to respond to Claimant's Remedy
Statement, they chose not to do so.  Respondents stated that because Respondents'
"Initial submission answers Daesang's initial submission, no further response is
required."  [Respondents' Application at 2]

interpretation of the words "by any customer" in Section 10 of the JDA. [Respondents' Remedy Statement at 2]  The second alleged error was the Tribunal's rejection of Respondents' fraudulent inducement defense based on the representations in the APA. [Respondents' Remedy Statement at 2]  Finally, Respondents urge that the Tribunal incorrectly concluded that Respondents had not asserted a breach of contract claim for damages independent of their rescission claims. [Respondents' Remedy Statement at 3][9]

**B.    The Tribunal's Analysis of Respondents' Arguments**

**1.    Respondents' Arguments Relating to Alleged Errors in the Partial Award**

120.    The Tribunal will address both sets of arguments made by Respondents – (i) the alleged errors in the Partial Award and (ii) the appropriate remedy in this case.

121.    Initially, Respondents assert that the Tribunal improperly rejected their defenses and counterclaims in the Partial Award "based on two threshold errors of law and a clear mistake concerning NutraSweet's counterclaim for damages resulting from Daesang's breaches of contract." [Respondents' Remedy Statement at 2]  Neither the ICC Rules nor the procedures adopted by the Tribunal in this case provide for reargument or reconsideration of the issues previously resolved in the Partial Award.  Nevertheless, the Tribunal has considered each of the asserted "errors of law" and "clear mistake" identified by Respondents.  Upon careful review of each of these arguments and the record in this case, the Tribunal rejects each of Respondents' arguments as to legal error and mistake and reaffirms the decisions that it made in the Partial Award.  Each of Respondents' arguments and the Tribunal's response is addressed below.

122.    Respondents' argue that the Tribunal committed a legal error in failing to conclude that the filing of *In re Aspartame Antitrust Litigation* constituted a Rescission Event under the JDA for three reasons.

---

[9] Claimant addressed each of these arguments in Claimant's Remedy Rebuttal Statement.

123.    First, Respondents assert that the Tribunal's interpretation of the words of the JDA "brought . . . by" fails to take into account the dictionary definition of "by," which includes "on behalf of." [Respondents' Remedy Statement at 2, 9] However, this argument ignores the words chosen by the parties in their agreement.  Section 10 of the JDA defines a Rescission Event to mean a proceeding "brought by a governmental body or agency or by any customer with annual worldwide aspartame requirements in excess of 1,000,000 pounds." [JDA ¶ 10] The parties used the word "by" with respect to both a governmental entity and a very large customer.  The plain meaning of "brought by" in the context of the JDA as a whole is that the person initiating the proceeding must be one of the entities specifically identified in Section 10.  In contrast, when the parties intended that an action could be taken by a representative rather than by a particular person, the parties expressly used the words "on behalf of." [*See APA*, Sec. 2(c)(v), 3(z) & (aa), 4(f) & (g)]  In such circumstances, we must apply the words specifically chosen by the parties.  There is no ambiguity in the parties' words or any need to resort to a dictionary in such circumstances.

124.    We reiterate our conclusion that the meaning of Section 10 of the JDA is clear from the words chosen by the parties.  Respondents failed to establish a Rescission Event under Section 10 of the JDA because the antitrust lawsuit filed was not brought by the type of plaintiff specifically required by the parties. [Partial Award ¶¶ 90-97]

125.    Second, Respondents argue that the Tribunal's decision is "contrary to the Supreme Court's holding" in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 550-51 (1974). [Respondents' Remedy Statement at 2-10]  Of course, the issue in this arbitration is the meaning of Section 10 of the JDA.  Since the meaning of that contractual provision was not the subject of the *American Pipe* decision, the Tribunal's award could not be "contrary to the Supreme Court's holding."  The Tribunal reiterates that it has interpreted the parties' contract and

has not found the *American Pipe* decision to be helpful in applying the words chosen by the parties. [Partial Award ¶ 95]

126. Third, Respondents argue that the Tribunal's interpretation of Section 10 of the JDA ignores an admission made at the hearing by one of Daesang's witnesses. [Respondents' Remedy Statement at 2] The relevant transcript portion is as follows:

> "Q.   So if I understand your testimony
> right, Mr. Lim, you are saying that Daesang
> understood that class actions were included
> as triggering events.
> A.   That's right. That's right.
> Under the condition that it meets the
> condition of the qualified event. Qualified
> triggering event."

[Transcript, July 11, 2011 at 82] It is obvious from this testimony that the witness recognized that a class action could be a Triggering Event "if it meets the condition of the qualified event. Qualified triggering event." There is no "admission" in this testimony that helps Respondents or changes the Tribunal's interpretation of the parties' agreement.

127. The parties agreed to a specific triggering event requiring that an action be "brought by" a specific kind of plaintiff. That did not happen here. Therefore, the Tribunal reiterates that the requirements for rescission based on Section 10 of the JDA were not satisfied. [Partial Award ¶ 97]

128. Respondents also argue that the Tribunal made a "clear error of law" in concluding that Respondents' claim of fraud in the inducement did not provide a basis for rescission under New York law. [Respondents' Remedy Statement at 2-11] They assert the same arguments previously made and previously rejected. Respondents' reliance on *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007), is misplaced. That case has no application to the facts

ICC Case No. 15641/VRO/AGF/RD

here for the reasons previously explained by the Tribunal. [Partial Award, ¶ 101-112][10]

129.     Finally, Respondents argue that the Tribunal "incorrectly concluded" that Respondents failed to assert any breaches of the JDA and Processing Agreement as a basis of damages independently of its claim for rescission. [Respondents' Remedy Statement at 3, 14] Citing the Terms of Reference, Respondents argue that they "always asserted stand-alone counterclaims of damages and set-offs based on Daesang's breaches of the APA and the Processing Agreement." [Respondents' Remedy Statement at 14] Respondents claim that it was "clear error for the Tribunal to conclude that NutraSweet did not seek damages for Daesang's breaches of contract independent of the claims for rescission." [Respondents' Remedy Statement at 15] Respondents reiterated in their final submission that the Tribunal "errantly and inexplicably disregarded these claims." [Respondents' Calculation Response at 5-6]

130.     Respondents' argument ignores the record in this case. After the evidentiary hearing and after the parties had submitted written summaries of their respective claims and defenses with supporting references to the record, the Tribunal heard oral argument from the parties.   At oral argument, Respondents' counsel addressed Sections III and IV of Respondents' claim summaries that covered various alleged misrepresentations and breaches of contract. The Tribunal inquired specifically as to the precise relief being sought by Respondents in this case:

> "THE TRIBUNAL:  What is the contract provisions that this claim is based on and what is the basis for the rescission remedy?

---

[10] In fact, the federal district court in New York has recognized that *Merrill Lynch* is "inapplicable to situations where, as here, the fraud claim is premised *entirely* upon the same warranty that also underlies the contract claim." *Kriegel v. Donelli*, 2014 U.S. Dist. LEXIS 90086 at *47 n. 15 (S.D.N.Y. June 30, 2014).

ICC Case No. 15641/VRO/AGF/RD

> Because as I understand it this claim, like the one we have just talked about, the remedy that is being sought is rescission.

> COUNSEL FOR RESPONDENTS: **The remedy that is being sought under section 3 is equitable rescission,** section 3 of NutraSweet's post hearing summaries.

> **For some of the same claims NutraSweet also seeks damages under section 4 in the context of its rescission claim NutraSweet is also seeking, for lack of a better term, rescissionary damages or out-of-pocket damages,** things which NutraSweet expanded that improved the plant in Gusan . . .

> **In the rescission context NutraSweet is asking for a return of the out-of-pocket expenditures to put it back in the place that the parties were had the contract never been made."**

[Transcript, Oct. 20, 2011 at 316-20 (emphasis added)]

131.   Thereafter, there were further questions from the Tribunal to Respondents' counsel as to the relief being sought by Respondents:

> "THE TRIBUNAL:  But when I went back to reread what is written here irrespective of whether you tied the two together with NS 230 or not you are looking for damages on all of these claims.

> COUNSEL FOR RESPONDENTS: **Rescission including the purchase price payments returned and then the rescissionary damages meaning the money we spent improving Daesang's plant and the other items.**

> **Those are not breach of contract damages.**

29

ICC Case No. 15641/VRO/AGF/RD

*     *     *

THE TRIBUNAL:  I am not asking breach o[f] contract or not.  I am just talking about what you are seeking here.

*     *     *

COUNSEL FOR RESPONDENTS: **Rescission including money. Not rescission plus money.**

*     *     *

COUNSEL FOR CLAIMANT:  **The point is that he is trying to make he is not asking for money damages for the specific act of violating 3Q and 3V [of the APA].**

**Is that a fair statement?**

COUNSEL FOR RESPONDENTS: **That is a fair statement.**

**The money that NutraSweet is seeking based on that is based on the rescission to put the parties back in the position they were status quo ante.**

But that is true.  **There are no contract damages that NutraSweet is seeking** for failure to disclose the Coke complaint before the transaction.

THE TRIBUNAL:  Okay.  That helps.”

[Transcript, Oct. 20, 2011 at 361-63 (emphasis added)]

132.    The statements by Respondents' counsel are consistent with Respondents' damages exhibit.  Respondents specifically set out the damages that they were seeking in their "Summary of NutraSweet's Counterclaim Damages Based on JDA and Equitable Rescission Alternatives." [NS230-Updated]  This document lists two categories of damages that were sought as part of Respondents' rescission counterclaims – "Purchase Price Payment" and "Breach of Contract/Fraudulent Misrepresentations."  All the damages that Respondents sought in this arbitration fall into one of two legal theories – "JDA Rescission" or

30

"Equitable Rescission." Respondents did not seek damages under any other theory and specifically did not seek any damages outside their claims of rescission. Importantly, there is no claim for damages based on an alleged breach of contract.

133. To the extent Respondents sought to assert a damages claim for breach of contract at an earlier stage in this arbitration, by the time of oral argument following the evidentiary hearing Respondents chose to pursue a strategy of seeking only rescission and only damages relating to rescission. [See paragraphs 129-132, above.] This meant waiving any independent breach of contract claim. Having submitted their case exclusively on a theory of rescission to the Tribunal in response to specific questions from the Tribunal as to the precise remedy being sought and based on an exhibit that only provided for rescissionary damages [NS230-Updated]. Respondents cannot now, after the fact and years of arbitration, attempt to change their theory of the case when that theory turns out to have been unsuccessful. Therefore, the Tribunal reiterates its conclusion that Respondents "have not asserted any alleged breaches of the APA and the Processing Agreement as a claim independent of its claim for rescission of these agreements." [Partial Award ¶ 114] As a result, Respondents cannot now seek an award of damages based on an alleged breach of contract.[11]

### 2. Respondents' Position Regarding the Appropriate Remedy

134. Respondents assert that "because the value of the aspartame assets at the time of the breach exceeded the unpaid amounts under the APA, Daesang suffered no damages and is entitled to no additional recovery." [Respondents' Remedy Statement at 3] Relying on the New York Court of Appeals decision in *White v. Farrell*, 20 N.Y.S. 3d 487, 494 (2013), Respondents argue that under New York law, the measure of damages "is the difference between the unpaid payments

---

[11] In light of Respondents' express waiver of any independent contract claims [Terms of Reference, ¶ 30(2)(d)], Respondents cannot now ask the Tribunal to consider any alleged breach of contract claims. [Respondents' Remedy Statement at 6-7]

under the APA and the market value of the assets." [Respondents' Remedy
Statement at 4] Respondents further argue that when the value of the assets sold
by Daesang is compared to the amounts claimed by Daesang, "Daesang received
a benefit" that exceeds the amounts due and owing to it. [Respondents' Remedy
Statement at 6][12]

135.   This argument must be rejected for two reasons. First, the decision in *White v.
       Farrell* is inapplicable to this case because the parties agreed in the APA to a
       specific remedy in the event of a breach. That remedy is set out in Section 2(d) of
       the APA.[13] The New York Court of Appeals has emphasized that "parties to a
       civil dispute are free to chart their own course and, unless public policy is
       affronted, they may fashion . . . how damages are to be computed without
       interference by the courts." *J. D'Addarro & Co., Inc. v. Embassy Indus., Inc.*, 20
       N.Y.3d 113, 119 (2012) quoting *Town of Orangetown v. Magee*, 88 N.Y.2d 41,
       54 (1996). Here, the parties have chartered their own course, and this Tribunal is
       bound by their choice "unless public policy is affronted."

136.   Second, Respondents' argument assumes that the "Purchased Assets" that were
       sold pursuant to the APA are now the property of Claimant and that Claimant
       must account for their value. That is not the case. The APA provided for the sale,
       transfer and conveyance of the Purchased Assets by Claimant to NSC. [APA § 2]
       Therefore, under the parties' agreement, the Purchased Assets became the
       property of NSC (and its subsidiaries), not Claimants. Although on June 18,
       2007, Respondents attempted to transfer and convey all the assets purchased from
       Claimant based on Respondents' purported rescission of the transaction [NS4],

---

[12] Respondents also argue that they were entitled to terminate the Processing Agreement
under Article 6.2(a) for "convenience" as a result of which Daesang was entitled to a
termination payment of $8,640,000 plus the profit "forgone" in 2007. [Respondents'
Remedy Statement at 5] This argument is addressed by the Tribunal in paragraphs
179-181, below.

[13] Section 2(d) of the APA is set out in relevant part in Appendix B, attached hereto.

that transfer is of no legal effect because there was no basis to rescind the transaction. Therefore, NSC (and its subsidiaries) remain the owners of the Purchased Assets, and Claimant cannot account for property owned by NSC (and its subsidiaries).

137.   Nor can Respondents claim entitlement to damages based on an alleged breach of contract claim. [Respondents' Remedy Statement at 6-7] As discussed above, Respondents pursued a strategy in this arbitration of only seeking damages in connection with their theory that the parties' agreement had been rescinded. Having failed to establish a basis for rescission and having waived any independent contractual basis for seeking damages, Respondents have no damages claim. [Partial Award ¶ 114; paras 129-133, above] Accordingly, Respondents' arguments for recovering damages notwithstanding their breach of the APA and the Processing Agreement are rejected.

## C.   The Appropriate Remedy In This Case

### 1.   The APA

138.   NSC defaulted with respect to the third anniversary installment payment of US$ 9.25 million on June 12, 2006. [Partial Award ¶ 65; para. 92, above] Claimant exercised its right to accelerate the remaining purchase price installment payments of US$ 55 million pursuant to Section 2(d)(i)(B)(1) of the APA. [Partial Award ¶ 66; DS 18] Respondents do not dispute the calculation of the principal amount of Claimant's claim. [Partial Award ¶ 74]

139.   Claimant elected the remedy available under Section 2(d)(i)(B)(1) of the APA to assert a claim for the purchase price that remained due and owing plus interest. This amounts to US$ 64,250,000 plus interest as provided in Section 2(d)(i)(A) and 2(d)(i)(B)(1) of the APA. [Appendix B] There is no dispute with respect to these amounts. [Partial Award ¶ 74]

140.   However, Claimant also invoked Section 2(d)(i)(B)(2) of the APA.  Pursuant to that provision, for so long as NSC was in default or was not paying any amount under Section 2(d)(i)(B)(1), Claimant "shall be entitled to use the Purchased Assets, with no compensation to the Buyer [NSC], in order to produce aspartame products for sale to the [Claimant's] customers." [APA, § 2(d)(i)(B)(2); Appendix B]  Claimant exercised its rights under this section by letter dated March 15, 2007.  [Partial Award ¶ 67; DS 30]

141.   The record establishes that from March 15, 2007, Claimant may have used the Purchased Assets to manufacture aspartame for its own account pursuant to Section 2(d)(i)(B)(2) of the APA.  However, there is no evidence in the record as to what benefit, if any, has been obtained by Claimant during this nine-year time period.

142.   New York law recognizes that parties may structure how damages for breach of contract will be determined "'unless public policy is affronted.'" *J. D'Addarro & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 119 (2012).  It is also settled that "[c]ontract damages are ordinarily intended to give the injured party the benefit of the bargain by awarding a sum of money that will, to the extent possible, put that party in as good a position as it would have been in had the contract been performed." *Goodstein Construction Corp. v. City of New York*, 80 N.Y.2d 366, 373 (1992).  In contrast to compensatory damages, "it has always been held that punitive damages are not available for mere breach of contract." *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358 (1976).

143.   Claimant chose a remedy in Section 2(d)(i)(B)(1) of the APA – recovery of the purchase price installments – that is clearly intended to give the aggrieved party (the Claimant here) the benefit of the bargain (the purchase price).  However, Claimant also invoked Section 2(d)(i)(B)(2) to use and benefit from the Buyer's assets in addition to recovering the purchase price.  Claimant had the right to do so because Section 2(d)(ii) of the APA provides that the remedies in Section 2(d)(i)(B) are "cumulative and not alternative to each other."

34

144.    However, these remedies are different and serve different purposes.  While
Section 2(d)(i)(B)(1) provides for recovery of the purchase price (benefit of the
bargain), Section 2(d)(i)(B)(2) allows Claimant to use Respondents' property and
derive benefit from its use.  Claimant recognized the difference between the
remedies provided in Section 2(d)(i)(B) of the APA.  It noted that due to the
presence of Section 2(d)(i)(B)(2) in the APA, "Daesang was *required* to make any
aspartame sales it could in order *to mitigate the damages* it has suffered due to
NutraSweet's non-payment default and other breaches."  [Claimant's Pre-Hearing
Reply Brief at 86, emphasis in original]

145.    However, there is nothing in the record that would enable the Tribunal to
determine whether Claimant benefited from Section 2(d)(i)(B)(2).  To the extent
that Claimant derived any benefit from the use of the Purchased Assets during the
past nine years, such benefit would need to be considered and taken into account
by the Tribunal in rendering its award.

### (a)    The Parties' Submissions Regarding Claimant's Use of Respondents' Property

146.    Although Respondents did not raise this issue during the arbitration, the Tribunal
undertook in Procedural Order No. 14 to determine whether Claimant derived any
benefit from the use of the Purchased Assets in order to ensure that the Final
Award is consistent with New York law and public policy.  The Tribunal directed
that the parties make supplemental submissions regarding "the benefits obtained
by Claimant under Section 2(d)(i)(B)(2) of the APA and the issue of mitigation of
damages."  [Procedural Order No. 14]

147.    In response to the Tribunal's request for information in Procedural Order No. 14
regarding Claimant's use of the Purchased Assets and the issue of "mitigation,"
Claimant made several arguments.  First, Claimant argued that under New York
law, the issue of mitigation "is irrelevant and must not be considered in assessing
damages" where the parties have agreed upon the damages that will result from a
breach.  [Claimant's Mitigation Mem. at 2-6]  Second, Claimant argued that

ICC Case No. 15641/VRO/AGF/RD

Respondents removed the issue of mitigation from the case when they "voluntarily withdrew Defense F, which had alleged a failure by Daesang to minimize or mitigate damages." [Claimant's Mitigation Mem. at 7]  Third, Claimant asserted that the parties agreed that Claimant could use the Purchased Assets "at no compensation," which Claimant asserted meant without "any set-off against or other reduction of any damages." [Claimant's Mitigation Mem. at 7] Finally, Claimant argued that it made reasonable efforts to mitigate damages by selling aspartame pursuant to Section 2(d)(i)(B)(2) of the APA.  [Claimant's Mitigation Mem. At 8]

148.   With respect to its sales of aspartame, Claimant submitted the Samil Benefit Report prepared by Samil PwC that calculated the benefit obtained by Claimant from the sale of aspartame pursuant to Section 2(d)(i)(B)(2) of the APA based on information provided by Claimant and derived from its books and records.  The Samil Benefit Report stated that for the period 2007 – August 2015, Claimant obtained a total "Modified Benefit"[14] of US$ 142,000.  This calculation is based on the following information that appears in Table 1 of the Samil Benefit Report (p. 7):

---

[14] Defined to mean "the gross profit less direct SG&A of Daesang Korea only," not including indirect SG&A of Daesang Korea or direct and indirect SG&A of other Daesang subsidiaries.  [Claimant's Mitigation Mem. at 12 n.4]  Claimant asserts that if these expenses were allocated to aspartame sales, there would be no benefit realized from the use of the Purchased Assets.  [Claimant's Mitigation Mem. at 12-13]

| KRW in million, USD in thousand | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015.08 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Adjusted Aspartame Sales | 1,760 | 4,881 | 12,154 | 12,895 | 15,896 | 12,186 | 10,169 | 3,166 | 2,557 | 75,665 |
| Adjusted Aspartame COS | 1,240 | 6,177 | 11,122 | 13,984 | 14,859 | 11,586 | 9,532 | 2,001 | 2,228 | 72,728 |
| Gross profit | 520 | -1,296 | 1,032 | -1,089 | 1,037 | 600 | 638 | 1,165 | 329 | 2,938 |
| Direct SG&A of Daesang | 82 | 249 | 517 | 584 | 546 | 396 | 315 | 115 | 111 | 2,916 |
| Benefit | 437 | -1,545 | 515 | -1,673 | 491 | 204 | 322 | 1,050 | 219 | 21 |
| KRW/USD exchange rate | 929.18 | 1,104.76 | 1,275.82 | 1,156.05 | 1,108.02 | 1,126.25 | 1,094.70 | 1,053.21 | 1,115.56 | |
| Modified Benefit (USD in thousand) | 471 | -1,398 | 404 | -1,447 | 443 | 181 | 294 | 997 | 196 | 142 |

(Source: Sales Data, sub ledgers, inventory in-out list, ERP as provided by Claimant)

149.    In response, Respondents made the following arguments. First, Respondents argued that although the "parties characterized then 2003 transaction as an asset purchase, in substance it was a co-packing relationship" and that until the purchase price was fully paid, "the assets remained Daesang's property or collateral." [Respondents' Benefits Submission at 3]  As a result, "Daesang's measure of damages is the difference between the unpaid amounts under the APA and the market value of the assets at the time of the alleged breach in 2006." [Respondents' Benefits Submission at 5]  Second, Respondents challenged the benefits that Claimants state they received from the sale of aspartame based on Claimant's failure to deduct the actual marginal costs of production instead of an allocated percentage of its plant and company-wide costs of its aspartame business. [Respondents' Benefits Submission at 7]  Respondents estimate that Claimant's actual benefit from the aspartame sales were at least equal to US$ 14.6 million based on Claimant's allocation of costs to produce aspartame that are not incremental costs of manufacturing aspartame and allocating fixed costs and profits related to the manufacture of raw materials to the costs of manufacturing

aspartame. [Respondents' Benefits Submission at 8][15]  Third, Respondents argue that Claimant failed to account for the benefits of future aspartame revenue, which Respondents argue would continue for the next 15 years. [Respondents' Benefits Submission at 11]

150.    Claimant responded to each of Respondents' arguments as follows:  First, Claimant argued that Respondents' belated attempt to recharacterize the transaction now as a "co-packing arrangement," as opposed to a sale of assets, is "pure fiction." [Claimant's Benefits Reply at 1]  Second, Cláimant insisted that the existence of a liquidated damages provision in both the APA and Processing Agreement "precludes an inquiry into the issue of mitigation of damages." [Claimants' Benefits Reply at 4]  Third, Claimant argued that its methodology for determining the benefits received from the use of the Purchased Assets was proper and that Claimant obtained "no benefit from use of the Purchased Assets." [Claimant's Benefits Reply at 6-7]

151.    In accordance with Procedural Order No. 14, Claimant submitted its Final Calculation of Damages on November 27, 2015.  Claimant reiterated that it is entitled to damages (1) for breach of the APA in the principal amount of US$ 64,250,000 plus interest and damages for breach of the Processing Agreement plus interest, without any reduction.  [Claimant's Final Calculation at 1-4]  Claimant also addressed each of the "benefits" claimed by Respondents in Claimant's sale of aspartame.  [Claimant's Final Calculation at 5-10]  Specifically, Claimant asserted that Respondents' incremental costs argument was based on principles of managerial accounting that "is an inappropriate and patently unfair accounting method for use" in this context.  [Claimant's Final Calculation at 5]  Claimant also responded to Respondents' assertion that

---

[15] Respondents also argue that as a result of Claimant's refusal to produce documents requested regarding Claimant's marginal costs to produce aspartame, the Tribunal should draw an adverse inference against Claimant. [Respondents' Benefits Submission at 7-8]  The Tribunal addresses Respondents' arguments with respect to document requests in paragraph 172, below.

Claimant failed to account for future benefits from use of the Purchased Assets. [Respondents' Benefits Submission at 11]  Claimant stated that this hypothetical future benefit was speculative and had not been properly calculated.  In addition, Claimant represented that it "had no intention to continue manufacturing aspartame for the next 15 years" and that it intends to ask Respondents to remove the Purchased Assets from its plant "[a]s soon as the arbitration is completed." [Claimant's Final Calculation at 6]

152.    In response, Respondents repeated many of their prior arguments.  In addition, Respondents addressed Claimant's specific damages claims under the Processing Agreement and reiterated that all revenue received by Claimant "over its incremental cost to manufacture aspartame was a benefit to Daesang" and must be accounted for.  [Respondents' Calculation Response at 1-2, 4]  Finally, Respondents asserted that Claimant could no longer ask Respondents to remove the Purchased Assets because Claimant had elected "to keep the assets and use them."  [Respondents' Calculation Response at 3]

153.    Respondents made a further submission in which they assert that "to the extent that Daesang contended (without evidence) that its control over and use of the Korean aspartame assets was impaired as a result of the asserted tax lien, it has been removed."  [Respondents' Supplemental Tax Response at 2]  In reply, Claimant notes that Respondents' submission "only confirms and further augments the substantial evidence Daesang previously submitted establishing that NutraSweet has remained the owner of (and always claimed ownership to) the Purchased Assets at all times."  [Claimant's Reply to Respondents' Supplemental Tax Response at 2]

(b)    **The Tribunal's Analysis of the Parties' Positions**

154.    The parties have largely repeated their prior arguments with respect to the appropriate remedy in this case in addressing the Claimant's use of the Purchased Assets.  The Tribunal rejects Claimant's assertion that the issue of mitigation is

irrelevant because the parties agreed to a contractual remedy in the event of a breach. The Tribunal has recognized and given full scope to the purchase price remedy agreed to by the parties in Section 2(d)(i)(B)(1) of the APA. However, the Tribunal cannot ignore the fact that in addition to seeking the full purchase price, Claimant used Respondents' property since 2007 pursuant to Section 2(d)(i)(B)(2) of the APA. Having invoked this provision, and used Respondents' property, Claimant must now account for whatever benefit was obtained so that the remedy awarded by the Tribunal does not exceed full compensation. Receiving both the purchase price and any benefit from the use of Respondents' property would exceed full compensation and constitute a penalty, which is contrary to New York public policy. [See para. 142, above]

155.    The Tribunal also rejects Claimant's argument that the Tribunal should not consider any benefit received by Claimant because Respondents withdrew their mitigation defense. On September 30, 2011, Respondents withdrew three of the defenses in their Answer, one of which (Defense F) stated: "Daesang's claims are barred by Daesang's failure to minimize or mitigate its damages." [See note 3, above] This constitutes a waiver of Respondents' defense based on Claimant's "failure to minimize or mitigate its damages," and the Tribunal will give it full effect. However, the issue here is not simply whether Respondents have waived a defense.

156.    The Tribunal views the question of whether Claimant obtained any benefit from the use of the Purchased Assets as part of its obligation to ensure that this award is consistent with New York law. If Claimant received any benefit under Section 2(d)(i)(B)(2) of the APA that is not accounted for by the Tribunal in determining damages, Claimant could receive more than the total purchase price under the contract. Allowing Claimant to obtain more than the benefit of the bargain could have the effect of imposing a penalty on Respondents, which would not be consistent with New York law. *See Garrity,* 40 N.Y.2d at 358.

157.　The Tribunal also rejects Claimant's argument that any benefit obtained by Claimant must not be considered because Section 2(d)(i)(B)(2) allows Claimant to use the Purchased Assets "with no compensation to the Buyer." The Tribunal does not view accounting for any benefit received from the use of the Purchased Assets to be inconsistent with the contractual language that "no compensation" is to be paid to Respondents. The right to use someone else's property is different from the right to benefit from the use of such property. It is only the latter that is at issue here.

158.　With respect to Respondents' arguments, the Tribunal rejects Respondents' attempt to recharacterize the parties' transaction as something other than an asset sale. [Respondents' Benefits Submission at 5; Claimant's Mitigation Reply at 1.] This new argument is refuted by the express language of the APA. [APA § 2] Similarly, Respondents' argument that Claimant's damages must be reduced by the value of the Purchased Assets when those assets were acquired by Respondents and remain Respondents' property has already been considered and rejected (see paras. 134-136, above). Nor does Respondents' most recent submission regarding the tax situation with respect to the Purchased Assets in Korea make a difference. It only confirms, as Claimant has argued, that the Purchased Assets remain the property of Respondents (as indicated by the unofficial translation of the tax document submitted by Respondents). [Respondents' Supplemental Tax Response, Exhibit A]

159.　That leaves for consideration the following questions – whether there is any benefit that Claimant received from use of the Purchased Assets and, if so, how it should be accounted for in calculating damages.

**(c)　Claimant's Use of the Purchased Assets**

160.　The Tribunal concludes that Claimant did receive a benefit from using the Purchased Assets that amounts to US $142,000 as of August 2015 and that this

benefit (adjusted to reflect the passage of time until the issuance of this award) must be deducted from the damages recoverable by Claimant under the APA.

161.   In reaching this conclusion, the Tribunal observes that Claimant used the Purchased Assets for over eight years and continued to sell aspartame during each of these years. Clearly, Claimant perceived that doing so was beneficial to its business. To suggest otherwise is inconsistent with Claimant's own conduct.

162.   The Tribunal accepts for purposes of this inquiry the calculation made by Samil PwC in Table 1 of the Samil Benefit Report (para. 148, above). That calculation begins with Claimant's adjusted aspartame sales over more than eight years (totaling 75,665 million KRW). From this amount Samil PwC deducted two amounts: (1) adjusted aspartame cost of sales (COS) and (ii) Daesang's direct SG&A (selling, general and administrative expenses). Samil PwC did not include any direct or indirect SG&A of the Daesang subsidiaries that sold aspartame manufactured by Claimant using the Purchased Assets. [See para. 148 and n.13, above] This resulted in the adjusted benefit of US$ 142,000 as of August 2015.

163.   Respondents have argued these two deductions from Claimant's adjusted aspartame sales understate the benefit derived by Claimant. First, Respondents argue that Claimant should have deducted its actual marginal costs of production from the aspartame revenues, rather than an allocated percentage of its plant and company-wide costs of its aspartame business. Because Claimant did not produce its actual marginal costs to produce aspartame, Respondents used information received from Daesang in 2006 in order to estimate the amount of plant and company-wide costs that was allegedly improperly allocated to the aspartame business (approximately US$ 3.9 million). [Respondents' Benefits Submission at 7-9]

164.   Second, Respondents argue that Claimant overstated its raw material costs with respect to two of the components of aspartame, L-Phenylalanine ("L-Phe") and

42

glucose, thereby understating the benefit it received by approximately US$ 10.6 million.  [Respondents' Benefits Submission at 9-10]

165.   Finally, Respondents argue that the future benefit of aspartame sales to Claimant for the next 15 years is approximately US$ 27 million.  [Respondents' Benefits Submission at 10-11.]

166.   The Tribunal accepts for purposes of this inquiry the benefit analysis in the Samil Benefit Report and rejects Respondents' arguments for the following reasons.

167.   First, as required by the Tribunal in Procedural Order No. 14, Claimant provided a report prepared by its certified public accounting firm that addresses the benefits obtained by Claimant form the use of the Purchased Assets.  Although Respondents have challenged the Samil PwC Report, Respondents have not offered any contrary opinion from a certified public accounting firm.

168.   Second, the Samil PwC Report describes the procedures used to make the calculation of benefits received by Claimant from the use of the Purchased Assets, including certain tests conducted on a sample basis as well as comparing the data used to Claimant's audited financial statements.  This confirms that a standard methodology was used in preparing the report.

169.   Third, Samil PwC has responded to Respondents' criticism that Claimant should have used actual marginal costs of production rather than an allocated percentage of costs.  Samil PwC stated that the "allocation of costs is a useful, necessary and routinely used method in calculating a benefit."  [Yang Statement ¶ 9]  Samil PwC also stated that non-cash expenditures or costs, such as depreciation, "should also be used in calculating a benefit" consistent with basic accounting concepts and principles.  [Yang Statement ¶ 10]  Although Respondents disagree with the methodology used by Samil PwC, there is nothing to suggest that the method was not a proper methodology or was not reasonable.

170.   Fourth, with respect to Respondents' challenge to Claimant's COS figures, Samil PwC reviewed underlying data provided by Claimant and concluded that "it is clear that Daesang's costs to manufacture L-Phenylalanine ("LPA"), without any profit element or mark-up, was the cost figure of LPA used in determining COS for aspartame." [Yang Statement ¶ 11]  Furthermore, Claimant has confirmed with respect to the cost of LPA and glucose, that the market price of LPA and glucose was actually higher than the Daesang costs to manufacture these products. [2d Yang Statement ¶¶ 10-11]  These responses negate Respondents' assertion that Claimant has overstated its material costs.

171.   Fifth, Samil PwC confirmed that Claimant calculated selling, general and administrative costs ("SG&A") on a monthly basis for each of its product lines, including aspartame, and that these numbers are reflected in the company's audited financial statements.  [Yang Statement ¶ 14]  Therefore, it appears that Claimant used the same SG&A calculations in estimating the benefit received as it used for other financial reporting purposes.

172.   Sixth, the Tribunal rejects Respondents' argument that it is now entitled to document production in connection with the issue of Claimant's use of the Purchased Assets.  Respondents never raised any issue regarding the Purchased Assets during the course of the arbitration and expressly waived any mitigation defense on September 20, 2011.  [See para. 47 and n.3, above]  Although the Tribunal permitted the parties to seek document disclosure in connection with their claims and defenses (See Procedural Order No. 1, Sec. 3), Respondents did not seek documents relating to Claimant's use of the Purchased Assets. Therefore, Respondents cannot now, after the evidentiary hearing is closed and after many years of arbitration, seek documents with respect to an issue that they never raised.  Furthermore, it appears that Claimant did provide Respondents with the same documents that were furnished to Samil PwC.  [Claimant's Final

Calculation at 10][16]  The Tribunal recognizes that accounting for the benefit obtained by Claimant involves the exercise of judgment as to the appropriate accounting methodology to be used and how that methodology is to be applied. Based on the record, the Tribunal is satisfied that the methodology presented by Claimant as reflected in the Samil PwC Report is not unreasonable.

173.   The foregoing addresses the benefit obtained by Claimant from use of the Purchased Assets. However, Respondents have also raised the question of future use of the Purchased Assets. The Tribunal cannot accept Respondents' assertion that Claimant must now account for possible future benefits that might be obtained from use of the Purchased Assets over the next 15 years. [Respondents' Benefits Submission at 11]  There is no basis in the record for the assumption that Claimants will continue to use the Purchased Assets. Nor has Claimant argued that it has a contractual right to use the Purchased Assets pursuant to Section 2(d)(i)(B)(2) of the APA after the issuance of the Final Award. In fact, in response to Respondents' arguments, Claimant has represented that it "has no intention to continue manufacturing aspartame for the next 15 years" and that "[a]s soon as the arbitration is completed, Daesang intends to request NutraSweet to remove the Purchased Assets from its plant." [Claimant's Final Calculation at 6]

174.   Based on the record, the Tribunal concludes that there is no basis to believe that Respondents will continue to use the Purchased Assets and obtain any future benefit after the issuance of the Final Award. Although helpful, Claimant's representation as to its "intent" does not fully address Respondents' argument. Section 2(d)(i)(B)(2) of the APA provides that Claimant has a right to use the Purchased Assets "for so long as . . . the buyer's failure to pay" the purchase price "is continuing." [APA § 2(d)(i)(B)(2)]  Apart from Claimant's intentions, the question is whether Claimant could continue to use the Purchased Assets even

---

[16] Claimant did not produce documents relating to incremental costs since Claimant "does not maintain its records based on incremental cost concepts." [Claimant's Final Calculation at 10]

45

ICC Case No. 15641/VRO/AGF/RD

after the Final Award is issued.  The Tribunal concludes that Claimant cannot do so consistent with New York law.  If Claimant could continue to exercise the right to use Respondents' assets after the issuance of the Final Award, then Claimant could receive further benefits that would not have been accounted for in the calculation of damages in the Final Award.  That would result in Claimant receiving more than full compensation for Respondents' breach of contract, contrary to New York law and public policy.  The APA must be read to be consistent with New York law and public policy.  Therefore, Claimant's right to use the Purchased Assets and receive benefits therefrom cannot continue after the issuance of the Final Award.

175. Therefore, the Tribunal concludes that the undisputed sums to which Claimant is entitled under the APA plus interest must be reduced by the benefit obtained by Claimant from using the Purchased Assets.  This is necessary to ensure that the Final Award is consistent with New York law and public policy.  That benefit, as calculated by Samil PwC, is US$ 142,000 as of August 2015.  The Tribunal will adjust that amount to US$ 362,500,[17] to reflect Claimant's use of the Purchased Assets for the 9 months after the period covered by the Samil PwC report.  Furthermore, the Tribunal concludes based on Section 2(d)(i)(B)(2) of the APA, interpreted consistently with New York law and public policy, that Claimant may not continue to use the Purchased Assets after the issuance of the Final Award.

**2.      The Processing Agreement**

176. Claimant has asserted three claims for breach of the Processing Agreement.  First, Claimant seeks to recover US$ 238,301 plus interest for aspartame manufactured and delivered under the Processing Agreement and not paid for.  [Claimant's Remedy Statement at 11; Daesang Initial Claim Form 2]  Second, Claimant seeks to recover US$ 45,835 plus interest for employment related expenses that were

---

[17] The Tribunal has used the benefit of US$ 196,000 for the period January – August 2015 to determine the average monthly benefit (US$ 24,500) and has used that monthly benefit to provide the benefit obtained for the next 9 months (US$ 220,500).

not reimbursed. [Claimant's Remedy Statement at 12; Daesang Initial Claim Form 3] Third, Claimant seeks to recover US$ 647,030 plus interest for the amount owing for [Respondents'] failure to purchase the full amount of the 2007 Binding Forecast of aspartame. [Claimant's Remedy Statement at 12; Daesang Initial Claim Form 4] Fourth, Claimant seeks to recover US$ 15,575,000 plus interest, representing the damages for failure to provide Binding Forecasts for the years 2008-2011 and to purchase the minimum volumes for those years. [Claimant's Remedy Statement at 13; Daesang Initial Claim Form 5] Alternatively, Claimant seeks the termination fee under Article 6.2 of the Processing Agreement of US$ 8,640,000 plus interest. [Claimant's Remedy Statement at 13 n.4; Daesang Initial Claim Form 6] Claimant seeks interest on all amounts due and owing under the Processing Agreement. [Claimant's Remedy Statement at 11-13] [18] Respondents do not dispute the calculation of the principal amount of the claims under the Processing Agreement. [Partial Award ¶ 74]

177. With respect to the claim of US$ 238,301 for aspartame manufactured and delivered. Respondents argue that they "set off" this amount against amounts allegedly owed by Claimant. [NSC Summaries § V at 29] However, the Processing Agreement provides that Daesang shall invoice NSC Korea upon shipment of the product, and NSC Korea "shall not be entitled to offset or withhold from amounts due and owing to Daesang" any sums due and owing to any of the Respondents. [Processing Agreement, Art. 5.3] Therefore, Respondents' argument that the Processing Agreement permitted NSC Korea to offset any amounts owed to NSC Korea is incorrect. Claimant is entitled to recover the claimed amount of US$ 238,301 that was invoiced plus interest.

---

[18] The Processing Agreement provides for interest in Article 13.3, which states:

"Any amount not paid when due hereunder, net of any amounts then due to the other party, shall bear default interest at the Applicable Rate (as defined in the APA) plus five percent (5%) per annum."

178.   With respect to the claim for reimbursement of certain employment related expenses of US$ 45,835 plus interest, Respondents' only defense is that these expenses were incurred "post-rescission." [NSC Summaries § IV at 30] However, all of Respondents' claims of rescission have been denied, and therefore Respondents have no valid defense to this claim. Claimant is entitled to recover US$ 45,835 plus interest.

179.   With respect to the US$ 647,030 plus interest owing for Respondents' failure to purchase the full amount of the 2007 Binding Forecast, there is no defense. [NSC Summaries § V at 31] Article 6.2(a) of the Processing Agreement requires payment of this amount in the event of a termination. Claimant is entitled to recover US$ 647,030 plus interest. [Processing Agreement, Art. 6.2(a)]

180.   With respect to failure to purchase the minimum quantities for years 2008 – 2012 or, alternatively, the termination fee, Respondents argue that only the termination fee can apply because they had the right to terminate the Processing Agreement "for convenience." [Respondents' Remedy Statement at 5; Processing Agreement, Art. 6.2(a)] Claimant argues that because Respondents' termination of the Processing Agreement did not state that the termination was "for convenience," it cannot now be recharacterized so as to come within this provision. [Claimant's Remedy Rebuttal at 7-8][19]

181.   The Tribunal concludes that Claimant is only entitled to recover the "termination fee" provided for in Article 6.2 of the Processing Agreement. Article 6.2 allowed NSC Korea "at any time" prior to the end of the current term of the Processing Agreement "to terminate this Agreement . . . without cause." In that event, the Article 6.2 required NSC Korea to pay the Foregone Profit for the minimum amount of product obligated to be purchased for the current contract year

---

[19] In Claimant's Final Calculation, Claimant only seeks to recover for failure to purchase minimum volumes for the years 2008-2011, not the alternative remedy of the termination fee. [Claimant's Remedy Statement at 3] Respondents have challenged that position. [Respondents' Calculation Reply at 1]

ICC Case No. 15641/VRO/AGF/RD

(US$ 647,030), plus the termination payment required in Exhibit 6.2
(US$ 8,640,000).

182.   There is no dispute that Respondents advised Claimant on June 18, 2007 that they
were terminating all agreements, including the Processing Agreement.  [NSC 4]
Although this termination was part of Respondents' effort to rescind the
transaction, the Tribunal does not believe that is relevant under their agreement.
The parties had agreed that NSC Korea could terminate the Processing Agreement
"at any time" and "without cause."  That is essentially what Respondents did.  To
require, as Claimant requests, any further recovery of damages than what had
already been agreed to in the event of a termination for convenience would only
be punitive.  The Tribunal will follow the remedy agreed to by the parties in the
event of a termination by NSC Korea "for convenience."  Therefore, Claimant is
entitled to recover the termination payment provided in Article 6.2(a) of the
Processing Agreement – US$ 8,640,000 plus interest.

**3.    Conclusion**

183.   Claimant seeks and is entitled to recover the following elements of damages from
Respondents NSC, IPCO and NSC Korea, jointly and severally,[20] for breach of
the APA:

(i)    US$ 9.25 million plus interest; plus

(ii)    US$ 55 million plus interest; less

(iii)    US$ 362,500 to account for the benefit Claimant received from the
Purchased Assets as of June 2016.

---

[20] It is undisputed that Respondents are jointly and severally liable for the obligations
under the APA because both IPCO and NSC Korea assumed these obligations and
agreed to become jointly and severally liable with NSC for the performance of all
obligations under the APA.  [Request for Arbitration, App. C, Exhibits 1 &2]

184.   Pre-award interest is calculated under the APA as follows:  (i) at the rate of 10 percent per annum on the amount of US$ 9,250,000 from June 12, 2006 (the date the installment was due) until December 22, 2006 (the date of acceleration) and (ii) at the rate of 3.25 percent per annum (the prime lending rate of Deutsche Bank Trust Company Americas) on the amount of US$ 64,250,000 from December 22, 2006 until the date of payment.  [APA §§ 2(d)(i)(A) & (B), 1 ("Applicable Rate")]

185.   Claimant also seeks and is entitled to recover the following elements of damages from Respondents NSC and NSC Korea, jointly and severally,[21] for breach of the Processing Agreement:

   (i)      US$ 238,301 plus interest; plus

   (ii)     US$ 45,835 plus interest; plus

   (iii)    US$ 647,030 plus interest; plus

   (iv)    US$ 8,640,000 plus interest.

186.   Pre-award interest is calculated under the Processing Agreement at the rate of 3.25 percent per annum (the prime lending rate of Deutsche Bank Trust Company Americas) plus 5 percent per annum on each amount owed.  [Processing Agr. Art. 13.3]

187.   As explained in paragraph 174, above, Claimant may not continue to use the Purchased Assets pursuant to Section 2(d)(i)(B)(2) of the APA after issuance of the Final Award.

---

[21] Pursuant to Article 16 of the Processing Agreement, NSC and NSC Korea are "jointly and severally liable for full performance of any obligation" under the Processing Agreement.

## VII.   COSTS

188.   On November 21, 2014, the parties submitted their applications for costs in
accordance with Procedural Order No. 13.

189.   The Claimant, on the one hand, and the Respondents on the other hand, have each
paid the advance on costs in this case in equal shares.  Pursuant to an agreement
between the parties that is reflected in their respective costs applications, the
parties agreed to limit their applications to recover costs in this arbitration solely
to the fees and expenses of the arbitral tribunal and the ICC administrative
expenses totaling US$ 860,000 ("Arbitration Costs"), that they had paid in equal
shares.  [Claimant's Costs Application at 1 and n.1; Respondents' Costs
Application at 1]  The parties agreed that they would bear their own legal fees and
expenses, expert fees and expenses and all other costs of the arbitration, except, as
indicated above, the Arbitration Costs.

190.   The arbitration clauses in the APA (Section 10(o)) and the Processing Agreement
(Article 17.2) do not address the awarding of any costs in arbitration.  [APA §
10(o); Processing Agr. Art. 17.2]

191.   The parties' agreements are governed by New York law and the place of
arbitration in the APA and the Processing Agreement is New York, New York.
[APA § 10(b) & (o); Processing Agr. Arts. 17.1 & 17.2]

192.   Pursuant to Article 31(3) of the ICC Rules, the Tribunal in the final award "shall
fix the costs of the arbitration and decide which of the parties shall bear them or in
what proportion they shall be borne by the parties."

193.   Claimant based its claim for Arbitration Costs on Article 37 of the 2012 ICC
Arbitration Rules, rather than Article 31 of the ICC Rules, which apply to this
arbitration.  It argued that "'there is a general expectation'" that the losing party
will be required to compensate the successful party for reasonable legal and other

costs. [Claimant's Costs Application at 1]  Claimant further asserted that the Partial Final Award demonstrates that it is the prevailing party and that Respondents are the losing party.  Furthermore, Claimant stated that much of the arbitration was devoted to Respondents' "wholly meritless defenses and counterclaims all of which were dismissed." [Claimant's Costs Application at 2]

194.   Respondents argued that they should prevail on their defenses and counterclaims (notwithstanding the Tribunal's decision in the Partial Final Award) and that the Final Award should include the Arbitration Costs that Respondents' "paid to the ICC." [Respondents' Costs Application at 3]

195.   The Tribunal concludes that the Claimant, on the one hand, and the Respondents, on the other hand, shall each bear its own Arbitration Costs in this case.  In reaching that result, the Tribunal considered various factors.  The Tribunal considered the absence of any agreement in the APA and Processing Agreement as to the allocation of arbitration costs.  It also considered the choice of New York, New York as the place of arbitration, where the longstanding rule is that each party generally bears its own litigation costs.  The Tribunal considered that although the Respondents' defenses and counterclaims were rejected, those defenses and counterclaims raised serious legal and factual issues.  In addition, the Tribunal considered that Claimant's use of the Purchased Assets and the various issues relating to the impact of their use on the remedy in this case, which also involved serious legal and factual issues.  Finally, the Tribunal considered that the protracted nature of this arbitration should be attributed to both sides.  As a result of all these factors, the Tribunal concludes that each side should bear its own Arbitration Costs, and therefore Arbitration Costs shall not be awarded in this case.

## VIII.   <u>FINAL AWARD</u>

196.   For the reasons set forth above and in the Partial Final Award, the Tribunal renders and makes the following Final Award as to issues not resolved in the Partial Final Award:

(i)      Respondents breached the purchase price obligations in Section 2(c) of the APA;

(ii)     Claimant shall recover damages from Respondents, jointly and severally, in the amount of US$ 9,250,000 pursuant to Section 2(c)(i) of the APA;

(iii)    Claimant shall recover interest from Respondents, jointly and severally, on the damages awarded in subparagraph (ii) above in the amount of US$ 489,110 pursuant to Section 2(d)(i)(A) of the APA, from June 12, 2006 through December 22, 2006;

(iv)    Claimant shall recover damages from Respondents, jointly and severally, in the amount of US$ 55,000,000 pursuant to Section 2(d)(i)(B)(1) of the APA;

(v)     Claimant shall recover interest from Respondents, jointly and severally, on the damages awarded in subparagraphs (ii) and (iv) above in the amount of US$ 19,788,560 pursuant to Section 2(d)(i)(B)(1) of the APA, from December 22, 2006 to June 10, 2016;

(vi)    The benefit obtained by Claimant from use of the Purchased Assets totaling approximately US$ 362,500 shall be deducted from the amounts awarded in subparagraphs (ii) to (v) above;

(vii)   Respondents NSC and NSC Korea breached payment obligations in Articles 5.3, 2.2(a), 5.1(a) (Exhibit 5.1) and 6.2(a) of the Processing Agreement.

(viii)   Claimant shall recover damages from NSC and NSC Korea, jointly and severally, in the amount of US$ 238,301 pursuant to Article 5.3 of the Processing Agreement;

(ix)   Claimant shall recover interest on the damages awarded in subparagraph (viii) above from NSC and NSC Korea, jointly and severally, in the amount of US$ 173,599 pursuant to Article 13.3 of the Processing Agreement, from August 15, 2007 to June 10, 2016;

(x)   Claimant shall recover damages from NSC and NSC Korea, jointly and severally, in the amount of US$ 45,835 pursuant to Article 2.2(a) of the Processing Agreement;

(xi)   Claimant shall recover interest on the damages awarded in subparagraph (x) above from NSC and NSC Korea, jointly and severally, in the amount of US$ 32,074 pursuant to Article 13.3 of the Processing Agreement, from December 20, 2007 to June 10, 2016;

(xii)   Claimant shall recover damages from NSC and NSC Korea, jointly and severally, in the amount of US$ 647,030 pursuant to Article 5.1(a) and Exhibit 5.1 of the Processing Agreement;

(xiii)   Claimant shall recover interest on the damages awarded in subparagraph (xii) above from NSC and NSC Korea, jointly and severally, in the amount of US$ 475,447 pursuant to Article 13.3 of the Processing Agreement, from July 18, 2007 to June 10, 2016;

(xiv)   Claimant shall recover damages from NSC and NSC Korea, jointly and severally in the amount of US$ 8,640,000 pursuant to Article 6.2(a) of the Processing Agreement;

(xv)   Claimant shall recover interest on the damages awarded in subparagraph (xiv) above from NSC and NSC Korea, jointly and severally, in the

ICC Case No. 15641/VRO/AGF/RD

amount of US$ 6,348,802 pursuant to Article 13.3 of the Processing Agreement, from July 18, 2007 to June 10, 2016;

(xvi)   Claimant may not continue to use the Purchased Assets pursuant to Section 2(d)(i)(B)(2) of the APA after the issuance of the Final Award;

(xvii)   The Claimant, on the one hand, and the Respondents, on the other hand, shall each bear its own Arbitration Costs in this case; and

(xviii)   All other claims and counterclaims asserted by the parties in this arbitration are hereby denied.

Place of Arbitration:   New York, New York (U.S.A.)

Date:   June 14, 2016

THE ARBITRAL TRIBUNAL

Arnold S. Schickler
Co-Arbitrator

Louis B. Kimmelman
Chairman

Jonathan D. Schiller
Co-Arbitrator

55

ICC Case No. 15641/VRO/AGF/RD

# APPENDIX A:

# Partial Final Award
# dated December 21, 2012

**INTERNATIONAL CHAMBER OF COMMERCE**
**INTERNATIONAL COURT OF ARBITRATION**

**DAESANG CORPORATION,**

      **(Republic of Korea)**

                **Claimant,**

    -and-

                         **ICC Case No. 15641/VRO/AGF**

1. **THE NUTRASWEET COMPANY,**

        **(U.S.A.)**

2. **NUTRASWEET IP HOLDINGS, INC.,**

        **(U.S.A.)**

3. **SWEETENERS HOLDINGS KOREA LTD.,**

    **(Republic of Korea)**

                **Respondents.**

**PARTIAL FINAL AWARD**

**The Arbitral Tribunal:**

Arnold S. Schickler
Jonathan D. Schiller
Louis B. Kimmelman, Chairman

ICC Case No. 15641/VRO/AGF

## I.   INTRODUCTION

### A.   Summary of Case

1.   This case arises from the sale by Claimant Daesang Corporation ("Claimant" or "Daesang") of its aspartame[1] business to Respondent The NutraSweet Company ("Respondent" or "NSC").  Three years after the closing of the transaction, Respondent failed to make one of the required installment purchase price payments.  This default continued for a period of six months.  Claimant then exercised its contractual right to accelerate the remaining purchase price payment obligations.  Several months later, and almost four years after the closing of the transaction, Respondent sent notice that it was rescinding the entire transaction based on a provision in one of the transaction documents.  This arbitration followed.  Claimant seeks damages based on several alleged breaches of payment obligations under the transaction agreements, and Respondents argue that they are entitled to rescind the entire transaction and recover rescissionary damages.

### B.   Parties and Counsel

2.   **Claimant:**  The Claimant is DAESANG CORPORATION ("Claimant" or "Daesang"), a corporation organized under the laws of the Republic of Korea with offices located at:

> Daesang Corporation
> 96-48 Shinsul-dong, Dongdaemun-ku
> Seoul 130-706
> Korea

3.   Claimant is represented by counsel, The Law Offices of Richard B. Pacella, with offices located at:

---

[1]  Aspartame is a low-calorie artificial sweetener widely used in various products, including foods and beverages, around the world.

1

ICC Case No. 15641/VRO/AGF

> The Law Offices of Richard B. Pacella
> 80 Broad Street
> Suite 1200
> New York, New York  10004
> U.S.A.
> *Attention:*  Richard B. Pacella

4.    Respondents:  The Respondents are THE NUTRASWEET COMPANY ("NSC"), a corporation organized under the laws of the State of Delaware, U.S.A. and two of its wholly-owned subsidiaries, NUTRASWEET IP HOLDINGS, INC. ("IPCO"), also a Delaware corporation, and SWEETENERS HOLDINGS KOREA LTD. ("NSC Korea"), a Korea corporation (hereafter "NSC", "IPCO" and "NSC Korea" are collectively referred to as "Respondents" or the "NSC Parties"). The offices of the Respondents are located at:

1.    The NutraSweet Company
The Merchandise Mart
222 Merchandise Mart Plaza, Suite 936
Chicago, Illinois 60654
U.S.A.

and

1762 Lovers Lane
Augusta, Georgia 30901
U.S.A.

2.    NutraSweet IP Holdings, Inc.
The Merchandise Mart
222 Merchandise Mart Plaza, Suite 936
Chicago, Illinois 60654
U.S.A.

3.    Sweeteners Holdings Korea Ltd.
228-1 Soryong-dong, Gunsan
Jeollabuk-do 573-879
Korea

5.    Respondents are represented by counsel, Sperling & Slater, with offices located at:

Sperling & Slater
55 West Monroe
Suite 3200
Chicago, Illinois  60603
U.S.A.
*Attention:*    Greg Shinall, Michael G. Dickler

2

ICC Case No. 15641/VRO/AGF

## II.    PROCEDURAL HISTORY

### A.    Pleadings and Constitution of Arbitral Tribunal

6.     Claimant commenced this arbitration by filing a Request for Arbitration that was received by the International Court of Arbitration of the International Chamber of Commerce ("ICC Court") in Paris, France on or about June 4, 2008.

7.     In response, Respondents filed with the ICC Court an Answer and Counterclaims to the Request for Arbitration dated August 11, 2008 ("Answer and Counterclaims").

8.     Claimant filed a Reply to Counterclaims that was received by the ICC Court on or about September 15, 2008.

9.     In its Request for Arbitration, Claimant nominated Arnold S. Schickler, Esq. as a co-arbitrator in this case.  The ICC Court confirmed the nomination of Mr. Schickler on August 29, 2008, pursuant to Article 9(1) of the ICC Rules of Arbitration in force from 1 January 1998 ("ICC Rules").

10.    In their Answer and Counterclaims, Respondents nominated Jonathan D. Schiller, Esq. as a co-arbitrator in this case.  The ICC Court confirmed the nomination of Mr. Schiller on August 29, 2008, pursuant to Article 9(1) of the ICC Rules.

11.    At its session of August 29, 2008, the ICC Court decided that this arbitration proceed pursuant to Article 6(2) of the ICC Rules.

12.    By letters dated October 13, 2008, the parties advised the Secretariat of the ICC Court that they agreed to the appointment of a United States national as Chairman of the Arbitral Tribunal.

ICC Case No. 15641/VRO/AGF

13.    The ICC Court appointed Louis B. Kimmelman, Esq. as Chairman of the Arbitral
       Tribunal on November 7, 2008, pursuant to Article 8(4) of the ICC Rules, upon
       proposal of the United States National Committee of the ICC.

14.    The Arbitral Tribunal was fully constituted on November 7, 2008.

**B.    Terms of Reference and Provisional Timetable**

15.    On February 2, 2009, the parties and the Arbitral Tribunal signed the Terms of
       Reference in this case.

16.    In the Terms of Reference, Claimant summarized its claims against Respondents
       for breach of the purchase price obligations and other obligations in the
       transaction documents, plus interest and the fees and costs of this proceeding.

17.    In the Terms of Reference, Respondents also described their defenses and
       counterclaims.  Respondents claim a contractual right to rescind the entire
       transaction as well as an equitable right to rescission based on Claimant's alleged
       fraud plus rescissionary damages arising from alleged breaches of contract.

18.    On February 17, 2009 the parties requested the Tribunal to defer issuing the
       Provisional Timetable.  As a result of the parties' request, the proceedings in this
       case were stayed until April 22, 2009, at which time the Claimant requested the
       Tribunal to proceed with the case.

19.    Following written submissions from the parties, the Tribunal issued Procedural
       Order No. 1 dated May 19, 2009, which included the Provisional Timetable.

20.    Procedural Order No. 1 provided that the parties could apply to the Tribunal for
       resolution of any threshold or jurisdictional issues in the case by May 29, 2009.

21.    Claimant and Respondents both filed applications dated May 29, 2009 seeking a
       determination of certain threshold and/or jurisdictional issues.  On August 11,

4

2009, the Tribunal heard oral argument on the parties' respective applications. In Procedural Order No. 3 dated August 21, 2009, the Tribunal determined that it could not then resolve the various threshold and/or jurisdiction issues submitted by the parties and that it would consider these issues together with the merits of the case.

22.     On August 21, 2009, Respondents filed Amended Counterclaims in this case. By email dated September 4, 2009, the parties agreed that Respondents' "Amended Counterclaims are intended to entirely replace the counterclaims originally asserted by [Respondents] in [their] Answer and Counterclaims." The parties further agreed that the Reply filed by Claimant and referred to in paragraph 8 above would be deemed a denial of the allegations in the Amended Counterclaims.

## C.     Procedural Orders

23.     In Procedural Order No. 1 and in subsequent procedural orders, the Tribunal provided for various procedural steps to prepare the case for an evidentiary hearing. These steps included document disclosure, disclosure of fact witnesses, disclosure of expert witnesses, submission of pre-hearing memoranda and reply memoranda to address the various factual and legal issues in dispute, together with witness statements, expert reports and documentary evidence.

24.     In Procedural Order No. 2 dated July 6, 2009, the Tribunal provided that the evidentiary hearing would take place on January 25 - 29, 2010. At the request of the parties, the Tribunal changed the dates of the evidentiary hearing to October 26 - November 5, 2010 in Procedural Order No. 4 dated December 24, 2009.

25.     On April 7, 2010, Respondents submitted an "Additional Counterclaim and Defense" based on the affidavit of Dae Yeab Park that Respondents stated they obtained in January 2010. In response, Claimant submitted a motion objecting to the new counterclaim and defense.

5

26.   In Procedural Order No. 5 dated July 26, 2010, the Tribunal ordered that
Respondents could assert the Additional Counterclaim and Defense
(Counterclaim XIII and Affirmative Defense J) pursuant to Article 19 of the ICC
Rules.  In doing so, the Tribunal made no determination with respect to the
substantive issues or arguments advanced by the parties at that time and the
parties were permitted to make whatever arguments they deemed appropriate with
respect to the Additional Counterclaim and Defense or the "Affidavit of Dae
Yeob Park" in their respective filings with the Tribunal as provided in Procedural
Order No. 4 and at the Evidentiary Hearing.

27.   On July 29, 2010, Claimant submitted an application to extend various dates in
the case, including the dates for the evidentiary hearing.  Respondents opposed
this application.  In an order dated August 10, 2010, the Tribunal extended
various dates in the case, including the dates of the evidentiary hearing, and
requested the parties to confer and submit a proposed new schedule.

28.   Based on a joint proposal by the parties, the Tribunal in Procedural Order No. 6
dated September 14, 2010, ordered that the evidentiary hearing would take place
on May 2 - 13, 2011.

29.   On March 3, 2011, Respondents requested an extension of certain dates in the
case, including the dates of the evidentiary hearing.  Claimant opposed this
application.

30.   In Procedural Order No. 7 dated March 30, 2011, the Tribunal extended certain
dates in the case, including the dates of the evidentiary hearing.  The dates of the
evidentiary hearing were changed to July 11 - 23, 2011.

31.   On June 8, 2011, the parties submitted various applications with respect to the
conduct of the evidentiary hearing.

6

32.     The Tribunal held a procedural hearing with the parties on June 13, 2011 in New York City to plan for the evidentiary hearing.

33.     In Procedural Order No. 9 dated June 30, 2011, the Tribunal ruled on all the pending applications relating to the evidentiary hearing.

**D.      Evidentiary Hearing**

34.     Prior to the evidentiary hearing, the parties filed written submissions in support of their respective positions.

35.     On July 2, 2010, Claimant submitted its Opening Pre-Hearing Brief with supporting witness statements and exhibits.  On February 25, 2011, Claimant submitted its Pre-Hearing Opposition Brief with supporting witness statements and exhibits.  Finally, on May 31, 2011, Claimant submitted its Pre-Hearing Reply Brief with supporting witness statements and exhibits.

36.     On July 2, 2010, Respondents submitted their Pre-Hearing Memorandum with supporting witness statements and exhibits.  On February 25, 2011, Respondents submitted their Pre-Hearing Response Memorandum with supporting witness statements and exhibits.  On May 31, 2011, Respondents submitted their Pre-Hearing Reply Memorandum with supporting witness statements and exhibits.  On June 6, 2011, Respondents submitted a supplemental witness statement together with an exhibit.  On June 17, 2011, Respondents submitted an additional witness statement to amend a prior witness statement.  On June 30, 2011, Respondents submitted certain additional witness statements and exhibits.  In addition, on June 29, 2011, Respondents withdrew certain paragraphs of their Amended Counterclaims.[2]

---

[2] Specifically, Respondents withdrew paragraphs I(C), III(D), III(E), VIII(A) and XII(A) of their Amended Counterclaims.

37.   The evidentiary hearing took place in New York City on nine consecutive days during the period July 11 through July 15, 2011 and July 18 through July 21, 2011.

38.   Prior to the evidentiary hearing, Claimant submitted witness statements for the following fact witnesses:

Chang Keun Jeon Witness Statement No. 1, dated February 16, 2011
Chang Keun Jeon Witness Statement No. 2, dated May 25, 2011
Kun Keun Kim Witness Statement, dated February 16, 2011
Sun-Young Kim Witness Statement, dated May 25, 2011
Tae Chul "Scott" Kim Witness Statement, dated February 16, 2011
Hee Byung Lee Witness Statement No. 1, dated June 28, 2010
Hee Byung Lee Witness Statement No. 2, dated February 16, 2011
Yong Ki Lee Witness Statement, dated June 28, 2010
Jung Bae Lim Witness Statement No. 1, dated June 28, 2010
Jung Bae Lim Witness Statement No. 2, dated February 16, 2011
Seok Yeol Oh Witness Statement No. 1, dated February 16, 2011
Seok Yeol Oh Witness Statement No. 2, dated May 24, 2011
Richard B. Pacella, Esq. Witness Statement No. 1, dated February 25, 2011
Richard B. Pacella, Esq. Witness Statement No. 2, dated May 27, 2011

39.   Also prior to the evidentiary hearing, Claimant submitted the expert report of Dr. Michael A. Salinger, dated February 24, 2011.

40.   Prior to the evidentiary hearing, Respondents submitted witness statements for the following fact witnesses:

William L. DeFer Statement No. 1, dated July 2, 2010
William L. DeFer Statement No. 2, dated February 25, 2011
William L. DeFer Statement No. 3, dated May 31, 2011
William L. DeFer Statement No. 4, dated June 28, 2011
Jon B. Dubrow Statement, dated May 24, 2011
Kenneth E. Furlong Statement No. 1, dated July 2, 2010
Kenneth E. Furlong Statement No. 2, dated May 26, 2011
Kenneth E. Furlong Statement No. 3, dated June 24, 2011
Jeffrey M. Hoster Statement No. 1, dated February 23, 2011
Jeffrey M. Hoster Statement No. 2, dated June 10, 2011
Bernard S. Kramer Statement No. 1, dated February 25, 2011
Bernard S. Kramer Statement No. 2, dated May 31, 2011
Bernard S. Kramer Statement No. 3, dated June 6, 2011
Ted H. Park Statement, dated July 2, 2010

8

ICC Case No. 15641/VRO/AGF

Craig R. Petray Statement No. 1, dated July 2, 2010
Craig R Petray Statement No. 2, dated February 24, 2011
Craig R Petray Statement No. 3, dated May 31, 2011
Rick E. Seigler Statement No. 1, dated July 2, 2010
Rick E. Seigler Statement No. 2, dated May 27, 2011
Adam L. Suttin Statement, dated July 2, 2010

41.   Also prior to the evidentiary hearing, Respondents submitted the expert report of Dr. Russell Lamb, dated May 31, 2011.

42.   At the evidentiary hearing, Respondents cross-examined the following fact witnesses and expert witness offered by Claimant:

J. B. Lim
H. B. Lee
D. Y. Park
Dr. Michael A. Salinger

43.   At the evidentiary hearing, Claimant cross-examined the following fact witnesses and expert witness offered by Respondents:

William DeFer
John Dubrow
Craig Petray
Kenneth Furlong
Adam Suttin
Rick Seigler
Dr. Russell Lamb

44.   On the last day of the evidentiary hearing, the Tribunal requested the parties to submit several documents, including (1) an outline of each party's respective claims and defenses, together with citations to the factual and legal authority that supported those claims and defenses, and (2) a list of the issues to be determined in the case that had been included in the Terms of References, together with the parties' respective positions on each issue. The parties submitted these requested documents.

45. On September 20, 2011, Respondents withdrew certain defenses contained in their Answer and Counterclaims.[3]

46. After the evidentiary hearing, Claimant submitted the witness statement of Chang Keun Jeon dated September 23, 2012.

47. Following its receipt of the requested documents (*see* ¶ 44, above), the Tribunal heard oral argument on October 20, 2011 in New York City on the claims and defenses presented at the evidentiary hearing.[4]

48. The ICC Court at its session of December 19, 2012, extended the time limit for rendering the Final Award to February 28, 2013.

49. By email dated December 17, 2012, the Tribunal advised the parties pursuant to Article 22(1) of the ICC Rules that the proceedings were closed.

## III. JURISDICTION

50. The disputes in this case arise from three agreements. The first is an Asset Purchase Agreement dated April 30, 2003 ("APA") between NSC and Daesang. The second is a Processing Agreement dated May 13, 2003 ("Processing Agreement") between Daesang, NSC and NSC Korea. The third is a Joint Defense and Confidentiality Agreement dated December 13, 2002 ("JDA") between NSC, Daesang, counsel for NSC and counsel for Daesang. Claimant's claims in this arbitration are based on the APA and Processing Agreement. Respondents' defenses are based in part on the JDA.

---

[3] Specifically, Respondents withdrew defenses F, G and H in their Answer and Counterclaims.

[4] Before and after the hearing on October 20, 2011, the Tribunal received further submissions from the parties on September 23, 2011, September 24, 2011, September 30, 2011, October 3, 2011, October 14, 2011, October 17, 2011, October 18, 2011, October 28, 2011, and November 1, 2011.

51.     The Tribunal has jurisdiction to resolve the disputes in this case based on the
        arbitration clauses in the APA and Processing Agreement as well as the parties'
        agreement in the Terms of Reference.

52.     Section 10(o) of the APA (between Daesang and NSC) includes an arbitration
        clause that states in full as follows:

> All disputes arising out of or in connection with this
> Agreement shall be finally settled under the Rules of
> Arbitration of the International Chamber of Commerce
> (the "Rules") by three (3) arbitrators, of which one
> arbitrator shall be appointed by each of the Parties and the
> third arbitrator by the two (2) arbitrators designated by the
> Parties. If the two (2) arbitrators designated by the Parties
> are unable to agree upon the third arbitrator within thirty
> (30) days after the first two (2) arbitrators are appointed,
> the third arbitrator shall be appointed pursuant to the Rules
> as soon as possible thereafter. If the two (2) arbitrators
> designated by the Parties are unable to agree upon the third
> arbitrator within thirty (30) days after the first two (2)
> arbitrators are appointed, the third arbitrator shall be
> appointed pursuant to the Rules as soon as possible
> thereafter. Arbitration proceedings shall be held in New
> York, New York, and shall be conducted in the English
> language. Nothing in this §10(o) shall be construed to
> prevent either Party from seeking a preliminary injunction
> or other preliminary equitable relief in any court of
> competent jurisdiction before an arbitration proceeding is
> commenced or pending the final award or decision of the
> arbitrators. The resolution of disputes by the arbitrators
> shall be set forth in writing and shall be conclusive and
> binding upon and non-appealable by the Parties.

53.     Section 17.2 of the Processing Agreement (between Daesang, NSC and NSC
        Korea) includes an arbitration clause that states in full as follows:

> Except for disputes as to calculations required under this
> Agreement, any dispute or controversy arising out of or in
> connection with this Agreement shall be finally settled by
> arbitration in accordance with the arbitration rules of the
> International Chamber of Commerce then in effect.
> Arbitration proceedings shall be held in New York, New
> York and shall be conducted in the English language

11

> before a tribunal of three (3) arbitrators constituted in accordance with the aforesaid arbitration rules. Nothing in this paragraph shall be construed to prevent either party hereto from seeking preliminary injunction or other preliminary equitable relief in any court of competent jurisdiction before an arbitration proceeding is commenced or pending the final award or decision of the arbitrators.

54.     The JDA (between NSC, Daesang, counsel for NSC and counsel for Daesang), upon which Respondents base one of their defenses, does not contain an arbitration clause. Respondents contend that the APA and Processing Agreement were rescinded and terminated in accordance with Section 10 of the JDA. In the Terms of Reference, Respondents "consent[ed] to the jurisdiction of the Arbitral Tribunal to determine all issues concerning Paragraph 10 of the JDA," and Claimant did not object to this submission to jurisdiction. [Terms of Reference ¶¶ 41-42]

55.     Furthermore, in Paragraph 44 of the Terms of Reference, both Claimant and Respondents "agree[d] that these arbitration proceedings shall be determined by a single tribunal comprised of three members."[5]

56.     As a result, none of the parties raised any jurisdictional objection at the evidentiary hearing, at the oral argument on October 20, 2011 or in any of the post-hearing written submissions.

## IV.     FACTUAL BACKGROUND

57.     In 2002, Claimant Daesang and Respondent NSC discussed entering into a transaction in which Daesang would sell certain assets to NSC. The potential transaction was reflected in a letter of intent dated December 10, 2002. [Claimant's Exhibit A]

---

[5] In addition, on September 29, 2011, Respondents withdrew their original objections to jurisdiction in Paragraph H of their Answer and Counterclaims.

58.    Immediately thereafter, NSC and Daesang together with their respective counsel entered into a Joint Defense and Confidentiality Agreement dated as of December 13, 2002 ("JDA"). The JDA refers to the letter of intent entered into by NSC and Daesang and to the fact that NSC and Daesang concluded that they had a common interest with respect to any review or challenge of the transaction contemplated by the letter of intent and any resulting governmental investigation, proceedings or litigation. As discussed below, Section 10 of JDA provided that in certain circumstances NSC had the right to rescind the transaction that the parties were negotiating. The JDA contained a New York choice-of-law clause.

59.    Thereafter, NSC and Daesang entered into the APA on April 30, 2003. Pursuant to that agreement, NSC purchased certain of Daesang's assets in Korea for the manufacturing, marketing and selling of aspartame. The purchase price was US$79,250,000, which was to be paid by NSC, US$5,000,000 at closing and the balance in installments over a five year period as specified in the APA §2(c)(i) and APA Exhibit 2(c)(i). Under the APA, Daesang did not have a security interest in any of the transferred assets during the period that the purchase price installments were to be made. The APA contained various representations and warranties made by Daesang with respect to the assets being sold as well as remedies available to NSC in the event the representations and warranties were breached. The APA also contained an "Entire Agreement" provision, a New York choice-of-law clause and an arbitration clause.

60.    As provided in the APA, on the closing date of the transaction, May 13, 2003, Daesang, NSC and NSC Korea entered into the Processing Agreement. Pursuant to that agreement, Daesang was to utilize the assets purchased by the NSC Parties pursuant to the APA and certain of Daesang's manufacturing facilities to manufacture aspartame for the NSC Parties in accordance with agreed sales specifications. The Processing Agreement contained warranties with respect to the quality of the aspartame to be manufactured and remedies for any non-conforming goods. The Processing Agreement also contained an "Entire

ICC Case No. 15641/VRO/AGF

Agreement" provision, a New York choice-of-law clause and an arbitration clause.

61. NSC made the first anniversary purchase price payment under the APA of US$5,000,000 on or before June 12, 2004. [J.B. Lim, 6/28/10 at ¶ 6]

62. On May 12, 2005, Daesang granted, at NSC's request, a four-month extension of time for the NSC Parties to make the second anniversary payment under the APA. [J.B. Lim, 6/28/10 at ¶ 8; DS 11]

63. On October 25, 2005, NSC requested a further extension of time to make the second anniversary purchase price payment. [J.B. Lim, 6/28/10 at ¶ 9; DS 12] Daesang denied this extension request. [J.B. Lim, 6/28/10 at ¶ 9] On or before October 30, 2005, NSC made the second anniversary payment of US$5,000,000. [*Id.*]

64. On April 20, 2006, NSC requested an extension of time to make the third anniversary purchase payment. [DS 13] Daesang denied this extension request. [DS 14]

65. On June 12, 2006, NSC defaulted on the third anniversary installment payment of US$9.25 million. [J.B. Lim, 6/28/10 at ¶ 11]

66. On December 22, 2006, after the continuation of the default by the NSC Parties for six months, Daesang exercised the right to accelerate the remaining purchase price installment payments of US$55 million pursuant to Section 2(d)(i)(B)(1) of the APA. [J.B. Lim, 6/28/10 at ¶ 13; DS 18]

67. On March 15, 2007, Daesang notified NSC that pursuant to its rights under Section 2(d)(i)(B)(2) of the APA, Daesang would use the Korean manufacturing facility sold to NSC to produce aspartame for sale to Daesang's own customers. [J.B. Lim, 6/28/10 at ¶ 17; DS 30]

14

ICC Case No. 15641/VRO/AGF

68.     On March 20, 2007, NSC (by its attorneys McDermott, Will & Emery) notified
        Daesang that NSC had exercised its right to rescind the transaction pursuant to
        Section 10 of the JDA based upon the lawsuit captioned *In re Aspartame Antitrust
        Litigation* (Master Docket No. 2:06-CV-1732), which was filed in the U.S.
        District Court for the Eastern District of Pennsylvania on June 20, 2006.  The
        defendants in the case included major aspartame manufacturers, including NSC
        and Daesang.  The Consolidated Amended Class Action Complaint alleged an
        illegal agreement to allocate the aspartame market and to fix prices.  [NS 2][6]

69.     On June 18, 2007, NSC, NSC Korea and IPCO advised Daesang that NSC had
        exercised its right to rescind the transaction and that NSC, NSC Korea and IPCO
        were selling, transferring, assigning and reconveying all assets subject to the APA
        back to Daesang and terminating all agreements, including the Processing
        Agreement.  [NS 4]

70.     On June 4, 2008 Daesang commenced this arbitration.


V.      **ISSUES TO BE RESOLVED**

A.      **Daesang's Claims**

71.     Daesang has asserted claims in this arbitration under both the APA and the
        Processing Agreement.

72.     First, Daesang claims that NSC breached its purchase price payment obligations
        under the APA.  Daesang seeks to recover the third anniversary installment
        payment of US$9,250,000 and the remaining payments of US$55,000,000 that
        were due under the APA, totaling US$64,250,000.  In addition Daesang seeks

---

[6] On January 18, 2007, the district court in *In re Aspartame Antitrust Litigation* denied
the defendants' motions to dismiss the Consolidated Amended Class Action Complaint.
[NS 5]

ICC Case No. 15641/VRO/AGF

interest as provided in the APA.  [Daesang Initial Claim Form 1; APA
§ 2(c)(i)(D), (E), (F), APA §2(d)(i)(A), (B); Terms of Reference, ¶29 (1) & (2)]

73.    Second, Daesang has asserted several claims under the Processing Agreement.

(a)    First, Daesang seeks to recover US$238,301, plus interest, for its
manufacture and delivery of aspartame to NSC and NSC Korea.  [Daesang
Initial Claim Form 2; Processing Agreement, Art. 5.3; Terms of
Reference, ¶29 (6)]

(b)    Second, Daesang seeks to recover US$45,835, plus interest, for the failure
of NSC and NSC Korea to reimburse Daesang for employment-related
expenses for two employees in Korea.  [Daesang Initial Claim Form 3;
Processing Agreement, Art. 2.2(a); DS 43; Terms of Reference, ¶29 (8)]

(c)    Third, Daesang seeks to recover US$647,030, plus interest, for the profit
lost as a result of NSC and NSC Korea's failure to purchase the full
amount of aspartame as required in the 2007 Binding Forecast.  [Daesang
Initial Claim Form 4; Processing Agreement, Art. 5.1(a); Terms of
Reference, ¶29 (11)]

(d)    Fourth, Daesang seeks to recover US$15,575,000, plus interest, for NSC
and NSC Korea's breach of the obligation to provide Binding Forecasts
for the contract years 2008 – 2012 and to meet the minimum aspartame
purchase requirements for those years.  [Daesang Initial Claim Form 5;
Processing Agreement, Art. 5.2; Terms of Reference, ¶29 (15)]

(e)    Alternatively, with respect to claims (c) and (d) above, Daesang seeks to
recover the termination fee provided in Article 6.2 of the Processing
Agreement totaling US$9,287,030, plus interest. [Daesang Initial Claim
Form 6; Processing Agreement, Art. 6.2; Terms of Reference, ¶29 (16)]

16

ICC Case No. 15641/VRO/AGF

**B.    The Defenses/Counterclaims of the NSC Parties**

74.    The NSC Parties do not dispute the calculation of the principal amounts of
Daesang's claims. [Transcript, Oct. 20, 2012 at 8-11; 19-20; 27-30; 34; 57]
Rather, they assert that the entire transaction should be rescinded and that
rescission constitutes a total defense to Daesang's claims. [Terms of Reference,
¶26]

75.    First, NSC claims that it rescinded the transaction pursuant to Section 10 of the
JDA. As a result, NSC asserts that no payments are due under either the APA or
the Processing Agreement. [NS Summaries § I; Terms of Reference, ¶30 (1)]

76.    Second, the NSC Parties claim that they are entitled to equitable rescission
because Daesang fraudulently induced NSC to enter into the transaction by
misrepresenting in Section 3(f) of the APA that it had complied with all
applicable law in the operation of the aspartame business, when in fact it had
conspired to violate the antitrust laws. [NS Summaries § II; Terms of Reference,
¶30 (2) (viii); Respondents' Additional Counterclaim and Defense]

77.    Third, NSC claims that it is entitled to equitable rescission because Daesang
fraudulently induced NSC to enter into the transaction by misrepresenting certain
facts with respect to the aspartame that was to be manufactured for NSC. [NS
Summaries § III; Terms of Reference, §30(2)(a) & (b)]

78.    Fourth, in connection with the claim of rescission, the NSC Parties assert that
Daesang "breached every significant obligation it undertook pursuant to the APA
and the Processing Agreement." [NS Summaries § IV; Terms of Reference, §30
(2)(c) & (d)]

79.    Finally, the NSC Parties assert that each of the foregoing defenses based on fraud
in the inducement entitles the NSC Parties to recover rescissionary damages from
Daesang. [Terms of Reference, ¶26]

17

## VI.   ANALYSIS OF ISSUES

80.   Since the issue of liability turns on whether Respondents' rescission defenses and counterclaims constitute a bar to Daesang's claims, we turn first to Respondents' defenses and counterclaims.

### A.   NSC's JDA Rescission Defense

81.   NSC's initial defense is based on Section 10 of the JDA.  That provision in the JDA states in full as follows:

> 10.  The Client Parties [defined to mean NSC and Daesang] have executed a Letter of Intent relating to the Transaction.  In connection with the Letter of Intent the Client Parties have held discussions and reached a preliminary agreement as to the steps the Client Parties would each be entitled, or obligated, to take in the event that the Transaction were challenged at any time through Proceedings as hereinafter set forth in this Section 10.
>
> **If, during the five year period after the Consummation of the Transaction, a Rescission Event occurs, the Client Parties will take the following actions (and any other actions necessary to effectuate the foregoing) within 90 days after the occurrence of such Rescission Event:**
>
> (a)  NutraSweet will be released from any obligation to make further purchase price payments coming due after the occurrence of a Rescission Event;
>
> (b)  NutraSweet will convey, transfer and assign to Daesang all of its title, rights and interests in and to the property, plant and equipment, intellectual property and other assets acquired by NutraSweet in the Transaction, free and clear of any liens, security interests or other encumbrances, and, if the aspartame processing agreement between NutraSweet and Daesang has been terminated prior to the occurrence of such Rescission Event, substantially in the same operating condition (subject to ordinary wear and tear) in which such assets were delivered to NutraSweet upon the termination of such processing agreement;
>
> (c)  Daesang will acquire all such title, rights and interests and will retain all purchase price payments received prior to the occurrence of such Rescission Event;
>
> (d)  Daesang's agreement to not compete with NutraSweet will be terminated; and

ICC Case No. 15641/VRO/AGF

(e)  The processing agreement will be terminated and the Client Parties will enter into a new supply agreement on terms negotiated pursuant to a process agreed upon and reflected in an amendment to this Agreement or in a separate document, as long as such supply agreement would not violate the antitrust laws.

**A Rescission Event shall mean** (a) following an investigation by a governmental body or agency, the staff of such governmental body or agency gives notice to NutraSweet that such staff intends to recommend or has recommended that a complaint challenging the Transaction be filed by such governmental body or agency against NutraSweet in court or in a similar administrative proceeding the Client Parties mutually agree in writing to rescind the Transaction in light of such recommendation; or **(b) one of the events set forth in (i) or (ii) below has occurred, NutraSweet has given written notice to Daesang that such event has occurred, and NutraSweet has provided written notice to Daesang that it intends to exercise its right to rescind: (i) in the case of a Proceeding brought by a governmental body or agency or by any customer with annual worldwide aspartame requirements in excess of 1,000,000 pounds, a complaint has been filed against NutraSweet in court or in a similar administrative proceeding alleging that the Transaction was completed in violation of the antitrust laws or otherwise seeking to challenge the Transaction in any manner,** or (ii)  in the case of a Proceeding brought by a governmental body or agency, or any other party, NutraSweet receives a judgment from a competent court or agency declaring the transaction to have been in violation of the antitrust laws.  The written notice in clause (b) of this paragraph may be given by NutraSweet at any time after any of the enumerated events in clause (b) have occurred.  Upon the occurrences of any event giving NutraSweet (with or without the consent of Daesang) the right to exercise its right to rescind the Transaction under this Section 10, NutraSweet shall promptly notify Daesang thereof in writing and keep Daesang updated from time to time regarding the status of such event.  This notice of a triggering event shall not constitute the notice of the exercise of NutraSweet's right to rescind, although both such notices may be provided in the same document, at NutraSweet's unilateral discretion.

In the course of negotiating the definitive agreements for the Transaction, the Client Parties will negotiate a process for determining the terms of the supply agreement to be entered into upon rescission of the Transaction.

The foregoing provisions of this Section 10 are privileged and confidential, are considered work product protected by the attorney-client privilege and are included in the definition of Joint Privilege Materials hereunder.

[JDA ¶ 10, emphasis added]

19

82.   By its terms, Section 10 of the JDA afforded the parties certain rights and obligations during the five year period following consummation of the acquisition of certain assets related to Daesang's aspartame business.  These rights and obligations were triggered by the occurrence of a "Rescission Event."  The JDA defines a "Rescission Event" to mean:  (i) a proceeding brought "by any customer with annual worldwide aspartame requirements in excess of 1,000,000 pounds"; (ii) the complaint filed alleges that the "Transaction was completed in violation of the antitrust laws or otherwise seeking to challenge the Transaction in any manner"; (iii) NSC "shall promptly notify Daesang … in writing" of any event giving rise to a right to rescind and shall "keep Daesang updated from time to time regarding the status of such event"; and (iv) NSC has provided "written notice to Daesang that it intends to exercise its right to rescind."  [JDA ¶ 10]

83.   NSC asserts that it has complied with all the elements of Section 10 of the JDA; Daesang contends that NSC failed to satisfy each of these requirements.  [NS Summaries § I; Daesang Response to NutraSweet Defense Form I; Daesang Initial Defense Forms 12-16; NutraSweet Responses to Daesang Defense Forms 12-16]

84.   In addition, Daesang asserts that NSC's JDA rescission defense fails for two other reasons:  First, Daesang asserts that Section 10 of the JDA was superseded and extinguished by the merger clause in Section 10(c) of the APA.  Second, Daesang asserts that Daesang and NSC abandoned Section 10 of the JDA during the negotiation of the APA and the Processing Agreement.  NSC contests each of these two arguments.  [Daesang Initial Defense Form 11; NutraSweet Response to Daesang Defense Form 11]

85.   In order to prevail on its JDA rescission defense, NSC must establish each of the following elements:

   (i)     Section 10 of the JDA was not superseded by the APA and Processing Agreement;

ICC Case No. 15641/VRO/AGF

(ii)     Section 10 of the JDA was not abandoned by the parties when they negotiated and entered into the APA and Processing Agreement; and

(iii)    All the requirements for a Rescission Event in Section 10 of the JDA were satisfied.

In other words, the absence of any one element is fatal to NSC's JDA rescission defense.

86.    The Tribunal has concluded that it is unnecessary to determine whether each of these elements was satisfied.  Even if Section 10 of the JDA had not been superseded or abandoned, NSC failed to establish all the requirements for a Rescission Event. Specifically, the Tribunal concluded that NSC failed to establish that a proceeding had been brought "by any customer with annual worldwide aspartame requirements in excess of 1,000,000 pounds," as required by Section 10 of the JDA.  As a result, NSC's JDA rescission defense fails, and must be dismissed.

**(1)    The Parties' Positions**

87.    NSC contended that it properly rescinded the transaction "based upon the Proceeding styled *In re Aspartame Antitrust Litigation*, Master Docket No. 2:06-CV-1732 (E.D. Pa. USA) (Davis, J.)." [NS 3]  This proceeding was a consolidated class action in which five named plaintiffs brought "this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) & 23(b)(3) on behalf of the following Class:

> All individuals or entities (excluding governmental entities, Defendants, and their parents, predecessors, subsidiaries, affiliates, and their Co-Conspirators) who purchased Aspartame in the United States directly from any of the Defendants or their Co-Conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from January 1, 1992 to the present.

[NS 2 ¶ 34]

21

88.   NSC urged that the *In re Aspartame Antitrust Litigation* was a Rescission Event
      because the Supreme Court held in *American Pipe & Construction Co. v. Utah*,
      414 U.S. 538 (1974), that "'the claimed members to the suit'" from the filing of
      the class action "'until and unless they receive[d] notice thereof and cho[o]se not
      to continue'" are plaintiffs. *Id.* at 550-51. As a result, it was NSC's position that
      "when NutraSweet rescinded, all aspartame purchasers 'stood as parties' to the
      Antitrust Class Action, including those with annual aspartame requirements in
      excess of 1,000,000 pounds (e.g., Coke, Pepsi, Kraft, Cadbury and Cott)" because
      these large purchasers were members of the alleged class. [NS Summaries § VI
      (Response to Daesang Defense Form 12) at ¶ 1]

89.   Daesang argued in response that *In re Aspartame Antitrust Litigation* "was not
      'brought by' a customer with annual worldwide aspartame requirements in excess
      of 1,000,000 pounds." [Daesang Initial Defense Form 12 at 1] Furthermore,
      Daesang asserted, based on the Supreme Court's decision in *Smith v. Bayer Corp.*,
      131 S. Ct. 2368 (2011), that unnamed class members are not parties to a class
      action at the time of commencement or at any time prior to class certification.[7]
      [Daesang Response to NutraSweet Defense Form 1 at ¶ 1]

**(2)   The Tribunal's Decision**

90.   The Tribunal considered the question of whether there was a Rescission Event
      under the JDA to be an issue of contract interpretation. The JDA states that it
      "shall be governed by and interpreted in accordance with the laws of the State of
      New York." [JDA ¶ 14]

---

[7] See *Smith v. Bayer Corp.*, 131 S. Ct. at 2379: "In general, '[a] "party" to litigation is
"[o]ne by or against whom a lawsuit is brought," … or one who 'become[s] a party by
intervention substitution, or third-party practice … '" (internal citations omitted).

ICC Case No. 15641/VRO/AGF

91.   Under New York law, the objective of contract interpretation is to determine "the
      intention of the parties as derived from the language employed."[8] New York
      courts will enforce a contract according to its plain meaning when the terms of
      that contract are clear and unambiguous.[9] Clear and unambiguous terms should
      be understood in their plain, ordinary, popular and non-technical meaning.[10]
      Under New York law, meaning should be given to every sentence, clause and
      word in a contract.[11] In other words, to the extent possible, a contract should not
      be interpreted in a way that renders some of its terms superfluous.[12]

92.   The parties have not suggested that the language of Section 10 of the JDA is
      ambiguous nor does the Tribunal find any ambiguity.

93.   Where the language of a contract is unambiguous, as is the case here, New York
      law directs that a Tribunal enforce the parties' agreement as written. The New
      York Court of Appeals recently described a tribunal's obligation as follows:

> As we have repeatedly stated, "when parties set down their
> agreement in a clear, complete document, their writing
> should be enforced according to its terms" ... . It is the role
> of the courts to enforce the agreement made by the parties –
> not to add, excise or distort the meaning of the terms they
> chose to include, thereby creating a new contract under the
> guise of construction ... . Adherence to these principles is
> particularly appropriate in a case like this involving
> interpretation of documents drafted by sophisticated,
> counseled parties and involving ... substantial sums of
> money.[13]

---

[8] *Lopez v. Fernandito's Antique, Ltd.*, 305 A.D.2d 218, 219, 760 N.Y.S.2d 140, 140 (1st Dep't 2003) (quoting *Hartford Acc. & Indem. Co. v. Wesolowiski*, 33 N.Y.2d 169, 171-72 (1973)).

[9] *Signature Realty, Inc. v. Tallman*, 2 N.Y.3d 810, 811, 781 N.Y.S.2d 259 (2004) (quoting *R/S Assoc. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32 (2002)).

[10] *Lopez v. Fernandito's Antique, Ltd.*, 305 A.D.2d 218, 219, 760 N.Y.S.2d 140, 140 (1st Dep't 2003).

[11] *Travelers Cas. And Sur. Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 594, 734 N.Y.S.2d 531, 538 (2001).

[12] *DaPuzzo v. Globalvest Mgmt. Co., L.P.,* 263 F. Supp.2d 714, 729 (S.D.N.Y. 2003); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992).

[13] *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 259-60 (2011) (internal citations omitted).

ICC Case No. 15641/VRO/AGF

94.  The parties expressly provided in Section 10 of the JDA that a Rescission Event "shall mean" a proceeding "brought ... by any customer with annual worldwide aspartame requirements in excess of 1,000,000 pounds." Section 10 requires that the action must be "brought ... by" a specific kind of customer, a "customer with annual worldwide aspartame requirements in excess of 1,000,000 pounds." The language of Section 10 is clear—the action must be "brought ... by," not brought "on behalf of" or "for" a very large customer.

95.  It is undisputed that the named plaintiffs who "brought" the *In re Aspartame Antitrust Litigation* were not customers with annual worldwide aspartame requirements "in excess of 1,000,000 pounds." The Consolidated Amended Class Action Complaint identifies the five named plaintiffs, but does not provide any information as to their worldwide aspartame requirements.[14] [NS 2 ¶¶ 8-12, 37-38] NSC did not even suggest that any of the named plaintiffs in the class action satisfy the Rescission Event requirements. In relying on *American Pipe & Construction* to argue that large purchasers of aspartame were members of the class on whose behalf the lawsuit was filed, NSC attempted to satisfy the requirement that the action must be "brought ... by" certain large customers by arguing that the actions had been brought "on behalf of" certain large customers. However, New York law does not permit us to change the parties' words from

---

[14] The evidence submitted in this case includes the district court order dated August 11, 2008 granting a motion for summary judgment in *In re Aspartame Antitrust Litigation*. The order states: "Of the five plaintiffs originally named in the Amended Complaint, only Nog and Sorbee remain. Hank's Beverage Company, College Club Beverages Co., Inc. and Andora Ridge, the three other plaintiffs originally named in the Amended Complaint, have withdrawn as putative class representatives." [DS 62, n..2] The Court also made the following findings: "Nog purchased Aspartame from Defendant NutraSweet on three occasions – April 13, 1994, July 8, 1994 and July 17, 1995. These purchases totaled 13.23 pounds at a total cost of $460.05. After July 17, 1965, Nog did not purchase Aspartame from any Defendants." "From June 1997 through July 1999, Sorbee purchased approximately 1487.99 pounds of Aspartame for a total cost of $47,562.80 directly from Defendant NutraSweet ...." [DS 62, pp.3-5] The district court order was affirmed by the United States Court of Appeals for the Third Circuit. [DS 65]

"brought ... by" to brought "on behalf of."  We are required to interpret Section 10 of the JDA "'according to its terms.'"[15]

96.    Although the words of Section 10 of the JDA expressly required that a Rescission Event must be an action that is actually "brought ... by" a large aspartame consumer, NSC failed to establish this requirement.

97.    Therefore, the Tribunal has concluded that NSC failed to establish a Rescission Event under Section 10 of the JDA and NSC's JDA rescission defense must be dismissed. [NS Summaries § I; Terms of Reference, ¶ 30(1)][16]

**B.    The Fraud Defenses and Counterclaims of the NSC Parties**

98.    The NSC Parties in their second and third defenses and counterclaims referred to above (paragraphs 76-77, 79) seek equitable rescission of the transaction based on claims of fraud in the inducement. They have asserted claims of fraud in the inducement of the APA based on allegations that certain express representations in the APA and the Processing Agreement were false at the time these agreements were signed. Specifically, the NSC Parties allege that the following express representations were fraudulent:

(i)    Section 3(f) of the APA, in which Daesang represented that it had "complied in all material respect with all applicable laws ... in connection with the operation of the business." [NS Summaries § II]

(ii)   Article 3.1 of the Processing Agreement, in which Daesung represented that it would supply aspartame that satisfied Sales Specifications and Ancillary Specifications. [NS Summaries § III A]

---

[15] NML Capital v. Republic of Argentina, 17 N.Y. 3d at 259-60 (internal citations omitted).
[16] NSC's rescission defense that is hereby dismissed appears in the Nutrasweet Parties' Answer and Counterclaims, Sections IV(A), V(A) and VI(A).

(iii)   Section 3(q), Section 3(v) and the related Disclosure Schedule in which Daesang represented that it had not received customer complaints before the transaction.  [NS Summaries § III B]

(iv)   Section 3(j)(viii) of the APA in which Daesang represented that it manufactured aspartame in accordance with the Aspartame Manufacturing Process Memorandum dated April 20, 2003.  [NS Summaries § III C]

(v)   Section 3(u) of the APA, in which Daesang represented that the production capacity of aspartame that met Sales Specifications was 1,800 metric tons and could be increased to 3,000 metric tons. [NS Summaries § III D]

(vi)   Article 4.2(c) of the Processing Agreement, in which Daesang represented that Exhibit 4.2(c) of the Processing Agreement reflected Daesang's actual raw material and direct costs assuming 1,250 metric tons of production. [NS Summaries § III E]

(vii)   Section 3(p) of the APA, in which Daesang represented that the purchased inventory of 100 metric tons would conform to the Sales Specifications. [NS Summaries § III F]

99.   We note that the Second and Third Defenses and Counterclaims are not based on the assertion that Daesang breached any of the representations contained in the APA or the Processing Agreement.  Rather, the NSC Parties assert that these representations were fraudulent.  Nor do the NSC Parties assert that Daesang made any representations beyond those expressly stated in the APA or the Processing Agreement that were allegedly fraudulent. The NSC Parties claim that they are entitled to equitable rescission of the transaction because Daesang fraudulently induced NSC to enter into the APA and Processing Agreement based on certain factual representations contained in the APA and the Processing Agreement that were allegedly false at the time the agreements were signed.

ICC Case No. 15641/VRO/AGF

100. Both the APA and the Processing Agreement are governed by New York law. Section 10(h) of the APA states in its entirety:

> (h) Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

Article 17.1 of the Processing Agreement states in its entirety:

> 17.1 **Governing Law.** This agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding the U.N. Convention on Contracts for the International Sale of Goods, without giving effect to the conflict of laws principles of New York law.

**(1)     The Parties' Positions**

101. The threshold legal issue under New York law is whether the NSC Parties can assert a fraud claim based solely on the representations in the APA and the Processing Agreement.

102. The NSC Parties argued, largely based on the decision of the U.S. Court of Appeals in *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007), that a fraud claim may be brought for breach of the express representations in the APA and the Processing Agreement.

103. Daesang, in response, argued also based on New York law, that a fraud claim cannot be asserted based solely on the express representations that are set forth in the parties' agreements.

27

ICC Case No. 15641/VRO/AGF

**(2)**     <u>The Tribunal's Decision</u>

104.    The Tribunal has concluded that New York law does not permit a claim of fraud in the inducement to be based solely on the express representations contained in the parties' agreements.

105.    The New York law on this issue is summarized in *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 183-84 (2d Cir. 2007), as follows:

> ... under New York law, parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages.

106.    The court in *Merrill Lynch* found that the requirements of New York law had been satisfied and that a claim for fraud and for breach of contract could both be asserted. However, the facts of *Merrill Lynch* are very different than the facts here. *Merrill Lynch* involved claims arising out of Allegheny's purchase of a business owned by Merrill Lynch. As the transaction was being negotiated, Merrill Lynch prepared and delivered to Alleghany financial data regarding the business to be sold and made oral representations about this data. These financials contained significant errors and failed to disclose certain information. Thereafter the parties signed a purchase agreement that contained various representations, including representations as to accuracy and quality of the financial information provided by Merrill Lynch.

107.    After the transaction closed, a fraud was discovered in the business sold by Merrill Lynch and both sides asserted claims. In response to Merrill Lynch's lawsuit to enforce the terms of the contract, Allegheny asserted a counterclaim for fraud in the inducement of the contract. The district court dismissed the fraud in the inducement claim and granted judgment in favor of Merrill Lynch for breach of contract. On appeal, the Court of Appeals reversed the dismissal of the fraud claim.

28

108. The Court of Appeals found that Allegheny's fraud claim was based on misrepresentations regarding the financial statements delivered to Allegheny before the parties entered into their contract. This involved "a legal duty separate from the duty to perform under the contract" and also involved a misrepresentation that was "collateral or extraneous to the contract." *Id.* at 83. Thus, the misrepresentations with respect to the financial statements could give rise to a claim for fraud wholly apart from any claim of breach of contract.

109. In contrast, the fraud claims made by the NSC Parties fail to satisfy the requirements of New York law. The NSC Parties rely only on the language of the representations in the APA to support their claim of fraud in the inducement. However, the contract provision does not create a legal duty separate from the contract; it is not a provision collateral or extraneous to the contract. Furthermore, the NSC Parties do not seek special damages that are unrecoverable as contract damages. Thus, the NSC Parties' reliance on the *Merrill Lynch* decision is misplaced.

110. The facts of this case are much more similar to the cases relied on by Daesang. Those cases stand for the proposition that "a fraud claim will not lie if it arises out of the same facts as plaintiff's breach of contract claim." *Ritchie Capital Management, L.L.C. v. Coventry First LLC*, 2007 U.S. Dist. LEXIS 51081, *19 (S.D.N.Y. 2007). For instance, in *Dyncorp v. GTE Corp.*, 215 F. Supp. 2d 308, 324 (S.D.N.Y. 2002), the district court dismissed "fraud claims based on the breach of contractual warranties and representations ... as duplicative of its claim for breach of contract." In *Koch Industries, Inc. v. Hoechst*, 727 F. Supp. 2d 199 (S.D.N.Y. 2010), the district court also concluded that the plaintiffs' fraud claims based on the alleged breach of representations in the contract were "not 'collateral or extraneous'" and could not stand "concurrently with plaintiffs' breach of contact claims." *Id.* at 216. Similarly, the New York Supreme Court in *MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC*, 2011 N.Y. Misc. LEXIS 2548, 28 (Sup.Ct. N.Y. Co. 2011), concluded that fraud claims that duplicate

ICC Case No. 15641/VRO/AGF

breach of contract claims must be dismissed. The court summarized the relevant principles of New York law as follows:

> To the extent that MBIA alleges that it relied on contractual representations and warranties in the Insurance Agreement and PSA, the fraud claim duplicates the breach of contract claims and must be dismissed. To sustain a claim for fraudulently inducing a party to contract, the plaintiff must allege a representation that is collateral to the contract, not simply a breach of a contractual warranty, and damages that are not recoverable in an action for breach of contract.

111.   The NSC Parties cannot turn a breach of a representation in the APA or Processing Agreement into a claim of fraud. The New York Court of Appeals has emphasized:

> It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated .... This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract ... .

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987).

112.   The NSC Parties have failed to establish the required elements under New York law to assert a claim of fraud solely based on the express representations in the APA and Processing Agreement. Accordingly, all of the fraud defenses and counterclaims asserted by the NSC Parties must be dismissed. [NS Summaries §§ II & III][17]

---

[17] The dismissal of all the fraud defenses and counterclaims asserted by the NSC Parties means that Defense J and Counterclaim XIII are dismissed and that Defenses IV (B), V (B), and VI (B) and (D) and Counterclaims I, II, III, V, IX and X of the NSC Parties are also dismissed.

ICC Case No. 15641/VRO/AGF

**C.      Breach of Contract Defense and Counterclaims of the NSC Parties**

113.    Finally, the NSC Parties argue that Daesang breached "every significant
         obligation it undertook pursuant to the APA and the Processing Agreement."[18]
         [NSC Summaries § IV]

114.    However, the NSC Parties have not asserted any alleged breaches of the APA and
         the Processing Agreement as a claim independent of its claims for rescission of
         these agreements. Rather, in its pre-hearing submissions, at oral argument, and in
         its post-hearing submissions, Respondents stated that these alleged contractual
         breaches constitute a basis for rescissionary damages in the context of their claims
         of fraud and rescission. [See NutraSweet's Prehearing Reply Mem. at 49-50;
         Transcript, Oct. 20, 2011 at 291-96; NS 230 – Updated; NS Summaries §VII]
         However, as discussed in Section B above, the NSC Parties have failed to
         establish the requirements under New York law to assert a claim of fraud based
         solely on express representations in a contract. Since the fraud in the inducement
         and equitable rescission claim must be dismissed, there is no basis for
         rescissionary damages based on alleged breaches of contract.

115.    Moreover, these alleged breaches of the APA and the Processing Agreement
         could not independently give rise to a claim for rescission.

116.    In Section 9(g) of the APA, the parties agreed that any breaches of the APA and
         the Processing Agreement do not give rise to a right to rescind the agreements.
         Section 9(g) states as follows:

> (iii) Anything herein to the contrary notwithstanding; except
> as expressly provided in ¶2(d)(i)(C), ¶(a)(iii) and ¶2(f), no
> breach or failure to perform any representation, warranty,

---

[18] The NSC Parties allege breaches of the following provisions of the APA and
Processing Agreement: Article 3.1 and Exhibits 1.4 and 1.5 of the Processing
Agreement; Section 3(j)(viii) of the APA; Section 3(u) of the APA; Articles 4.1(g) and
4.1(n) of the Processing Agreement; Article 2.4(c) of the Processing Agreement;
Article 2.11 of the Processing Agreement; Article 2.13(c) of the Processing Agreement;
and Articles 3.4(c)(iii) and 3.7 of the Processing Agreement.  [NS Summaries § IV A-
H]

> covenant or obligation under this Agreement [APA] or
> under any of the Ancillary Agreements [Processing
> Agreement] shall give rise to the right of any Party to
> rescind, revoke or terminate this Agreement or any of the
> transactions contemplated hereby after the closing.

117. The parties expressly foreclosed (except in circumstances not relevant here), their
respective rights to rescind, revoke or terminate the APA or the Processing
Agreement for failure to perform any representation, warranty, covenant or
obligation, including all the contractual breaches alleged by NSC.

118. Such limitations on the remedies available to parties for breach of contract are
enforceable in New York. In *Metropolitan Life Ins. Co. v. Noble Loundes Int'l,
Inc.*, 84 N.Y.2d 430, 436 (1994), the New York Court of Appeals stated:

> A limitation of liability provision in a contract represents the
> parties' agreement on the allocation of the risk of economic
> loss in the event that the contemplated transaction is not
> fully executed, which the courts should honor.

Here, where sophisticated parties have negotiated a complex corporate
transaction, such contractual provisions are fully enforceable.

119. Therefore, the NSC Parties have not sought any independent relief based on any
alleged breaches of the APA and the Processing Agreement. This is consistent
with the terms of the applicable agreements, which contractually bar the NSC
Parties from seeking rescission for contractual breaches.

120. Accordingly, the NSC Parties' breach of contract defenses and counterclaims must
be dismissed. [NS Summaries § IV][19]

---

[19] The dismissal of the breach of contract defenses and counterclaims means that
Defenses IV (C), V (C) and VI (C ) and (D) and Counterclaims II, III, IV, V, VI, VII,
IX and XI in the Answer and Counterclaims and in the Amended Counterclaims are
dismissed.

ICC Case No. 15641/VRO/AGF

**D.    Conclusion and Further Proceedings**

121.    As discussed above, the Tribunal has considered all of the defenses and counterclaims of the NSC Parties and finds them without merit, including without limitation, the defenses and counterclaims of the NSC Parties for rescission, fraud and breach of contract. Therefore, all the defenses and counterclaims of the NSC Parties must be dismissed.

122.    Since each of the NSC Parties' defenses and counterclaims must be dismissed, there is no bar to Daesang's right to recover amounts owed under the APA and Processing Agreement (plus interest) for Respondents' breach of the APA and Processing Agreement.

123.    Following the issuance of the Partial Final Award, the Tribunal will need to determine, based on the record in this case, the nature and form of the relief that is appropriate in the context of this case.

124.    The Tribunal will issue a procedural order requesting the parties to submit a written statement addressing the appropriate remedy that should be granted by the Tribunal in the final award.

125.    The Tribunal will also address in a future award the costs of the entire arbitration pursuant to Article 31 of the ICC Rules.  The Tribunal will issue a procedural order requesting the parties to submit applications for costs.

**VII.    AWARD**

126.    For the reasons set forth above, the Tribunal renders and makes the following Final Partial Award:

(a)    Dismisses all the defenses and counterclaims that have been asserted by the NSC Parties.

33

ICC Case No. 15641/VRO/AGF

(b)     Reserves all other decisions, including the nature and form of relief to be
granted and the costs of the entire arbitration, to a future award.

Place of Arbitration:   New York, New York (U.S.A.)

Date:   December 21, 2012

THE ARBITRAL TRIBUNAL:

_____       _____       _____
Arnold S. Schickler             Louis B. Kimmelman              Jonathan D. Schiller
Co-Arbitrator                   Chairman                        Co-Arbitrator

34

ICC Case No. 15641/VRO/AGF/RD

# APPENDIX B:

# APA Section 2(d)

(d)     Seller's Remedies upon Payment Default

(i)     In the event that the Buyer, Newco or IPCO fails to make any Purchase Price Payment in full when due pursuant to §2(c) (subject to the Buyer's right to reduce any Purchase Price Payment pursuant to §§2(c)(ii), (iii), (iv), (v) or (vi)), then:

(A) the Buyer shall pay the Seller interest on the past due portion of the Purchase Price Payment at the rate of ten percent (10%) per annum from the original due date of the required Purchase Price Payment until the earlier of (1) the date of the payment of such past due portion of the Purchase Price Payment; (2) the date of the acceleration of the remaining Purchase Price Payments pursuant to §2(d)(i)(B)(1); or (3) the date that the Purchased Assets are re-conveyed to the Seller pursuant to §2(d)(i)(C);

(B) if such default continues for six (6) months or longer,

(1)     upon notice having been given to the Buyer, the Seller may declare all remaining Purchased Price Payments scheduled under §2(c) immediately due and payable, and such amount (including any overdue amount that remained unpaid at the time of such acceleration) shall bear interest at the Applicable Rate from the date of the acceleration pursuant to this §2(d)(i)(B) until the earlier of (x) the date that the Buyer pays all amounts due under this §2(d)(i)(B)(1) (including any overdue amount that remained unpaid at the time of such acceleration), or (y) the date that the Purchased Assets are re-conveyed to the Seller pursuant to §2(d)(i)(C); and

(2)     for so long as such default or the Buyer's failure to pay any amount due under §2(d)(i)(B)(1) is continuing, the Seller shall be entitled to use the Purchased Assets, with no compensation to the Buyer, in order to produce aspartame products for sale to the Seller's customers (with no volume limitation) solely to the extent that such use does not interfere with the Seller's performance of its obligations under the Processing Agreement; in furtherance of the foregoing, the Seller may enter into new supply agreements or amend or extend the term of any Retained Contract, provided, that any supply agreements entered into between the Seller and its customers and any amendment to or extension of any Retained Contract shall not have a term in excess of twelve (12) months (in the case of an amendment to or extension of any Retained Contract, in addition to the existing term of such contract); provided, further that to the extent that the use of the Purchased Assets does not interfere with the Seller's performance of its obligations under the Processing Agreement, the Seller shall be entitled to fulfill such supply agreements (including any amended or modified Retained Contract) for such term using the Purchased Assets even in the event that the Buyer remedies any payment default hereunder.

\*          \*          \*

# EXHIBIT "E"

SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT,

David Friedman, J.P.
Richard T. Andrias
Anil C. Singh
Peter H. Moulton, JJ.

5973
Index 655019/16

————————————————————————x

In re Daesang Corporation,
 Petitioner-Appellant,

  -against-

The NutraSweet Company, et al.,
 Respondents-Respondents.
  - - - - -
The Association of the Bar of the
City of New York,
 Amicus Curiae.

————————————————————————x

Petitioner appeals from an order of the Supreme Court, New York
  County (Charles E. Ramos, J.), entered May
  15, 2017, which, to the extent appealed from
  as limited by the briefs, held in abeyance
  the petition to confirm a final arbitration
  award, dated June 14, 2016, rendered in favor
  of petitioner by a tribunal of the
  International Chamber of Commerce, and
  granted respondents' cross motion to vacate
  the aforementioned final award and the
  preceding final partial award, dated December
  21, 2012, rendered by the same tribunal, to
  the extent of vacating the awards' dismissal
  of respondents' second, third and fourth
  defenses and counterclaims and remanding
  those defenses and counterclaims to the
  tribunal for redetermination.

Morvillo Abramowitz Grand Iason & Anello
P.C., New York (Edward M. Spiro, Jonathan S.
Sack and Miriam L. Glaser of counsel), and
Law Offices of Richard B. Pacella, New York
(Richard B. Pacella of counsel), for
appellant.

Tannenbaum Helpern Syracuse & Hirschtritt
LLP, New York (Paul D. Sarkozi of counsel),
for respondents.

Baker & McKenzie, LLP, New York (Grant
Hanessian and Derek A. Soller of counsel),
for amicus curiae.

2

FRIEDMAN, J.P.

This appeal, arising from a bitter international commercial dispute between producers of an artificial sweetener, raises the question of whether, under the Federal Arbitration Act (9 USC § 1 *et seq.*) (FAA), grounds exist to deny confirmation to an arbitration award rendered in New York.  In the order under review, Supreme Court vacated the award in substantial part and remanded to the arbitrators, for their redetermination, certain defenses and counterclaims that they had dismissed.  The court took this action, albeit "reluctant[ly]" (as it told the parties at oral argument), based on its view that the arbitrators, in disposing of these defenses and counterclaims, had manifestly disregarded the law and had misconstrued the procedural record.  This was error.

The order vacating the award in part cannot be justified under the "emphatic federal policy in favor of arbitral dispute resolution" embodied in the FAA, a policy that "applies with special force in the field of international commerce" (*Mitsubishi Motors Corp. v Soler Chrysler-Plymouth*, 473 US 614, 631 [1985]).[1]

---

[1] The United States Supreme Court has observed that "[a] contractual provision specifying in advance the forum in which disputes shall be litigated . . . is . . . an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction.  Furthermore, such a provision obviates the danger

3

Under the FAA, even if an arbitral tribunal's legal and procedural rulings might reasonably be criticized on the merits, an award is not subject to vacatur for ordinary errors of the kind the court identified in this case, as opposed to manifest disregard of the law, a concept that, as more fully discussed below, means "more than a simple error in law" (*Wien & Malkin LLP v Helmsley-Spear, Inc.*, 6 NY3d 471, 481 [2006] [internal quotation marks omitted]).  "The potential for . . . mistakes [by the arbitrators] is the price for agreeing to arbitration" (*Oxford Health Plans LLC v Sutter*, 569 US 564, 572-573 [2013]), and, "however disappointing [an award] may be," parties that have bargained for arbitration "must abide by it" (*Wilkins v Allen*, 169 NY 494, 497 [1902]; *see also Matter of Pine St. Realty Co., Inc. v Coutroulos*, 233 App Div 404, 407 [1st Dept 1931], *lv*

_____

that a dispute under the agreement might be submitted to a forum
hostile to the interests of one of the parties or unfamiliar with
the problem area involved.  A parochial refusal by the courts of
one country to enforce an international arbitration agreement
would not only frustrate these purposes, but would invite
unseemly and mutually destructive jockeying by the parties to
secure tactical litigation advantages" (*Scherk v Alberto-Culver
Co.*, 417 US 506, 516-517 [1974] [footnote and paragraph break
omitted]).  While the decision under review cannot fairly be
characterized as "parochial," we are cognizant, in deciding this
appeal, of the following caution issued by The Association of the
Bar of the City of New York in the amicus curiae brief it has
submitted in support of this appeal: "Any suggestion that New
York courts will review the arbitrators' factual and legal
determinations, as if on appeal, . . . will discourage parties
from choosing New York as the place of arbitration."

*denied* 258 NY 609 [1932] ["Errors, mistakes, departures from
strict legal rules, are all included in the arbitration risk"]).
Accordingly, we reverse, grant the petition to confirm the award,
and deny the cross motion to vacate it.

In 2002, petitioner Daesang Corporation and respondent The
NutraSweet Company, the world's largest producer of the
artificial sweetener aspartame, began to discuss NutraSweet's
potential acquisition of Daesang's aspartame business.[2]  In
connection with these discussions, Daesang and NutraSweet entered
into a December 2002 Joint Defense and Confidentiality Agreement
(JDA).  Section 10 of the JDA provides, *inter alia*, that
NutraSweet is entitled to rescind any transaction ultimately
agreed upon in the event legal proceedings challenging the deal
as an antitrust violation are instituted "by any customer with
annual worldwide aspartame requirements in excess of 1,000,000
pounds[.]"

On April 30, 2003, Daesang and NutraSweet entered into an
Asset Purchase Agreement (APA), pursuant to which Daesang sold
all of its aspartame assets to NutraSweet for $79,250,000, $5

---

[2]Daesang is incorporated and headquartered in the Republic
of Korea.  The NutraSweet Company, which is incorporated in
Delaware and headquartered in Illinois, is the parent of the two
other respondents, NutraSweet IP Holdings, Inc. and Sweeteners
Holdings Korea Ltd.  This opinion refers to the three respondents
collectively as NutraSweet.

million of which was to be paid at closing and the remainder in
five annual installment payments.  In connection with the APA,
the parties also entered into a Processing Agreement, dated May
13, 2003, pursuant to which NutraSweet engaged Daesang to provide
aspartame production services at the Korean manufacturing
facilities that NutraSweet was acquiring.  The APA and the
Processing Agreement each provides that it is governed by New
York law and that disputes are to be resolved through arbitration
by a three-member tribunal in New York under the rules of the
International Chamber of Commerce.  In this regard, the APA
provides that "the resolution of disputes by the arbitrators . .
. shall be conclusive and binding upon and non-appealable by the
Parties."

The APA and the Processing Agreement contain a number of
representations and warranties by Daesang that are relevant to
this appeal.  Among these is Daesang's representation in the APA
that it "has complied in all material respects with all
applicable laws" in operating its aspartame business (the
compliance-with-law warranty).  Also pertinent are Daesang's
representations and warranties in the APA and the Processing
Agreement concerning its product quality, manufacturing
processes,  production capacity, and production costs, and
concerning the absence of customer complaints.  However, another

provision of the APA bars either party from seeking rescission based solely on the other party's breach of its representations and warranties in the APA or the Processing Agreement.

After the transaction closed in May 2003, NutraSweet made the 2004 and 2005 annual installment payments of the purchase price under the APA, each in the amount of $5 million.[3] NutraSweet failed, however, to remit the third installment payment of $9.25 million, which became due in June 2006.  In December 2006, after the requisite period of time had passed without cure of the default, Daesang exercised its right under the APA to accelerate the $55 million balance of the purchase price.  In March 2007, Daesang notified NutraSweet that, pursuant to Daesang's rights under the APA in the event of a default, Daesang would resume manufacturing aspartame for its own account at the Korean plant NutraSweet had purchased.  Five days later, NutraSweet notified Daesang that it was rescinding the transaction pursuant to section 10 of the JDA, based on an antitrust class action that several industrial aspartame customers had commenced against NutraSweet and Daesang (among other aspartame producers) in June 2006 (*In re Aspartame*

---

[3]Daesang granted NutraSweet a four-month extension of the due date for the second installment payment but denied NutraSweet's request for an additional extension thereafter.

*Antitrust Litig.*, US Dist Ct, ED Pa, Master Docket No. 2:06-CV-1732).

In June 2008, Daesang, pursuant to the arbitration provisions of the APA and the Processing Agreement, commenced an arbitration proceeding against NutraSweet, seeking about $80 million in damages, plus interest, for breach of those agreements. NutraSweet filed its answer, defenses and counterclaims in August 2008. As clarified by the prehearing memorandum it submitted to the arbitrators in July 2010, NutraSweet asserted four defenses and counterclaims against Daesang:

> (1) First, NutraSweet asserted that it had validly rescinded the entire transaction pursuant to section 10 of the JDA, based on the *Aspartame Antitrust* action, which was brought on behalf of a class comprising all industrial aspartame customers worldwide — although it is undisputed that the annual requirements of the named plaintiffs in that proceeding, even in aggregate, did not meet the million-pound level required to trigger the contractual right of rescission.

> (2) Second, NutraSweet asserted that, independent of the JDA's rescission provision, it was entitled to "equitable rescission" of the transaction on the ground that Daesang's compliance-with-law warranty in the APA had been false when made and had fraudulently induced NutraSweet to enter into the deal.⁴

_____

⁴NutraSweet's claim of the falsity of Daesang's compliance-with-law warranty is principally based on an affidavit by Dae Yeob Park, a Daesang executive, that was submitted in the *Aspartame Antitrust* case. In this affidavit, Park admits that Daesang had committed certain antitrust violations in running its

(3) Third, NutraSweet asserted it was entitled to equitable rescission based on the alleged falsity of Daesang's representations and warranties in the APA and Processing Agreement concerning its product quality, manufacturing processes, production capacity, and production costs, and concerning the absence of complaints from customers.

(4) Fourth, NutraSweet alleged that Daesang had "continuously breached its obligations under the [APA and the Processing Agreement]" by "fail[ing] to maintain the plant, fail[ing] to manufacture aspartame according to the agreed-upon specifications, and fail[ing] to supply NutraSweet with sufficient quantities of saleable aspartame."

In support of their claims and defenses, the parties submitted, in addition to their pleadings and legal memoranda, written declarations by 20 witnesses and hundreds of evidentiary exhibits.  In July 2011, a nine-day evidentiary hearing was held in New York before the tribunal of three arbitrators, at which 11 witnesses were cross-examined.  At the end of the hearing, the tribunal directed the parties to make additional submissions, including documents outlining the parties' respective claims and defenses, with citations of supporting evidence and legal authority.

Pursuant to the tribunal's direction, NutraSweet submitted a 76-page document entitled "NutraSweet's Post-Hearing Summaries"

---

aspartame business before the sale to NutraSweet.  As Daesang points out, however, Park alleges in his affidavit that NutraSweet itself — a much larger aspartame producer than Daesang — participated in the anticompetitive activities he describes.

(hereinafter, the NS Post-Hearing Summaries), which, among other
things, set forth, in outline form, NutraSweet's aforementioned
four defenses and counterclaims — the first for rescission under
the JDA, the second and third for rescission based on fraudulent
inducement, and the fourth for breach of contract.  Attached to
the NS Post-Hearing Summaries was a three-page exhibit marked for
identification as "NS 230 — Updated," and entitled "Summary of
NutraSweet's Counterclaim Damages Based on JDA and Equitable
Rescission Alternatives" (hereinafter, NS 230), which sets forth
separate tabular calculations of damages based, respectively, on
rescission pursuant to the JDA (the first counterclaim) and
"equitable rescission" (the second and third counterclaims).[5]
Perhaps fatefully for the outcome of the arbitration, NS 230 does
not identify either set of damages calculations as relating to
NutraSweet's fourth counterclaim, for breach of contract.
Nevertheless, the summary of the breach-of-contract counterclaim
in the NS Post-Hearing Summaries asserts that the arbitrators
"should enter an award [on that claim] in favor of NutraSweet in

_____

[5]Although NS 230 calculates the damages to be awarded in the
event the panel validated NutraSweet's rescission of the
transaction pursuant to the JDA, the summary of the JDA
rescission claim in the NS Post-Hearing Summaries does not
mention any damages sought in connection with this claim.  This
unexplained discrepancy does not affect the disposition of this
appeal.

10

the amount [including interest through August 1, 2011] of $13,857,782.33" — the same amount sought in connection with the counterclaim for rescission based on the JDA.[6]

After a full day of oral closing argument was heard in New York on October 20, 2011, the tribunal issued a 34-page "Partial Final Award," dated December 21, 2012 (the partial award), unanimously finding in favor of Daesang on all of its claims and dismissing all of NutraSweet's defenses and counterclaims. NutraSweet's first counterclaim, asserting that it had validly rescinded the transaction pursuant to section 10 of the JDA, was rejected on the ground that the named plaintiffs in the *Aspartame Antitrust* class action, regardless of the broad class they purported to represent, did not themselves meet the annual one-million-pound-requirement threshold for triggering the contractual right to rescind.  The second and third

---

[6]Confusingly, the same page of the NS Post-Hearing Summaries states that "NutraSweet is entitled to a monetary award of $14,195,685.33" based on Daesang's alleged breaches.  The discrepancy corresponds to a set-off of $337,903 that was applied in NS 230 in reaching the lesser damages figure ($13,857,782.33) on the claim for rescission under the JDA.  We note that the counterclaims for fraud-based rescission sought a greater amount of damages ($20,691,915.99) because those claims sought a recovery that included the refund of the portion of the purchase price that NutraSweet had paid, less the amount of those payments that had been allocated to inventory.  Under the JDA, Daesang was entitled to keep any portion of the purchase price that had been paid before a rescission pursuant to Section 10 of that agreement went into effect.

11

counterclaims, for rescission based on alleged fraud in Daesang's
compliance-with-law warranty and its other contractual
representations and warranties, were rejected on the ground that,
based on the tribunal's analysis of the case law cited by the
parties, such claims were contractual in nature and could not be
pursued on a theory of fraudulent inducement under New York law.
As to breach of contract, while the arbitrators recognized that
NutraSweet alleged that Daesang had committed numerous breaches
of the APA and the Processing Agreement, they concluded that
NutraSweet "ha[d] not asserted any alleged breaches of the APA
and the Processing Agreement as a claim independent of its claims
for rescission of those agreements."  In this regard, the
tribunal emphasized that section 9(g) of the APA expressly
provides that neither party has "the right to rescind, revoke or
terminate" the transaction based on any "breach or failure to
perform any representation, warranty, covenant or obligation" of
the APA or the Processing Agreement.  Accordingly, NutraSweet's
fourth defense and counterclaim, for breach of contract, was
dismissed.  The partial award reserved decision on the remedy to
be granted to Daesang, which would be determined, after
additional submissions by the parties, in a final award.

   After the partial award was issued, NutraSweet submitted to
the tribunal its "Statement as to the Appropriate Remedy," dated

12

October 3, 2014 (the NS Remedy Statement).  In the NS Remedy
Statement, NutraSweet took the position that, because the value
of the aspartame assets that it had returned to Daesang exceeded
Daesang's alleged damages on its claims for breach of contract,
"Daesang suffered no damages and is entitled to no recovery."
NutraSweet also requested that the partial award in favor of
Daesang be reconsidered.  In seeking reconsideration, NutraSweet
argued, inter alia, that the tribunal had misapplied New York law
in dismissing the fraudulent inducement counterclaim based on the
compliance-with-law warranty and had been mistaken in concluding
that NutraSweet did not seek damages for breach of contract
independent of its claims for rescission.  In the latter regard,
NutraSweet asserted that it had "always . . . asserted stand-
alone counterclaims for damages and set-offs based on Daesang's
breaches of the APA and the Processing Agreement."  In support of
the argument concerning the breach of contract counterclaim,
NutraSweet pointed to the request for damages on that claim in
the NS Post-Hearing Summaries and to its counsel's statement at
the closing argument, when asked whether NutraSweet was pursuing
fraud claims or breach of contract claims, that "'[w]e have both
claims, we have a claim for fraud in Section III of the Post-
Hearing Summaries and we have a claim for breach of contract in

13

Section IV[.]'"[7]  The NS Remedy Statement concluded by requesting

that the tribunal reconsider the partial award and "award

NutraSweet $14,195,685.33 in damages, plus interest, as detailed

in [the NS] Post-Hearing Summaries § IV, and as summarized again

in the table above."[8]

The tribunal issued a final award, dated June 14, 2016,

awarding Daesang damages in the total amount of $100,766,258,

which included, among other elements, the $64.25 million unpaid

balance of the purchase price under the APA and interest through

June 10, 2016.  The tribunal stood by its dismissal of all of

NutraSweet's defenses and counterclaims, including the dismissal

of the counterclaim for damages for breach of contract.  In

---

[7]The conclusion of counsel's quoted sentence, for which the
NS Remedy Statement substituted an ellipsis, was: ". . . and I am
just dealing with them together here to make it quicker."

[8]This statement refers to a damages table set forth earlier
in the NS Remedy Statement, in which NutraSweet calculated its
damages for breach of contract (with interest through August 1,
2011) as $14,195,685.33, again, without explaining the failure to
apply the $337,903 set-off that had been used in calculating
damages on its other claims.  To the $14,195,685.33 figure, the
NS Remedy Statement's table added $2,734,012.27 for interest from
August 2, 2011 through October 31, 2014, and a further recovery
of $3,224,669.  The latter figure — which NutraSweet apparently
requested for the first time in the NS Remedy Statement,
submitted after the arbitrator's initial decision — represented
"restitution" of the amount by which the alleged value of the
returned aspartame assets exceeded the damages claimed by
Daesang.  Thus, the total recovery NutraSweet sought in the NS
Remedy Statement was $20,154,366.60.

14

response to NutraSweet's position that it had asserted a freestanding claim for damages for breach of contract, the tribunal concluded that, to the extent NutraSweet had asserted any such claim, that claim had been waived in the course of the proceedings.  The arbitrators wrote:

> "To the extent [NutraSweet] sought to assert a damages claim for breach of contract at an earlier stage in this arbitration, by the time of oral argument following the evidentiary hearing [NutraSweet] chose to pursue a strategy of seeking only rescission and only damages relating to rescission. . . .  This meant waiving any independent breach of contract claim. Having submitted [its] case exclusively on a theory of rescission to the Tribunal in response to specific questions from the Tribunal as to the precise remedy being sought and based on an exhibit that only provided for rescissionary damages [NS230-Updated][,] [NutraSweet] cannot now, after the fact and years of arbitration, attempt to change their theory of the case when that theory turns out to have been unsuccessful."

In support of its finding that NutraSweet had waived any freestanding claim for damages for breach of contract, the tribunal cited the following excerpts from the transcript of the October 2011 closing arguments (emphases and ellipses below are as set forth in the final award):

> "THE CHAIRMAN: What is [sic] the contract provisions that this claim is based on and what is the basis for the rescission remedy?
>
> "Because as I understand it this claim, like the one we have just talked about, the remedy that is being sought is rescission.
>
> "[NUTRASWEET'S COUNSEL]: *The remedy that is being*

15

*sought under section 3 is equitable rescission,* section
3 of NutraSweet's post hearing summaries.

"*For some of the same claims NutraSweet also seeks
damages under section 4 in the context of its
rescission claim NutraSweet is also seeking, for lack
of a better term, rescissionary damages or out-of-
pocket damages,* things which NutraSweet expanded that
improved the plant in Gusan . . .

"*In the rescission context NutraSweet is asking
for a return of the out-of-pocket expenditures to put
it back in the place that the parties were had the
contract never been made.*"

\* \* \*

"[TRIBUNAL MEMBER]: But when I went back to reread
what is written here irrespective of whether you tied
the two together with NS 230 or not you are looking for
damages on all of these claims

"[NUTRASWEET'S COUNSEL]: *Rescission including the
purchase price payments returned and then the
rescissionary damages meaning the money we spent
improving Daesang's plant and the other items.*

\* \* \*

"*Those are not breach of contract damages.*"

"[TRIBUNAL MEMBER]: I am not asking breach [of]
contract or not.

"I am just talking about what you are seeking
here."

\* \* \*

"[NUTRASWEET'S COUNSEL]: *Rescission including
money.  Not rescission plus money.*"

\* \* \*

"[DAESANG'S COUNSEL]: *The point is that he is*

16

*trying to make he is not asking for money damages for
the specific act of violating 3Q and 3V [of the
APA].*[9]

"*Is that a fair statement?*

"[NUTRASWEET'S COUNSEL]: *That is a fair statement.*

"*The money that NutraSweet is seeking based on
that is based on the rescission to put the parties back
in the position they were status quo ante.*

"But that is true.  *There are no contract damages
that NutraSweet is seeking* for failure to disclose the
Coke complaint before the transaction.

"THE CHAIRMAN: Okay.  That helps."

The tribunal also based its finding of waiver on NS 230, the

damages exhibit, concerning which the arbitrators wrote:

"[NutraSweet] specifically set out the damages that [it
was] seeking in [NS 230].  This document lists two
categories of damages that were sought as part of
[NutraSweet's] rescission counterclaims — 'Purchase
Price Payment' and 'Breach of Contract/Fraudulent
Misrepresentations.'  All the damages that NutraSweet
sought in this arbitration fall into one of two legal
theories — 'JDA Rescission' or 'Equitable Rescission.'
[NutraSweet] did not seek damages under any other
theory and specifically did not seek any damages
outside [its] claims of rescission.  Importantly, there
is no claim for damages based on an alleged breach of
contract."

In September 2016, Daesang commenced this proceeding in

Supreme Court, New York County, by filing its petition to confirm

---

[9]Sections 3(q) and 3(v) of the APA are Daesang's
representations concerning the absence of prior customer
complaints.

the final award pursuant to article 75 of the CPLR and the FAA. NutraSweet answered and cross-moved to vacate both the partial award and the final award "on the grounds that the arbitrators manifestly disregarded the law and evidence, violated public policy, and utterly failed to discharge their duties in accordance with the law and the Terms of Reference governing the arbitration[.]"

After hearing argument in December 2016, Supreme Court issued an order, entered May 15, 2017, granting NutraSweet's motion to vacate the awards to the extent of vacating the dismissals of the second and third counterclaims seeking equitable rescission based on fraudulent inducement and of the fourth counterclaim for breach of contract, and remanding the matter to the arbitration tribunal for a "redetermination" of those claims.  Daesang's petition for confirmation was held in abeyance pending the tribunal's redetermination of the remanded claims.

In its decision, Supreme Court recognized that the enforceability of the partial award and final award is governed by the FAA, that judicial review of an arbitration award under the FAA (as under New York law) is extremely limited, and that the doctrine of manifest disregard of the law does not authorize a court to vacate an arbitration award based simply on the

18

arbitrators' arguable error or misunderstanding of the applicable law.  Applying these principles, the court concluded that it could not vacate the tribunal's dismissal of NutraSweet's counterclaim for rescission under section 10 of the JDA.[10]  The court reached a different conclusion, however, with regard to the dismissal of the counterclaims for equitable rescission and for breach of contract.

Concerning the counterclaims for equitable rescission, the court found that "the Tribunal chose to disregard the well-established principle [invoked by NutraSweet during the arbitration] that a fraud claim can be based on a breach of contractual warranties where the misrepresentations are of present facts (in contrast to future performance) and cause the actual losses claimed."  As to the counterclaim for breach of contract, the court found that "a careful reading of the transcript utterly fails to demonstrate that there was a waiver by Nutra[S]weet of its breach of contract counterclaim at the

---

[10]The court found that the dismissal of the counterclaim for rescission under the JDA had to be upheld under the FAA even though the court disagreed with the arbitrators' view that the aspartame requirements solely of the named plaintiffs in the *Aspartame Antitrust* class action could be considered in determining whether the contractual right to rescind had been triggered.  Because NutraSweet, the only party aggrieved by this aspect of the decision, has not taken an appeal, we need not further consider the claim for rescission under the JDA.

19

October 20, 2011 [closing argument] hearing." The court opined that "[t]he portion of the transcript relied upon by the Tribunal was a dialogue concerning counterclaim III, re[s]cission, not [counterclaim] IV, breach of contract. Thus, there was no basis to conclude that there was a waiver by NutraSweet." Therefore, the court concluded, "The refusal to consider the merits of NutraSweet's breach of contract counterclaim and the baseless determination of waiver goes beyond mere error in law or facts, and amounts to an egregious dereliction of duty on the part of the Tribunal" (citing *Wien & Malkin*, 6 NY3d at 480-481). The court did not reach NutraSweet's argument that enforcement of the awards would be contrary to public policy. This appeal by Daesang ensued.

The parties agree that the enforcement of the arbitration awards rendered in this international commercial dispute is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (21 UST 2517, reprinted following 9 USCA § 201) (the Convention) and by the FAA (*see Yusuf Ahmed Alghanim & Sons, W.L.L. v Toys "R" Us, Inc.*, 126 F3d 15, 18-19 [2d Cir 1997], *cert denied* 522 US 1111 [1998]). Because the awards were rendered in the United States, the FAA governs (pursuant to the Convention, art V, § 1[e], and 9 USC § 208) whether the awards may be set aside or vacated in this

20

proceeding brought within the United States (*Yusuf Ahmed Alghanim & Sons*, 126 F3d at 20-23).  The Convention and the FAA mandate, however, that a court "shall confirm [an arbitral] award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention" (9 USC § 207; Convention, art V, §§ 1, 2).

The Court of Appeals has offered the following guidance concerning the enforcement of arbitration awards under the FAA:

> "It is well settled that judicial review of arbitration awards is extremely limited.  An arbitration award must be upheld when the arbitrator offers even a barely colorable justification for the outcome reached.  Indeed, we have stated time and again that an arbitrator's award should not be vacated for errors of law and fact committed by the arbitrator and the courts should not assume the role of overseers to mold the award to conform to their sense of justice" (*Wien & Malkin*, 6 NY3d at 479-480 [citations, brackets and internal quotation marks omitted]).

The FAA expressly provides four grounds on which a court, upon application by a party, may vacate an arbitration award (9 USC § 10[a]).  Of these four express statutory grounds for vacatur, only one is invoked by NutraSweet here — a situation "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made" (9 USC § 10[a][4]).  In addition, NutraSweet argues that the subject awards are subject to vacatur on the implied ground of manifest disregard of the law

21

(*see Wilko v Swan*, 346 US 427, 436-437 [1953]), of which the
Court of Appeals has written:

> "[A]n award may be vacated under federal law if it
> exhibits a 'manifest disregard of the law' (*Duferco
> Intl. Steel Trading v T. Klaveness Shipping A/S*, 333
> F3d 383, 388 [2d Cir 2003]; *Goldman v Architectural
> Iron Co.*, 306 F3d 1214, 1216 [2d Cir 2002], citing
> *DiRussa v Dean Witter Reynolds Inc.*, 121 F3d 818, 821
> [2d Cir 1997]). But manifest disregard of the law is a
> 'severely limited' doctrine (*Matter of Arbitration No.
> AAA13-161-0511-85 Under Grain Arbitration Rules*, 867
> F2d 130, 133 [2d Cir 1989]). It is a doctrine of last
> resort limited to the rare occurrences of apparent
> 'egregious impropriety' on the part of the arbitrators,
> 'where none of the provisions of the FAA apply'
> (*Duferco*, 333 F3d at 389). The doctrine of manifest
> disregard, therefore, 'gives extreme deference to
> arbitrators' (*DiRussa*, 121 F3d at 821). The Second
> Circuit has also indicated that the doctrine requires
> 'more than a simple error in law or a failure by the
> arbitrators to understand or apply it; and, it is more
> than an erroneous interpretation of the law" (*Duferco*,
> 333 F3d at 389). We agree with that premise. To
> modify or vacate an award on the ground of manifest
> disregard of the law, a court must find 'both that (1)
> the arbitrators knew of a governing legal principle yet
> refused to apply it or ignored it altogether, and (2)
> the law ignored by the arbitrators was well defined,
> explicit, and clearly applicable to the case' (*Wallace
> v Buttar*, 378 F3d 182, 189 [2d Cir 2004], quoting *Banco
> de Seguros del Estado v Mutual Mar. Off., Inc.*, 344 F3d
> 255, 263 [2d Cir 2003])" (*Wien & Malkin*, 6 NY3d at 480-
> 481 [footnotes omitted]).[11]

---

[11]Since *Wien & Malkin* was decided, the Second Circuit has
clarified, in light of *Hall St. Assoc., L.L.C. v Mattel, Inc.*
(552 US 576 [2008]), that it regards the doctrine of manifest
disregard of the law as "a judicial gloss on the specific grounds
for vacatur enumerated in section 10 of the FAA," rather than as
"a ground for vacatur entirely separate from those enumerated in
the FAA" (*Stolt-Nielsen SA v AnimalFeeds Intl. Corp.*, 548 F3d 85,
94 [2d Cir 2008], *revd on other grounds* 559 US 662 [2010]).

22

We turn first to the arbitrators' dismissal of NutraSweet's second and third counterclaims for equitable rescission of the transaction based on fraud in the inducement.  As previously noted, Supreme Court set aside this determination, and remanded the two equitable rescission counterclaims to the arbitrators for redetermination, on the ground that the tribunal had manifestly disregarded the law in holding that these claims, based on allegedly false representations made by Daesang in the APA and the Processing Agreement, were contractual in nature and therefore could not be pursued by NutraSweet on a theory of fraud.  In so doing, Supreme Court plainly erred.  At most, the tribunal "state[d] an intention to apply a law, and then misapplie[d] it," which constitutes nothing more than a mere error of law for which "[an] award will not be set aside" (*Matter of Sprinzen [Nomberg]*, 46 NY2d 623, 629 [1979]).

To recapitulate, NutraSweet, in its second and third counterclaims, alleges that Daesang's compliance-with-law warranty in the APA, and several other representations and warranties concerning Daesang's aspartame business in the APA and the Processing Agreement, were materially false when made. Before the arbitrators, NutraSweet contended that, because these allegedly false contractual representations fraudulently induced it to enter into the transaction, it was entitled to rescission

23

of the entire transaction on equitable grounds.[12]  The parties
disputed, among other issues relating to these counterclaims,
whether claims that contractual representations had been false
when made could be pursued on a fraud theory (as opposed to a
theory of breach of contract) under New York law.

In debating whether the second and third counterclaims could
be maintained on a theory of fraud, each side relied on an
opposing line of decisional authority.  One of the cases on which
NutraSweet placed primary reliance was *Merrill Lynch & Co. Inc. v
Allegheny Energy, Inc.* (500 F3d 171 [2d Cir 2007]).  In
dismissing the equitable rescission counterclaims in the partial
award, the arbitrators quoted and applied (whether correctly or
incorrectly) the following standard set forth in *Merrill Lynch*
for resolving the issue presented:

> "[U]nder New York law, parallel fraud and contract
> claims may be brought if the plaintiff (1) demonstrates
> a legal duty separate from the duty to perform under
> the contract; (2) points to a fraudulent
> misrepresentation that is collateral or extraneous to
> the contract; or (3) seeks special damages that are
> unrecoverable as contract damages" (*id.* at 183).

---

[12]Again, Supreme Court upheld the arbitrator's dismissal of
NutraSweet's first counterclaim, for contractual rescission
pursuant to section 10 of the JDA, and that claim is not at issue
on this appeal.  It should also be borne in mind that NutraSweet
could not seek rescission on a breach-of-contract theory because,
as previously noted, the APA bars rescission as a remedy for
breach of a representation or warranty.

The tribunal went on to discuss the facts of *Merrill Lynch*, observing that the fraud claim in that case was allowed to proceed because it was

> "based on misrepresentations regarding the financial statements delivered to Allegheny *before* the parties entered into their contract.  This involved a legal duty separate from the duty to perform under the contract and also involved a misrepresentation that was collateral or extraneous to the contract.  Thus, the misrepresentations with respect to the financial statements could give rise to a claim for fraud wholly apart from any claim for breach of contract" (citation and internal quotation marks omitted).

The tribunal concluded that *Merrill Lynch* was distinguishable from the instant matter because NutraSweet

> "rel[ies] only on the language of the representations in the APA to support [its] claim of fraud in the inducement.  However, the contract provision does not create a legal duty separate from the contract; it is not a provision collateral or extraneous to the contract. . . . Thus, [NutraSweet's] reliance on the *Merrill Lynch* decision is misplaced."

The tribunal further opined that "[t]he facts of this case are much more similar to the cases relied on by Daesang," citing, inter alia, *Dyncorp v GTE Corp.* (215 F Supp 2d 308, 324 [SD NY 2007] [dismissing "fraud claims based on the breach of contractual warranties and representations . . . as duplicative of (the party's) claim for breach of contract"]).

The foregoing suffices to show that the resolution in the partial award of the issue of the viability of NutraSweet's fraud

counterclaims — whether or not that resolution was correct (a
question on which we express no opinion) — does not meet the high
standard required to establish manifest disregard of the law,
namely, a showing that "the arbitrator[s] knew of the relevant
principle, appreciated that this principle controlled the outcome
of the disputed issue, and nonetheless willfully flouted the
governing law by refusing to apply it" (*Westerbeke Corp. v
Daihatsu Motor Co.*, 304 F3d 200, 217 [2d Cir 2002]).   On the
contrary, the tribunal accepted the authority of the decision on
which NutraSweet primarily relied (*Merrill Lynch*) and, "after
analyzing [the] case law offered by both sides" (*Cheng v Oxford
Health Plans, Inc.*, 45 AD3d 356, 357 [1st Dept 2007]), made a
good-faith effort to apply to the facts of this case the *Merrill
Lynch* standard proffered by NutraSweet.   That the arbitrators did
not accept NutraSweet's view of how the relevant legal principle
applies to the facts of this case does not amount to "refus[ing]
to apply [the principle] or ignor[ing] it altogether" (*Wien &
Malkin*, 6 NY3d at 481 [internal quotation marks omitted]).   The
arbitrators' ruling, whether or not we agree with it on the
merits, more than meets the requirement that there be at least "a
barely colorable justification for the outcome reached" (*id.* at
479 [internal quotation marks omitted]).   Even if a thorough
analysis of the underlying legal issue (which we do not propose

26

to undertake here) would lead us to conclude that NutraSweet was correct on the merits, a finding of manifest disregard of the law "requires more than a simple error in law or a failure by the arbitrators to understand or apply it" (*id.* at 481 [internal quotation marks omitted]). On this record, NutraSweet can show nothing more than this.

Moreover, it cannot be said that the point of law at issue was sufficiently "well defined" (*id.* [internal quotation marks omitted]) to give rise to a claim that the award was rendered in manifest disregard of the law. The meaning of the rule that an alleged misrepresentation is actionable as fraud if it is "collateral or extraneous to the contract" (*Merrill Lynch*, 500 F3d at 183) — which NutraSweet unsuccessfully argued to the tribunal that its second and third counterclaims satisfied — is not necessarily transparent from the quoted words alone and must be drawn out through detailed analysis of cases in which the rule has been applied. Even if the arbitrators erred in concluding that NutraSweet's fraud claims were not "collateral or extraneous" to the contractual representations in the APA and the Processing Agreement, the arbitrators did not manifestly disregard the law by according to the quoted decisional language what may have reasonably seemed to them its natural meaning. Certainly, any error by the arbitrators in deciding this issue

27

(and, again, we make no determination as to whether they in fact erred) was far from "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator" (*Merrill Lynch, Pierce, Fenner & Smith, Inc. v Bobker*, 808 F2d 930, 933-934 [2d Cir 1986]), which is the standard for a showing of manifest disregard of the law.[13]

In its appellate brief, NutraSweet appears to defend the vacatur of the dismissal of its second counterclaim (based on the alleged falsity of the compliance-with-law warranty) on the ground that "Daesang's admissions of criminal wrongdoing [in the aforementioned affidavit of its executive, Dae Yeob Park] should have been of critical importance to the arbitrators' deliberations[.]"  Any such argument, to the effect that the

_____

[13]The difficulty of applying the legal rule in question is highlighted by the fact that there were dissents from two of the decisions of this Court cited by Supreme Court (in the decision appealed from) and by NutraSweet (on this appeal) in support of the position that the arbitrators manifestly disregarded the law (*see Wyle Inc. v ITT Corp.*, 130 AD3d 438, 442-450 [1st Dept 2015] [Moskowitz, J., dissenting]); *GoSmile, Inc. v Levine*, 81 AD3d 77, 83-84 [1st Dept 2010], *lv dismissed* 17 NY3d 782 [2011] [Nardelli, J., dissenting in part]).  *Wyle*, which was decided after the issuance of the partial award, is in any event irrelevant to determining whether the tribunal manifestly disregarded the law because that decision was never brought to the attention of the tribunal.  We note that, contrary to a statement in the decision appealed from, nowhere in either the partial award or the final award did the arbitrators "mischaracterize[] NutraSweet's fraudulent inducement counterclaim and defense as one in which NutraSweet merely alleged that Daesang made an insincere promise of future performance."

28

tribunal did not give sufficient weight to a part of the evidentiary record before it, is entirely without merit. "Manifest disregard of the facts is not a permissible ground for vacatur of an award" (*Wien & Malkin*, 6 NY3d at 483; *see also United Paperworkers Intl. Union, AFL-CIO v Misco, Inc.*, 484 US 29, 39 [1987] ["improvident, even silly, factfinding" does not afford "a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts"]); *Matter of Dowleyne v New York City Tr. Auth.*, 3 NY3d 633, 634 [2004] [reversing vacatur of an award "because (the court) improperly substituted its factual finding for that of a majority of the arbitration panel"]).[14]

This brings us to NutraSweet's fourth counterclaim, for breach of contract, the dismissal of which by the arbitrators — first (in the partial award) on the ground that NutraSweet had not asserted any claim for breach of contract independent of its dismissed rescission claims, then (in the final award) on the

_____

[14]We note that, although the tribunal did not base its dismissal of the second counterclaim on findings of fact, it may well have concluded that, if it were to credit Park's admission in his affidavit that Daesang had participated in an anticompetitive conspiracy, it should also credit Park's allegations in the same affidavit that NutraSweet had been involved in the same conspiracy — which, if true, would negate NutraSweet's claim of reliance on Daesang's compliance-with-law warranty.

29

ground that NutraSweet had waived any freestanding claim to recover damages for breach of contract — was vacated by Supreme Court as "an egregious dereliction of duty on the part of the Tribunal."  On appeal, Daesang argues that there were no grounds for this judicial action under the FAA because the court failed to identify any "well defined and clearly applicable" point of law that the arbitrators had disregarded, and because the arbitrators' factual findings and procedural rulings were beyond the court's review.  We agree.

In opposing Daesang's appeal, NutraSweet chiefly argues that Supreme Court's reinstatement of its breach of contract counterclaim was warranted by the provision of the FAA authorizing vacatur of an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made" (9 USC § 10[a][4]).[15]  NutraSweet contends that its breach of contract counterclaim was submitted to the arbitrator as a freestanding claim for monetary damages (independent of the counterclaims for rescission) and — contrary to the arbitrators'

---

[15]NutraSweet does not identify any point of law that was known to the arbitrators but disregarded by them in dismissing the breach of contract counterclaim.  We therefore conclude that the vacatur of this aspect of the partial and final awards cannot be affirmed as a proper application of the doctrine of manifest disregard of the law.

ultimate determination — was never waived or withdrawn. Therefore, NutraSweet argues, the tribunal's dismissal of the breach of contract counterclaim without addressing its merits rendered the final award such an "imperfect[] execut[ion]" of the arbitrators' powers that the final award was not "a mutual, final and definite award upon the subject matter submitted[.]"

Contrary to NutraSweet's arguments, that an arbitral tribunal disposed of a claim or defense on procedural grounds, without reaching its merits — even if such a disposition would have constituted error reversible on appeal in a judicial proceeding — does not mean that the arbitral tribunal exceeded or imperfectly executed its powers, nor does it mean that the resulting award falls short of being a mutual, final, and definite award upon that claim or defense (see *AmeriCredit Fin. Servs., Inc. v Oxford Mgt. Servs.*, 627 F Supp 2d 85, 96 [ED NY 2008] ["Regardless of whether the arbitrator dismissed defendant's counterclaim on the merits or as a procedural matter, that decision is within his broad grant of authority under the (arbitration agreement)"]). While, as previously noted, this matter is governed by the FAA, we observe that similar conclusions have been reached by courts applying the analogue of 9 USC § 10(a)(4) in CPLR article 75, which authorizes vacatur where an arbitrator "exceeded his [or her] power or so

31

imperfectly executed it that a final and definite award upon the subject matter submitted was not made" (CPLR 7511[b][iii]). "An award is deficient . . . only if it leaves the parties unable to determine their rights and obligations, if it does not resolve the controversy submitted or if it creates a new controversy" (*Matter of Meisels v Uhr*, 79 NY2d 526, 536 [1992]; *see also Yoonessi v Givens*, 78 AD3d 1622, 1623 [4th Dept 2010], *lv denied* 17 NY3d 718 [2011] ["the arbitration award was final and definite . . . even if (the arbitrators) failed to consider an award for economic loss or loss of consortium"]; *Matter of Wabst v Scoppetta*, 56 AD3d 399, 399 [1st Dept 2008] ["The arbitrator's refusal to address petitioner's state law defenses to charges 9 and 10, based on his mistaken belief that he lacked jurisdiction, does not deprive the award of finality and definiteness"]).

Moreover, Supreme Court's determination, based on its own "careful reading of the transcript," that the tribunal had misinterpreted the procedural history of the arbitration in finding that NutraSweet had waived its breach of contract counterclaim, was misplaced in a proceeding brought to confirm an arbitration award under the FAA. Even if a "careful reading of the transcript" would lead us to agree that the tribunal's finding of waiver in the final award was based on a misunderstanding of NutraSweet's oral arguments and written

32

submissions, it would not affect the outcome of this appeal.  A court is not empowered by the FAA to review the arbitrators' procedural findings, any more than it is empowered to review the arbitrators' determinations of law or fact.  "[W]hen the subject matter of a dispute is arbitrable, 'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator" (*United Paperworkers*, 484 US at 40; *cf. Howsam v Dean Witter Reynolds, Inc.*, 537 US 79, 84 [2002] [noting that "the presumption is that the arbitrator should decide allegations of waiver" when asserted as a defense to arbitration] [internal quotation marks and brackets omitted]).

Given that parties agreeing to arbitrate their disputes entrust the determination of procedural issues arising out of the arbitration — no less than issues of law and of fact — to the arbitrators, the arbitrators' reading of the procedural record before them should be judged by the same highly deferential standard that is applied to their construction of the parties' agreements.  Thus, "an arbitral decision even arguably construing or applying the [procedural record] must stand, regardless of a court's view of its (de)merits" (*Oxford Health Plans*, 569 US at 569 [internal quotation marks omitted]).  "So the sole question for us is whether the arbitrator[s] (even arguably) interpreted the [procedural record], not whether [they] got its meaning right

33

or wrong" (*id.*).  If it were otherwise, "arbitration would become
merely a prelude to a more cumbersome and time-consuming judicial
review process" (*id.* at 568-569 [internal quotation marks
omitted]).  As with issues of contractual interpretation,
"plenary review by a court of the [procedural record] would make
meaningless the provisions that the arbitrator's decision is
final, for in reality it would almost never be final" (*United
Steelworkers of Am. v Enterprise Wheel & Car Corp.*, 363 US 593,
599 [1960]).[16]

As in *Oxford Health Plans*, "we have already all but answered
th[e] question [of whether the arbitrators were even arguably
interpreting the procedural record] by summarizing" their
reasoning (569 US at 570) in finding, in the final award, that
the breach of contract counterclaim had been waived, insofar as
it sought a monetary recovery independent of the remedy of
rescission, at the time of closing oral arguments, if not before.
That reasoning, as noted, was based primarily on an analysis of
NutraSweet's oral closing argument and NS 230, the damages

---

[16]That the eight-year-long arbitration in this complex
international business dispute was itself unavoidably "cumbersome
and time-consuming" does not modify the FAA's mandate to steer
clear of full-blown judicial review of the arbitrators' legal,
factual and procedural findings.  However protracted the
arbitration proceedings were, following them up with judicial
review would only further delay the matter's final resolution.

exhibit NutraSweet submitted before closing arguments.  It is
possible that, as NutraSweet contends, the arbitrators
misunderstood the portions of NutraSweet's closing oral argument
quoted in the final award.[17]  It is also possible that the
arbitrators misread NS 230, which sets forth damages calculations
to accompany contractual rescission (first counterclaim) and
equitable rescission (second and third counterclaims),
respectively, but does not indicate which calculation applies to
the fourth counterclaim, for breach of contract, or whether the
latter counterclaim is being pursued independently of the
rescission claims at all.  However, whether or not the
arbitrators' finding of waiver was based on a misconstruction of
NutraSweet's oral arguments and written submissions is a question

> "not properly addressed to a court. . . .  All we say
> is that convincing a court of an . . . error [by the
> arbitrators] — even [their] grave error — is not
> enough.  So long as the arbitrator[s] [were] arguably

---

[17]Such a misunderstanding conceivably might have arisen from
NutraSweet's choice, for purposes of saving time, to address
simultaneously its damages arguments under the third and fourth
counterclaims, and in so doing, to refer repeatedly to its claims
for "rescissionary" damages.  In this regard, the arbitrators
highlighted in the final award NutraSweet's statement in its
closing argument that it sought, without qualification,
"[r]escission including money.  Not rescission plus money."  We
note that NutraSweet does not identify any point during the
arbitration at which it expressly clarified to the tribunal,
either orally or in writing, that, in the event all of its claims
for rescission were rejected, it sought monetary damages for
breach of contract as an alternative, stand-alone remedy.

35

construing the [procedural record] — which this
[tribunal] was — a court may not correct [their]
mistakes under § 10(a)(4).   The potential for those
mistakes is the price of agreeing to arbitration. . . .
The arbitrator[s'] construction holds, however good,
bad, or ugly" (*id.* at 572-573 [internal quotation marks
and citations omitted]).

Stated otherwise, because the arbitrators gave at least "a barely

colorable justification for the outcome reached" (*Wien & Malkin*,

6 NY3d at 479 [internal quotation marks omitted]), their finding

of waiver must stand.[18]

Finally, NutraSweet argues, in the alternative, that the

order appealed from should be affirmed on the independent ground

— not reached by Supreme Court — that the enforcement of the

partial and final awards would be contrary to the public policy

of the United States.  While the Convention permits a court of a

signatory country to deny an arbitral award enforcement if such

enforcement "would be contrary to the public policy of that

country" (Convention, art V, § 2[b]), we see no conflict between

---

[18]To the extent NutraSweet argues that the final award is
internally inconsistent in dismissing the fraud-based claims for
rescission as duplicative of claims for breach of contract, while
at the same time finding that any freestanding claim to recover
damages for breach of contract had been waived, such an argument
is unavailing.  "[I]nternal inconsistencies within an arbitral
judgment are not grounds for vacatur" (*Westerbeke*, 304 F3d at
211).  This is so even if the court finds that the claim of
internal inconsistency is "plausible" (*Saint Mary Home, Inc. v
Service Empls. Intl. Union, Dist. 1199*, 116 F3d 41, 45 [2d Cir
1997]).

enforcement of the partial and final awards and national public policy.  NutraSweet does not contend that the contracts enforced against it by the awards — the APA and the Processing Agreement — were themselves unlawful.  Rather, NutraSweet argues it was fraudulently induced by Daesang's allegedly false compliance-with-law warranty (concerning its prior conduct) to enter into those agreements and, therefore, enforcing the award of damages to Daesang for NutraSweet's breach of the agreements would (in NutraSweet's view) permit a wrongdoer to profit from its own wrongdoing.  However, the arbitral tribunal made no finding that NutraSweet was, in fact, fraudulently induced to enter into the transactions with Daesang.[19]  Thus, there is nothing on the face of the partial and final awards to indicate that they violate public policy and, hence, no basis to deny those awards enforcement on public policy grounds (see *Matter of Metrobuild Assoc., Inc. v Nahoum*, 51 AD3d 555, 557 [1st Dept 2008], *lv denied* 11 NY3d 704 [2008]).  We have no hesitation in reaching this conclusion, given that — "in light of the overriding purpose of the Convention . . . to unify the standards by which

---

[19]As previously noted, assuming the truth of the Park affidavit on which NutraSweet bases its claim that the compliance-with-law warranty was false, there is substantial reason to doubt that NutraSweet actually placed any reliance on that warranty.

agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries" (*Waterside Ocean Nav. Co. v International Nav. Ltd.*, 737 F2d 150, 152 [2d Cir 1984] [internal quotation marks omitted], quoting *Scherk*, 417 US at 520 n 15) — the Convention's public policy defense to enforcement of an award "should be construed narrowly" and "should apply only where enforcement would violate our most basic notions of morality and justice" (*Waterside*, 737 F2d at 152 [internal quotation marks omitted]).

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered May 15, 2017, which, to the extent appealed from as limited by the briefs, held in abeyance the petition to confirm a final arbitration award, dated June 14, 2016, rendered in favor of petitioner by a tribunal of the International Chamber of Commerce, and granted respondents' cross motion to vacate the aforementioned final award and the preceding final partial award, dated December 21, 2012, rendered by the same tribunal, to the extent of vacating the awards' dismissal of

38

respondents' second, third and fourth defenses and counterclaims and remanding those defenses and counterclaims to the tribunal for redetermination, should be reversed, on the law, with costs, the petition granted, and the cross motion denied.  The Clerk is directed to enter judgment accordingly.

All concur.

Order, Supreme Court, New York County (Charles E. Ramos, J.), entered May 15, 2017, reversed, on the law, with costs, the petition granted, and the cross motion denied.  The Clerk is directed to enter judgment accordingly.

Opinion by Friedman, J.P.  All concur.

Friedman, J.P., Andrias, Singh, Moulton, JJ.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:  SEPTEMBER 27, 2018

CLERK

39

LMS Packing Slip

# Package ID: 3023165

| | |
|---|---|
| **Tracking Number:** | 783772947095 |
| **Package Recipient:** | Lauren Watson |
| **Recipient Company:** | Morgan, Lewis & Bockius LLP |
| **Recipient Address:** | 1 Federal St   Boston MA 02110-1726 USA |
| **Phone Number:** | 6173417796 |

## Package Contents:

| Transmittal Number | Case Number | Title of Action |
|---|---|---|
| 18962846 | 2018RCCV00566 | Daesang Corporation vs. The Nutrasweet Company |



**CSC**

KOC / ALL
Transmittal Number: 18962846
Date Processed: 11/14/2018

# Notice of Service of Process

| Primary Contact: | Lauren Watson<br>Morgan, Lewis & Bockius LLP<br>1 Federal St<br>Boston, MA 02110-1726 |
|---|---|

| | |
|---|---|
| Entity: | Manus Bio Inc.<br>Entity ID Number  3821611 |
| Entity Served: | Manus Bio, Inc. |
| Title of Action: | Daesang Corporation vs. The Nutrasweet Company |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Contract |
| Court/Agency: | Richmond County Superior Court, GA |
| Case/Reference No: | 2018RCCV00566 |
| Jurisdiction Served: | Georgia |
| Date Served on CSC: | 11/13/2018 |
| Answer or Appearance Due: | 20 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Davis A. Dunaway<br>706-722-4481 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# SUPERIOR COURT OF RICHMOND COUNTY
## STATE OF GEORGIA

⚖ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
RICHMOND COUNTY, GEORGIA
**2018RCCV00566**
CARL C. BROWN JR.
NOV 06, 2018 10:20 AM

*Hattie Holmes Sullivan*
Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

CIVIL ACTION NUMBER   2018RCCV00566

Daesang Corporation

**PLAINTIFF**

VS.

The Nutrasweet Company
Manus Bio, Inc.

**DEFENDANTS**

## SUMMONS

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

> **Davis Dunaway**
> **Hull Barrett, P.C.**
> **801 Broad Street**
> **7th Floor**
> **Augusta, Georgia 30901**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 6th day of November, 2018.**

Clerk of Superior Court

*Hattie Holmes Sullivan*

Hattie Holmes Sullivan, Clerk
Richmond County, Georgia

Page 1 of 1

Print Form

86153

SHERIFF'S ENTRY OF SERVICE

Civil Action No. 2018RCCV00566

| | |
|---|---|
| Superior Court ☑ | Magistrate Court ☐ |
| State Court ☐ | Probate Court ☐ |
| Juvenile Court ☐ | |

Date Filed November 6, 2018

Georgia, Richmond _____ COUNTY

Daesang Corporation
_____
Plaintiff

Attorney's Address

Davis A. Dunaway, Esq.

Hull Barrett, P.C.

P.O. Box 1564, Augusta, Georgia 30903

VS.

Name and Address of Party to Served

Manus Bio, Inc., Corporation Service Co.

40 Technology Parkway South, #300

Norcross, Georgia 30092

The Nutrasweet Company;

Manus Bio, Inc.
_____
Defendant

_____
Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**
I have this day served the defendant _____ personally with a copy
☐ of the within action and summons.

**NOTORIOUS**
I have this day served the defendant _____ by leaving a
☐ copy of the action and summons at his most notorious place abode in this County.

Delivered same into hands of _____ described as follows:
age, about _____ years; weight _____ pounds; height _____ feet and _____ inches, domiciled at the residence of
defendant.

**CORPORATION**
Served the defendant _____Manus Bio_____ a corporation
☑ by leaving a copy of the within action and summons with _____Alisha Smith_____
In charge of the office and place of doing business of said Corporation in this County.

**TACK & MAIL**
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises
designated in said affidavit and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an
☐ envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice
to the defendant(s) to answer said summons at the place stated in the summons.

**NON EST**
Diligent search made and defendant _____
☐ not to be found in the jurisdiction of this Court.

This 13 day of Nov , 20 18.

_____

DEPUTY

**CLERK'S COPY**

## Service of Process Transmittal
11/14/2018
CT Log Number 534408692

**TO:** Bernard Kramer
McDermott Will & Emery LLP
444 W Lake St Ste 4000
Chicago, IL 60606-0029

**RE:** **Process Served in Georgia**

**FOR:** The NutraSweet Company  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | DAESANG CORPORATION, Pltf. vs. THE NUTRASWEET COMPANY and MANUS BIO, INC., Dfts. |
| **DOCUMENT(S) SERVED:** | Entry, Summons, Complaint, Attachment(s) |
| **COURT/AGENCY:** | Richmond County Superior Court, GA Case # 2018RCCV00566 |
| **NATURE OF ACTION:** | Property Damage Litigation |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Lawrenceville, GA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/14/2018 at 11:06 |
| **JURISDICTION SERVED :** | Georgia |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | David E. Hudson Hull Barrett, P.C. PO Box 1564 Augusta, GA 30903-1564 (706) 722-4481 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780107808887 Email Notification,  Bernard Kramer  bkramer@mwe.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 289 S Culver St. Lawrenceville, GA 30046-4805 |
| **TELEPHONE:** | 214-932-3601 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.